Case 2:05-cv-03923-DRH-ART   Document 1   Filed 08/16/05   Page 1 of 32 PageID #: 1

*Hurley 3923*
*Toren*

**IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y**

★ AUG 16 2005 ★

**LONG ISLAND OFFICE**

§JS 44 (Rev. 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br>ROBERT WARING, Individually and on Behalf of All Others Similarly Situated, | **DEFENDANTS**<br>SYMBOL TECHNOLOGIES, INC., WILLIAM R. NUTI an MARK T. GREENQUIST |
| **(b)** County of Residence of First Listed Plaintiff _Nassau_<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant _Suffolk_<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number)<br>Lerach Coughlin Stoia Geller Rudman & Robbins LLP<br>200 Broadhollow Road, Melville, NY 11747  631/367-7100 | Attorneys (If Known) |

**CV 05 3923**

**HURLEY, J.**

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|---|

**LINDSAY, M.J.**

| II. BASIS OF JURISDICTION | III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only) | | PTF | DEF |
|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐ 1 ☐ 1 Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☐ 2 ☐ 2 Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | Citizen or Subject of a Foreign Country ☐ 3 ☐ 3 Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud<br>☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

| **V. ORIGIN** (Place an "X" in One Box Only) | | | | | | Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §§78j(b) and 78t(a)
Brief description of cause:
Claims asserted arise under §§10(b) & 20(a) of the Securities Exchange Act of 1934 ("1934 Act")

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE                    DOCKET NUMBER

DATE 08/16/2005          SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## ARBITRATION CERTIFICATION

I, Samuel H. Rudman _____ , counsel for Robert Waring _____
_____ do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of my knowledge and belief the damages recoverable in the above captioned civil action exceed the sum of $150,000 exclusive of interest and costs.
_____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

Did the cause arise in Nassau or Suffolk County? _____ Yes

If answered yes, please indicate which county. _Suffolk_____

County of residence of plaintiff(s)    (1)_____
                                       (2)_____
                                       (3)_____

County of residence of defendant(s)    (1)_____
                                        (2)_____
                                        (3)_____

**I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.**

Yes___✓___                              No_____

**Are you currently the subject of any disciplinary action(s) in this or any other state or federal court?**

Yes_____(If yes, please explain)     No___✓___
_____
_____

Please provide your E-MAIL Address and bar code below. Your bar code consists of the initials of your first and last name and the last four digits of your social security number or any other four digit number registered by the attorney with the Clerk of Court.
(This information must be provided pursuant to local rule 11.1(b) of the civil rules).
**ATTORNEY BAR CODE:** SR-7957_____

**E-MAIL Address:** SRudman@lerachlaw.com_____

I consent to the use of electronic filing procedures adopted by the Court in Administrative Order No. 97-12, "In re Electronic Filing Procedures(EFP)", and consent to the electronic service of all papers.

Signature: _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   AUG 16 2005   ★

LONG ISLAND OFFICE

----------------------------------------x

ROBERT WARING, Individually and on
Behalf of All Others Similarly Situated,

                   Plaintiff,

    vs.

SYMBOL TECHNOLOGIES, INC.,
WILLIAM R. NUTI and MARK T.
GREENQUIST,

                Defendants.

----------------------------------------x

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES
LAWS

**JURY TRIAL DEMANDED**

# CV 05 3923

## HURLEY, J.

### ORENSTEIN, M.J.

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Symbol Technologies, Inc. ("Symbol" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the securities of Symbol between May 10, 2004 to August 1, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Following major accounting scandals from 1998 to 2003, Symbol settled government and private litigation and promised a "new" Symbol Technologies, one which in the two years prior to the start of the Class Period had "implemented various initiatives intended to materially improve its internal controls and procedures, address the systems and personnel issues raised in the course of the restatement and help ensure a corporate culture that emphasizes integrity, honesty and accurate financial reporting. These initiatives address Symbol's control environment, organization, staffing, policies, procedures, documentation and information systems."

3.     Contrary to these reassurances, Symbol's internal controls and financial systems were anything but honest and accurate. During the Class Period, Symbol would be required to:  (i) revise financial statements for the first three quarters of 2004; (ii) revise financial projections for much of fiscal 2005 by understating expenses requiring massive charges against earnings; and (iii) acknowledge, finally, that its financial and internal controls were defective and inadequate for the purpose of any meaningful, honest and accurate financial projections when it replaced defendant

- 1 -

Greenquist as chief financial officer. In addition, Defendants failed to disclose that demand for the Company's products was materially declining such that its earnings guidance was lacking in a reasonable basis and therefore materially false and misleading.

4.      As the market learned the true information about Symbol, the inflation caused by Defendants' misrepresentations was removed and the price of Symbol common stock fell by nearly 50% from its Class Period high.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act.

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Symbol conducts business in this District.

8.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff Robert Waring, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Symbol at artificially inflated prices during the Class Period and has been damaged thereby.

10.     Defendant Symbol is a corporation organized under the laws of Delaware with its principal executive offices located in Holtsville, New York.  Symbol describes itself as follows in recent press releases:

> Symbol Technologies, Inc., The Enterprise Mobility Company™, is a recognized worldwide leader in enterprise mobility, delivering products and solutions that capture, move and manage information in real time to and from the point of business activity. Symbol enterprise mobility solutions integrate advanced data capture products, radio frequency identification technology, mobile computing platforms, wireless infrastructure, mobility software and world-class services programs under the Symbol Enterprise Mobility Services brand. Symbol enterprise mobility products and solutions are proven to increase workforce productivity, reduce operating costs, drive operational efficiencies and realize competitive advantages for the world's leading companies.

11.     Defendant William R. Nuti ("Nuti") is and was throughout the Class Period Symbol's President, Chief Executive Officer and a Director.  On August 1, 2005, Symbol announced that Nuti had resigned his positions at the Company to become CEO of NCR Corporation.

12.     Defendant Mark T. Greenquist ("Greenquist") was throughout the Class Period Symbol's Chief Financial Officer.

13.     Defendants Nuti and Greenquist are referred to herein as the "Individual Defendants."

14.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Symbol were privy to confidential and proprietary information concerning Symbol, its operations, finances, financial condition, present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Symbol, as discussed in detail below.  Because of their positions with Symbol, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in

- 3 -

connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15.     The Individual Defendants are liable as direct participants in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Symbol's business.

16.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

17.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Symbol's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future

- 4 -

business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Symbol's common stock would be based upon truthful and accurate information. The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants are liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Symbol common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Symbol's business, operations and management and the intrinsic value of Symbol common stock, and caused Plaintiff and members of the Class to purchase Symbol common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Symbol between May 10, 2004 to August 1, 2005, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Symbol common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Symbol or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 5 -

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Symbol; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

### SUBSTANTIVE ALLEGATIONS

25.     Defendant Symbol is engaged in the business of enterprise mobility, delivering products and solutions that capture, move and manage information in real time to and from the point of business activity.

- 6 -

26.     The Class Period begins on May 10, 2004. On that date, Symbol released its financial

and operational results for the first quarter ended March 31, 2004. The press release stated, in

pertinent part, as follows:

> Revenue for the first quarter ended March 31, 2004, was $419.7 million, an increase
> of 9 percent over first-quarter 2003 revenue of $386.3 million and an increase of 7
> percent over fourth-quarter 2003 revenue of $393.0 million.
>
> First-quarter net earnings were $6.8 million, or $0.03 per share, which includes a
> $13.5 million, or $0.05 per share, charge to income taxes for a portion of a
> previously recorded deferred tax asset, related to ongoing negotiations to settle the
> previously disclosed government investigation, that may not be realized. Excluding
> this charge, net earnings were $20.3 million, or $0.08 per share. This compares with
> a first-quarter 2003 net loss of ($31.0) million, or $(0.13) per share, and fourth-
> quarter 2003 net earnings of $16.2 million, or $0.07 per share. [...]
>
> William Nuti, Symbol president and chief executive officer, said, "I want to
> congratulate our associates and channel partners on a strong first-quarter revenue
> performance. At $419.7 million, first-quarter 2004 revenue came in above the top of
> our range and set a vigorous pace for 2004. [...]

27.     On June 3, 2004, Symbol announced that it had settled lawsuits by the SEC, United

States Justice Department and private litigants stemming from an accounting fraud during the years

1998 to 2003. The press release stated, in pertinent part, as follows:

> CEO Summation
>
> "Symbol has worked tirelessly during the past two years to resolve problems created
> by the Company's former management," William Nuti, Symbol president and chief
> executive officer, said. "During the past two years, we have executed a remarkable
> change management program in an effort to dramatically improve our corporate
> culture, organizational structure, operational excellence and financial performance.
>
> Today we are pleased to announce that we settled the grand jury and SEC
> investigations, as well as the preponderance of class action litigation against us. We
> have now succeeded in putting the vast majority of our problems behind us and have
> taken this opportunity to put in place a dramatically improved corporate governance
> infrastructure. Even as we worked through these challenges, we've remained focused
> on our business, our customers and partners, as well as our Company's future. *With
> an improving balance sheet and new products gaining traction in the marketplace,
> we are extremely enthusiastic about the future of the Company and believe Symbol
> is strongly positioned to lead in the new age of enterprise mobility. Today is a very
> good day for the new Symbol Technologies - The Enterprise Mobility Company."*

Background of the Investigations

The SEC formally investigated certain accounting matters, principally concerning the timing and amount of revenue recognized by Symbol during the period of January 1, 2000 through December 31, 2001, as well as the accounting for certain reserves, restructurings, certain option programs and several categories of cost of revenue and operating expenses. The United States Attorney's Office for the Eastern District of New York (part of the Department of Justice) commenced a related investigation.

The Company on February 25, 2004, filed with the SEC its 2002 Annual Report on Form 10-K/A, which includes a restatement for the years 1998 through 2001 as well as the first three quarters of 2002, known as the restatement period. The Company filed its Form 10-Q for 2003's first, second and third quarters on February 25, 2004. Symbol filed its 2003 Annual Report on Form 10-K on March 12, 2004.

***The Company has implemented various initiatives intended to materially improve its internal controls and procedures, address the systems and personnel issues raised in the course of the restatement and help ensure a corporate culture that emphasizes integrity, honesty and accurate financial reporting. These initiatives address Symbol's control environment, organization, staffing, policies, procedures, documentation and information systems.*** [Emphasis added.]

28.     On July 28, 2004, Symbol released its financial and operational results for the second

quarter ended June 30, 2004.  The press release stated, in pertinent part, as follows:

Revenue for the second quarter ended June 30, 2004, was $432.8 million, representing the Company's highest quarterly revenue in its history as well as a gain of 16 percent over second-quarter 2003 revenue of $373.8 million and an increase of 3 percent over first-quarter 2004 revenue of $419.7 million.

Second-quarter 2004 net earnings were $28.8 million, or $0.12 per share, compared with second-quarter 2003 net earnings of $6.6 million, or $0.03 per share, and first-quarter 2004 net earnings of $6.8 million, or $0.03 per share.

29.     On September 9, 2004, Symbol announced that it had completed the acquisition of

Matrics, Inc for $230 million.  "Symbol financed this acquisition with short-term borrowings under a

new senior, unsecured bank credit facility and expects to refinance the borrowings in a capital

markets equity or equity-linked transaction later this year, market conditions permitting."

30.     On October 26, 2004, Symbol released reported "record" revenues for the third

quarter ended September 30, 2004.  The press release stated, in pertinent part, as follows:

- 8 -

Revenue for the third quarter ended September 30, 2004, was $442.7 million, representing the Company's highest quarterly revenue in its history as well as a gain of 17 percent over third-quarter 2003 revenue of $377.1 million and an increase of just over 2 percent compared to second-quarter 2004 revenue of $432.8 million.

Third-quarter 2004 net earnings were $21.1 million, or $0.09 per share, compared with third-quarter 2003 net earnings of $11.5 million, or $0.05 per share, and second-quarter 2004 net earnings of $28.8 million, or $0.12 per share. [...]

Third-quarter 2004 results extended some financial trends that the Company has been achieving, as follows:

--Five sequential quarters of revenue growth, most recently to $442.7 million in the third quarter from $432.8 million in the prior quarter.

--Four sequential quarters with gross margins in excess of 45 percent, improving to 46.5 percent in the third quarter from 45.4 percent in the prior quarter.

--Seven sequential quarters of improved operating income and operating margin, absent the effect of the Matrics acquisition, to $47.2 million and 10.7 percent, respectively, in third quarter 2004 from $43.7 million and 10.1 percent, respectively, in the prior quarter.

--A strong balance sheet, with $231.5 million in cash at September 30, 2004, compared to $143.7 million at June 30, 2004. [...]

2004 Fourth-Quarter Guidance

***Building on the strong 2004 third-quarter financial results, the Company expects that fourth-quarter 2004 revenue will be in a range of $445 million to $450 million, flat to up 2 percent sequentially and up 13 percent to 14 percent year-over-year. Earnings per share for the fourth-quarter of 2004 are expected to be $0.09 to $0.10. It should be noted that this guidance includes an anticipated negative $0.05 impact on fourth-quarter earnings resulting from the combined impact of the Matrics acquisition, including interest expense and amortization of fees associated with the short-term debt financing as well as the dilutive impact of an anticipated equity offering.*** [Emphasis added.]

31.     Symbol's financial statements and other representations for the first three quarters of 2004 were materially false and misleading and in violation of Generally Accepted Accounting Practices because such financial statements materially overstated Symbol's revenues.

32.     On November 8, 2004, Symbol admitted that its financial statements for the first three quarters of 2004 were materially false and misleading when it announced that it would have "a two-

- 9 -

week delay in filing with the Securities and Exchange Commission the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2004, which was due to be filed by November 9, 2004. The Company also believes that it may be required to amend one or both of its previously filed reports for 2004." The press release continued, in pertinent part, as follows:

> "As part of our regular control procedures, we discovered certain discrepancies in the amount of inventory at a distributor as well as inventory on hand that affected our previously announced results. As such, we are delaying our third-quarter filing with the SEC for approximately two weeks," said William Nuti, Symbol president and chief executive officer. "We've moved swiftly to ascertain the nature and extent of these discrepancies. We are in the process of determining whether any amendment to our previously filed SEC quarterly reports is necessary. Symbol is committed to ensuring that its financial statements are accurate and can be relied upon by our shareholders."

Nature of Discrepancies

During Symbol's regular physical inventory control testing, two independent errors were discovered. These errors were the result of two discreet events.

One event had to do with inaccurate inventory levels reported to Symbol by a large distribution partner. The underreported inventory levels resulted in Symbol inaccurately recording approximately $3.3 million in sales in the third quarter. This was an oversight on the part of the distributor, which made Symbol aware of the reporting error as soon as it was discovered. This error occurred only in the third quarter of 2004, and no previous quarter was affected.

The other discrepancy was the result of errors that occurred at a Symbol-owned distribution facility that serves one of its large retail customers. The distribution center relies on its own internal reporting system, and misreported quarter-end inventory levels that resulted in inaccurate sales reporting. Consequently, revenue for the nine months ended September 30, 2004, was overstated by approximately $10 million. Symbol believes that the large majority of this overstated revenue relates to third quarter 2004, with the remaining balance in prior quarters.

Revised Nine-Month Financial Summary

Revised revenue for the nine months ended September 30, 2004, is $1,281.8 million, a $13.3 million decrease from the previously announced $1,295.1 million. The revised figure represents an increase of 13 percent over revenue of $1,137.3 million in the nine months ended September 30, 2003. Revised year-to-date earnings per diluted share are $0.22, a decrease of $0.02 from the $0.24 per diluted share previously announced.

- 10 -

At this time, the Company expects to file its quarterly report on Form 10-Q for 2004's third quarter and potentially amend one or both of its previously filed quarterly reports on Form 10-Q within the next two weeks.

33.     Symbol stock fell more than 7% on November 8, 2004, in reaction to the announcement of its improper financial statements.

34.     On December 29, 2004, Symbol announced that it had entered into "a new $250 million credit facility, which will replace its proposed stock offering, and act as the permanent financing vehicle for the Company's acquisition of Matrics, Inc. Additionally, the new credit facility will provide Symbol with a source of ongoing liquidity."

35.     On March 1, 2005, Symbol released its financial and operational results for the fourth quarter and year-ended December 31, 2004. The press release stated, in pertinent part, as follows:

Revenue for the fourth quarter ended December 31, 2004, was a record $450.5 million, slightly exceeding the Company's guidance of $445 million to $450 million. Fourth-quarter revenue represented a 15 percent increase compared to the $393 million in revenue reported in the corresponding year-earlier period. Gross margin, at 48.1 percent, was above 45 percent for the fifth sequential quarter. Fourth-quarter net earnings were $28.5 million, or $0.11 diluted earnings per share, compared to $16.2 million, or $0.07 diluted earnings per share, in the corresponding year-earlier period.

Revenue for the year ended December 31, 2004, was $1.73 billion, compared to $1.53 billion for the year ended December 31, 2003. Net earnings for the year ended December 31, 2004, were $81.8 million, or $0.33 diluted earnings per share, compared to net earnings of $3.3 million, or $0.01 diluted earnings per share, in the prior year. [...]

'Positive Momentum'

"Fourth quarter 2004 and the year were validation of the hard work, effort and results of our associates and channel partners. I want to recognize and thank them for their focus and execution. During the last year, Symbol has undergone significant change management that positively influenced customer and partner satisfaction, bottom-line results, cash flow and productivity, and provided us a strong foundation of business and financial controls. The addition of Matrics and the work done by the Symbol team on our vision-to- execution plan set the foundation for future success. We look forward to 2005 and beyond with confidence and excitement," William R. Nuti, Symbol president and chief executive officer, said.

- 11 -

*"Going forward, our goal is to drive profitable top-line growth and increase our market share in all sales theaters, product divisions and vertical markets. We need to do this while staying 100 percent laser focused on becoming an industry leader in cost structure, both process and technology innovation, product lifecycle management and solutions selling," Nuti added.*

*"Our earnings performance in the fourth quarter was encouraging, and we're also very pleased to be able to announce that Symbol will be certifying its compliance with the internal control provisions of Sarbanes-Oxley 404 -- an outstanding achievement in light of where we were from an internal controls perspective two years ago," Mark T. Greenquist, senior vice president and chief financial officer, said.* [Emphasis added.]

36.     On May 3, 2005, Symbol released its financial and operational results for the first quarter ended March 31, 2005. The press release stated, in pertinent part, as follows:

Revenue for the first quarter ended March 31, 2005, was $457.5 million, representing the Company's highest quarterly revenue in its history as well as a gain of 9 percent over first-quarter 2004 revenue of $419.7 million and an increase of 2 percent over fourth-quarter 2004 revenue of $450.5 million.

First-quarter 2005 net earnings were $22.2 million, or $0.09 per share, compared with first-quarter 2004 net earnings of $6.8 million, or $0.03 per share, and fourth-quarter 2004 net earnings of $28.5 million, or $0.11 per share.

Continued Strong Operating and Financial Performance

"The positive trends that we experienced during 2003 and 2004 continued in 2005's first quarter. At $457.5 million, this was a record-revenue quarter for Symbol, although it was slightly lower than we had expected, as the economy and information technology spending cooled in Q1," said William R. Nuti, Symbol president and chief executive officer.

"Going forward, we're planning to adopt a more concerted approach to reducing total operating expenses, both on an absolute basis and as a percentage of sales. As we complete our three-year turn-around plan, which we began to implement in 2003, our attentions can now be focused on organizing around growth and profitability versus a successful turn-around. Net-net, with the turn-around phase of our strategic plan nearing its end, now is the right time to take the work that has been substantially completed and turn it into bottom-line leverage for our shareholders. While we cannot discuss details with you right now, our target is to lower our operating expense run rate to approximately $170 million by year-end 2005. On our 2005 second-quarter earnings call, likely to be held in early August, we will provide details on any charges associated with this plan and outline the anticipated financial impact to our operating margins in 2005," Nuti added.

- 12 -

Mark T. Greenquist, Symbol senior vice president and chief financial officer, said, "With cash flow from operations of approximately $73 million, 2005's first quarter represented another solid performance for cash generation. In addition, at $218 million, our cash balances at March 31, 2005, remained unchanged versus year-end 2004. That balance excludes the $52 million of restricted cash on the balance sheet. Also of note, the Company paid down an additional $50 million in bank debt in the first quarter."

2005 Second-Quarter and Full-Year Guidance

*The Company expects that revenue in second quarter 2005 will be in a range of $460 million to $470 million, representing growth of 1 percent to 3 percent sequentially and 6 percent to 9 percent year-over-year. With regard to full-year revenue guidance, the Company believes that revenue growth for fiscal year 2005 will likely be at the lower end of its previously disclosed 10 percent to 15 percent range. Second-quarter gross margin is expected to be in the 45 percent to 46 percent range, and operating expenses are anticipated to be in a range of $177 million to $180 million.*

*Diluted earnings per share for second quarter 2005 are expected to be $0.05 to $0.07 per share, reflecting the anticipated impact of a change in New York state tax law that would result in a second-quarter effective tax rate of approximately 50 percent, compared to a normalized effective tax rate of 34 percent.*

Without the one-time negative impact, diluted EPS would be $0.07 to $0.09, which would represent second-quarter operating margins of approximately 6.5 percent to 7.5 percent.

37.     A May 4, 2005 MarketWatch article entitled "Symbol shares slump on weak outlook" provided, in pertinent part, the following additional information:

Symbol Technologies' shares as much as 16% on Wednesday after the mobile-computing company reported first-quarter results that failed to meet expectations and gave a weaker-than-anticipated second-quarter outlook.

In afternoon trading, Symbol (SBL: news, chart, profile) gave up $1.93 to fall to $11.05 after earlier touching a 52-week low of $10.92.

The pullback followed the Holtsville, N.Y.-based company's report and outlook, released after Tuesday's close of trading.

Symbol reported a profit than grew to $22.2 million, or 9 cents a share, compared to $6.8 million, or 3 cents, earned in the first quarter a year ago.

Revenue also rose, climbing to $457.5 million from $419.7 million in the year-ago period.  However, Symbol's results fell short of the company's previous estimates calling for a profit between 10 cents and 11 cents a share on revenue of $465 million.

Analysts surveyed by Thomson First Call had forecast Symbol would, on average, earn 11 cents a share on $465 million.

"The economy and IT (information technology) spending market were a little weaker," said Mark Greenquist, Symbol's chief financial officer. "Our year-over-year growth trajectory is still going up, but not up as steeply as we thought."

Symbol, which makes bar-code scanners, mobile computers and wireless networking technology, said it sold $384.2 million in products, up 10% from a year ago, while services revenue edged up 3%, hitting $73.2 million.

David Sterman, an analyst with Halpern Capital, said that the last month of the quarter appeared to be especially weak for Symbol, and the company's overall comments suggest more weakness ahead.

"Management concedes that near-term visibility is limited and expects the sales weakness to persist at least through the second-quarter, if not longer," Sterman said in a research note.

Offering a look ahead, Symbol expects to post a second-quarter profit of 5 cents to 7 cents a share, on revenue of $460 million to $470 million. Excluding the impact of a change in New York state tax law, Symbol said it should earn between 7 cents and 9 cents a share.

Wall Street analysts' average forecasts had called for Symbol to earn 11 cents a share on $479 million.

38.    On June 15, 2005, Symbol announced that it had appointed Elise Kirban as its Chief

Ethics and Compliance Officer, effective immediately.  The press release continued, in pertinent

part, as follows:

"For the past two years, we have undertaken an enormous change management turnaround program at Symbol, resulting in becoming a leading example of good corporate governance. Elise Kirban's appointment demonstrates our strong and continuing commitment to being a model of good corporate governance with best-in-class ethics and compliance," said Bill Nuti, Symbol president and chief executive officer. ***Adhering to the highest level of integrity and conducting business in the most ethical, honest and open manner is at the core of Symbol's culture.*** Elise Kirban is a talented professional with unquestionable integrity. Since she joined the Company, Elise has had a tremendously positive impact on our compliance initiatives and I am proud to have someone of her caliber leading our compliance efforts." [Emphasis added.]

39.    On June 28, 2005, Symbol announced a "a restructuring plan to reduce costs and

drive profitability. The Company is also revising its second quarter financial outlook, as it believes

- 14 -

its sales have been negatively affected by continued economic sluggishness, particularly in the global retail market. The restructuring will realign resources to provide for enhanced focus on customer-facing sales initiatives, services programs and new product design activities in targeted geographic regions and vertical growth markets in the second half of 2005." The press release continued, in pertinent part, as follows:

> "With the turnaround phase of our transformation plan nearing its end, we need to shift resources to efforts focused on growing profitability in 2005 and beyond. Over the past several years, we have allocated substantial resources to certain functional areas in order to permit Symbol to successfully implement its turnaround program. *Now that we are in the next phase of Symbol's evolution, we must balance our spending on the activities needed to drive profitable growth, while maintaining strong financial controls and business processes," said Bill Nuti, Symbol president and chief executive officer.*

> Symbol expects to take a total pre-tax, non-recurring charge in the range of $75 to $95 million associated with the cost saving initiatives, of which two-thirds will be cash charges and the remaining one-third will be non-cash charges. The Company expects to record roughly half of the total pre-tax charges in the second quarter of 2005, ending June 30, with the remainder to be incurred in the subsequent two quarters.

> As part of its restructuring plan, Symbol will be reducing its current worldwide workforce, and approximately 700 positions will be impacted by year-end 2005. The Company will also consider adding new positions in field sales, product development and global services over the next several quarters to drive growth opportunities. Other elements of the restructuring plan include the elimination and consolidation of certain facilities on a global basis, as well as writing off certain other assets.

> The restructuring will result in overall quarterly savings of approximately $15 million, with a rough split of two-thirds of the savings in operating expenses and one-third of the savings associated with the cost of sales.

> "After careful and deliberate consideration, we decided that restructuring the Company, including reducing our workforce and consolidating some facilities, was the right choice for Symbol's future. While it is never easy to make such a decision, it is vital to ensure Symbol is positioned well for a competitive global marketplace. We remain confident in Symbol's future prospects and position as a leader in the enterprise mobility segment," Nuti explained.

> Second Quarter Earnings Results

Symbol currently expects revenue and earnings in the second quarter 2005 to be below the guidance provided in early May of revenue in the $460 to $470 million range and earnings per share in the $0.07 to $0.09 per share range, excluding a $5 million negative tax impact caused by a state tax law change. The Company now believes second quarter 2005 revenue and earnings will be approximately $440 million and $0.02 to $0.05 per share, excluding the negative tax impact and the restructuring and related charges. For the full year 2005, the Company anticipates revenue growth in the three to six percent range, versus previous guidance of the low end of the 10 to 15 percent range.

40.     A June 28, 2005 Reuters' article entitled "Symbol Tech to take charge, warns on outlook" provided, in pertinent part, the following additional information:

Symbol Technologies Inc. (SBL.N: Quote, Profile, Research) on Tuesday slashed its earlier revenue and earnings estimates and said it would cut about 700 jobs to cope with weak demand from retailers and Europe.

***Its stock slumped 8 percent in after-hours trade to a two-year low, a level unseen since mid-2003 when several former Symbol executives pleaded guilty to criminal charges in the midst of a government accounting probe.***

Despite the heap of bad news, Symbol's Chief Executive Bill Nuti said the two-year turnaround plan at the bar code scanner and handheld computer maker is nearing its end. He cited macroeconomic reasons for the expected shortfalls.

The job cuts represent about 12 percent of the work force, which will be reduced from 5,700 to 5,000. Symbol will take restructuring charges between $75 million and $95 million for items such as headcount reductions and facility consolidation.

Symbol warned that second-quarter earnings and revenue will fall short of its original outlook because retailers around the world are slowing their spending. Symbol also cut its full-year revenue growth forecast given just two months earlier.

"When the retail segment gets a cold, we get a flu," Symbol Chief Executive Bill Nuti told analysts. "We are a company that is highly exposed to retail."

The restructuring will result in overall quarterly savings of about $15 million.

Symbol, based in Holtsville, New York, now expects second-quarter revenue of about $440 million and earnings, excluding a $5 million negative tax impact caused by a state tax law change, of 2 cents to 5 cents a share.

That is down from an early May forecast for revenue of $460 million to $470 million and earnings, excluding the impact of the state tax law change, of 7 cents to 9 cents a share. Analysts had been expecting second-quarter earnings of 6 cents a share on revenue of $465.2 million, according to Reuters Estimates.

- 16 -

For full-year 2005, Symbol now expects revenue growth in a range of 3 percent to 6 percent, well below an earlier forecast for 10 percent to 15 percent growth.

The company said it was considering adding new positions in field sales, product development and global services over the next several quarters to drive growth. "We have very few people in the field covering customers," Nuti said.

Symbol said two-thirds of the restructuring charge will be cash charges and the remaining one-third will be non-cash. It expects to record about half of the total pretax charges in the second quarter ending June 30, with the remainder to be taken in the subsequent two quarters.

Symbol shares traded at $9.60 after hours on the Inet electronic exchange from a close of $10.47 on the New York Stock Exchange on Tuesday. [Emphasis added.]

41.     On July 14, 2005, Symbol announced that defendant Greenquist had been replaced as Chief Financial Officer in order to "pursue other career interests." The press release stated, in pertinent part, as follows:

Additionally, Symbol is revising previously announced Second Quarter 2005 revenue expectations to approximately $425 to $430 million from approximately $440 million. The Company also expects second quarter operating expenses to be lower than the previous guidance of $177 to $180 million, including the $7 million in expenses related to the legal defense of prior management.

"While Symbol continues to undergo the implementation of new business processes across the organization, it is vital to have someone with Sal's operational and administrative expertise lead our efforts in these areas," said Nuti. "During the past three months, Sal has been instrumental in guiding the Company through a successful restructuring plan to reduce operating costs and has done so with the highest levels of efficiency and effectiveness. I'm excited to further benefit from Sal's superb talents, capabilities and business experience as he helps Symbol realize its true potential."

*"Symbol has made major strides in improving our financial controls, but much work remains in areas such as forecasting,"* noted Iannuzzi. *"I plan on intensely focusing my efforts on developing and implementing more effective forecasting processes."* [Emphasis added.]

42.     A July 15, 2005 *Newsday* article "Symbol CFO quits as forecast revised" provided the following additional details:

Symbol Technologies Inc., acknowledging problems with accurately forecasting financial results, yesterday said its chief financial officer resigned as it again revised second-quarter expectations downward.

In a surprise release yesterday after the stock-market close, Symbol said Mark Greenquist, who took over as CFO in 2003 as the company was embroiled in federal probes of its accounting, was leaving "to pursue other career interests."

In a conference call yesterday, chief executive William Nuti emphasized that Greenquist "is not being fired from the company." Nevertheless, Nuti said he personally will take over forecasting duties at the company, with direct assistance from Sal Iannuzzi, who takes over Greenquist's CFO role.

On the conference call, Iannuzzi, who is already Symbol's senior vice president and chief administrative and control officer, acknowledged the problems with forecasting financial results.

*"Two weeks ago we gave guidance and now we have to revise it," he said. "That's just not acceptable."*

*The problem, he said, stems from a number of "necessary" but "draconian" measures and controls implemented after the discovery of widespread accounting fraud at Symbol. "What we're seeing is that some of these procedures are extremely difficult to deal with," Iannuzzi said. "It's one of the principal reasons we're having such a difficult time giving you a forecast that works."*

After having done so two weeks ago, Symbol yesterday revised second-quarter revenue expectations downward, to a range of $425 million to $430 million, from a previous $440 million.

Responding to Wall Street concerns about rising expenses, Symbol said second-quarter operating expenses would be lower than previous guidance, although legal expenses tied to defending former executives and federal probes ballooned from a previous $4.5 million to around $7 million.

43.     Defendants' statements referenced above were materially false and misleading in that they failed to disclose and misrepresented that: (a) Symbol had inadequate and deficient internal and financial controls; (b) Symbol was understating its expenses; (c) Symbol had massive overcapacity and inefficient operations and obsolete assets; (d) Symbol was experiencing declining demand for its products; and (e) as a result of the foregoing, Symbol has no reasonable basis upon which to its issue financial guidance.

- 18 -

44. The Class Period ends on August 1, 2005. On that date, Symbol issued a press release announcing its financial results for the second quarter of 2005, the period ending June 30, 2005. The Company reported net revenue of $427.8 million and a net loss of $30.5 million. Symbol's acting President and CEO, Sal Iannuzzi, commented on the results stating in pertinent part as follows:

> The results we are reporting today are in line with the expectations we announced on July 14. . . While we are pleased with our operating expense performance and encouraged by our year-over-year growth in product bookings, we remain focused on balancing our spending on activities needed to drive profitable growth. Increasing shareholder value is our top priority, and our confidence in Symbol's future growth prospects and position as a leader in the enterprise mobility segment remains strong.

45. Also on August 1, 2005, Symbol issued a press release announcing that Nuti had resigned his positions as President and CEO of the Company and would be leaving to become the CEO of NCR Corporation.

46. In response to the earnings announcement and the departure of Nuti, the price of Symbol stock declined from $11.64 to $9.85 per share on extremely heavy trading volume.

### Additional *Scienter* Allegations

47. As alleged herein, Defendant acted with *scienter* in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Symbol, their control over, and/or receipt and/or receipt of information of Symbol's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Symbol, participated in the fraudulent scheme alleged herein.

- 19 -

48.     Defendants' scienter is further evidenced by suspicious and unusual insider trading. On December 30, 2004, Defendant Nuti sold 400,000 shares of his personally held Symbol common stock for proceeds of $6,580,000.  This was the only sale that Defendant Nuti had ever made of Symbol stock. This sale represented approximately 100% of Defendant Nuti's holdings of Symbol common stock at the time that he made the sale.

## Undisclosed Adverse Information

49.     The market for Symbol's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Symbol's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Symbol securities relying upon the integrity of the market price of Symbol's securities and market information relating to Symbol, and have been damaged thereby.

50.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Symbol's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Symbol's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of

- 20 -

Symbol and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

52. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices and those securities declined in value upon the truth about Defendants' representations reaching the market, thus causing the damages complained of herein.

**Applicability Of Presumption Of Reliance:
Fraud On The Market Doctrine**

53. At all relevant times, the market for Symbol's securities was an efficient market for the following reasons, among others:

(a) Symbol's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Symbol filed periodic public reports with the SEC and the NYSE;

(c) Symbol regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Symbol was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54. As a result of the foregoing, the market for Symbol's securities promptly digested current information regarding Symbol from all publicly available sources and reflected such

information in Symbol's stock price.  Under these circumstances, all purchasers of Symbol's securities during the Class Period suffered similar injury through their purchase of Symbol's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

55.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Symbol who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, Symbol and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Symbol's securities; and (c) cause

- 22 -

Plaintiff and other members of the Class to purchase Symbol's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Symbol's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

60.     Symbol and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Symbol as specified herein.

- 23 -

61.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Symbol's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Symbol and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Symbol's securities during the Class Period.

62.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Symbol's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's business,

operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Symbol's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Symbol's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Symbol securities during the Class Period at artificially high prices and were damaged thereby.

65.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Symbol, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Symbol securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     The Individual Defendants acted as a controlling person of Symbol within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, Symbol and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Symbol's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 16, 2005

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)

_____
SAMUEL H. RUDMAN
200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)


MURRAY, FRANK & SAILOR
Eric J. Belfi
275 Madison Ave
New York, New York 10016-1101
Telephone:  212/682-1818
212/682-1892 (fax)

ADEMI & O'REILLY, LLP
Guri Ademi
Shpetim Ademi
3620 East Layton Avenue
Cudahy, Wisconsin  53110
Telephone:  414/482-8000
414/482-8001 (fax)

Attorneys for Plaintiffs

Document4

- 28 -

# CERTIFICATION

I, Robert Waring, do hereby certify that:

1. I have reviewed the complaint and have authorized its filing.

2. I purchased securities of Symbol Technologies Inc., which are the subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, I have applied to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions:  Waring v. Atmel Corp. et al., 03-1034 (N.D. Ca. 2003); Waring v. Janus Capital et al., 03-6914 (S.D.N.Y. 2003); Waring v. Lexar Media, 04-2145 (N.D. Ca. 2004).

5. During the Class Period, I engaged in the following transactions:

## TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| Purchase | 7/14/05 | 500 | 12.20 |
| Sale | 7/15/05 | 500 | 11.10 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on __8__ / __10__ / 2005.        Signature _____