**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ———————————————— | : | |
| **IN RE SYMBOL TECHNOLOGIES, INC.** | : | **Consolidated** |
| **SECURITIES LITIGATION** | : | **Civil Action No. 05-CV-3923-DRH** |
| ———————————————— | : | **Jury Trial Demanded** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff Ironworkers Local # 580 Pension Fund, individually and on behalf of other persons similarly situated, by its attorneys, alleges the following upon personal knowledge as to its own acts, and otherwise upon information and belief based on the investigation conducted by its attorneys, including interviews of former employees of Defendant Symbol Technologies, Inc. ("Symbol Tech" or the "Company"), review of Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles, stock prices, and other publicly available information:

## SUMMARY OF THE ACTION

1.      This is a class action brought on behalf of investors who purchased Symbol Tech securities during the period between April 29, 2003 and August 1, 2005, both dates inclusive (the "Class Period"), for violations of federal securities laws.  Named as Defendants are Symbol Tech, William R. Nuti, Salvatore Iannuzzi, Mark T. Greenquist, Todd Abbott, Arthur O'Donnell and James M. Conboy.

2.      Symbol Tech is headquartered in Holtsville, New York.  The Company manufactures and sells products designed to help other companies manage their inventories including bar code scanners, point-of-sale systems, radio frequency identification ("RFID") tags and readers, handheld computers, and inventory management software.

3.      Symbol Tech has a long history of fraud.  Before the Class Period, Symbol Tech, former CEO Tomo Razmilovic, and other executives were investigated by the Department of Justice and the United States Postal Inspection Service for systematic accounting fraud, including the manipulation of inventory levels to artificially inflate reported revenues.  As a result, several

former executives pled guilty to criminal charges, and Razmilovic fled the United States and is now a fugitive believed to reside in Sweden.

4.  Thereafter, Symbol Tech embarked upon a campaign to convince the investing public that the Company had put its financial improprieties behind it. The Company repeatedly stated that new directors and management would make Symbol Tech a "leading example of good corporate governance," and touted the improved "authenticity and transparency of [its] financial reporting."

5.  However, the changes were only cosmetic. Far from being a "model of good corporate governance," Nuti and his team: (a) engaged in various ship-and-store, double-counting, and other schemes to artificially inflate revenues and understate inventories; (b) maintained and implemented internal controls that were wholly deficient and ineffective, notwithstanding their repeated public statements to the contrary; (c) issued false certifications in SEC filings attesting to the efficacy of such controls and the Company's compliance with Generally Accepted Accounting Principles ("GAAP"); and (d) consistently published revenue guidance that they either knew to be false or which lacked any reasonable basis.

6.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate. Regulation S-X also requires that interim financial statements comply with GAAP. 17 C.F.R § 210.10-01 (a).

7.  On November 15, 2004, Symbol Tech filed a 10-Q quarterly report falsely

characterizing previously-identified deficiencies in its internal controls as "discrete" errors that had been successfully "remediated." The Company revised downward previously-reported financial statements for the first three quarters of 2004 to reflect these errors, but promised investors that its accounting errors were remediated and its internal controls were finally effective. On December 30, 2004, Defendant Nuti took advantage of the ensuing rise in Symbol Tech shares, selling 400,000 shares, representing over 67% of his personal holdings, for more than $6.5 million.

8.      On June 27, 2005, the Company revealed that these statements and other public statements identified below touting improved and effective internal controls were false. On that date, the Company filed amendments to its 2003 10-K annual report and the 10-Q quarterly reports for the first three quarters of 2004, conceding that its internal controls during those periods were ineffective, notwithstanding Defendants' repeated promises to the contrary in both press releases and SEC filings.

9.      Defendants also deceived investors and artificially inflated Symbol Tech shares by issuing wildly optimistic revenue guidance that they either knew at the time was unreasonable and unattainable, or recklessly promised to investors, even though such guidance lacked any reasonable basis. Defendants were forced to repeatedly backpedal from this misleading guidance, and when they did, Symbol Tech shares fell sharply.

10.     For example, on March 1, 2005, the Company issued a press release telling investors to expect $465 million in revenue during the first quarter, even though Symbol Tech had never generated that amount of revenue in the past, first quarters were typically soft for the Company, and it lacked the basic internal controls to effectively forecast revenues, recognize

revenues, or manage inventory. Defendants also told investors to expect a substantial revenue increase of 10-15% for the year.

11.     On May 3, 2005, the Company reported disappointing first quarter revenues of only $457.5 million, $7.5 million less than it had told investors to expect. However, Defendants again promised dramatic improvements in the second quarter of 2005, which they stated would reach a record $460-470 million in revenues.

12.     On June 28, 2005, Symbol Tech guided down revenue projections for the second quarter of 2005 (which had only three days remaining) from $460-470 million to $440 million. Nuti admitted that this eleventh-hour reduction was due, in part, to poor sales forecasting, but promised investors that he would take "***personal responsibility***" for the accuracy of revenue forecasts going forward.

13.     Nuti broke his promise to investors less than three weeks later. On July 14, 2005, Symbol Tech slashed the very forecast that Nuti had just personally vouched was accurate, from $440 million to $425-430 million. Defendants also announced the resignation of the Company's Chief Financial Officer, Defendant Greenquist.

14.     On August 1, 2005, Symbol Tech issued a press release announcing that revenues for the second quarter of 2005 totaled only $427.8 million—substantially less than the revised guidance provided only a month earlier—and that the Company lost $30.5 million. The Company also announced that Nuti, the CEO who had personally promised a turnaround in both financial performance and corporate governance, had resigned after failing to reach either goal. Investors quickly dumped their shares of Symbol Tech, causing the stock price to plummet from $11.64 to $9.85 on unusually high trading volume. The next day, shares sank further to $9.41. In two short

days, Defendants' misconduct wiped out approximately $635 million of shareholder equity.

## JURISDICTION AND VENUE

15. The claims asserted below arise under §§10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

16. Jurisdiction is conferred upon this Court by §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

17. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) since Defendants have their principal place of business in this District, and many of the acts alleged herein, including the dissemination of the misleading statements to the investing public, occurred in substantial part in this District.

18. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephonic communications and the facilities of the national securities exchanges.

## THE PARTIES

### Lead Plaintiff

19. Lead Plaintiff, Iron Workers Local #580 Pension Fund, purchased shares of Symbol Tech common stock during the Class Period, as set forth in its previously-filed Certification, and was damaged as a result of Defendants' misconduct.

**Defendants**

20.     Defendant Symbol Technologies, Inc. is a Delaware corporation, authorized to do business in New York.  Its principal executive offices are located at One Symbol Tech Plaza, Holtsville, New York 11742.

21.     Defendant William R. Nuti ("Nuti") was Symbol Tech's President and Chief Operating Officer from the beginning of the Class Period until December 30, 2003.  On December 30, 2003, Nuti became the Company's Chief Executive Officer, President and Director.  On August 1, 2005, Nuti resigned from those positions after failing to provide the turnaround in corporate governance, financial performance, and effective internal controls he had promised to investors.

22.     Defendant Mark T. Greenquist ("Greenquist") was the Chief Financial Officer of Symbol Tech from the beginning of the Class Period until July 14, 2005, when he resigned following the disclosure of accounting irregularities and a series of downward revisions in revenue guidance.

23.     Defendant Salvatore Iannuzzi ("Iannuzzi") was the Chairman of the Board of Directors of Symbol Tech, and served on the Board's Nominating, Corporate Governance, Compensation, and Audit Committees from the beginning of the Class Period until April 7, 2005.  On April 11, 2005, he was named to the newly-created position of Senior Vice President and Chief Administrative and Control Officer of the Company.  On July 14, 2005, he also took on the position of Chief Financial Officer.  On August 1, 2005, Iannuzzi was named Symbol Tech's interim CEO to replace the departing Nuti.  This position was made permanent in January 2006.

24.     Defendant Todd Abbott ("Abbott") was Symbol Tech's Vice President of Worldwide Sales during the Class Period.

25.     Defendant Arthur O'Donnell ("O'Donnell") was Senior Vice President, General Manager of Global Services, and Chief Quality Officer at Symbol Tech during the Class Period.

26.     Defendant James M. Conboy ("Conboy") was Symbol Tech's Vice President, Controller and Chief Accounting Officer during the Class Period.

27.     Defendants Nuti, Greenquist, Iannuzzi, Abbott, O'Donnell and Conboy are collectively referred to hereinafter as the "Individual Defendants." During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Symbol Tech, were each privy to non-public information regarding the Company's inventory tracking failures, its ship-and-store schemes, the faulty revenue and earnings forecasting announcements, the Company's ineffective internal controls and other information concerning the Company from access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other documents provided to them in connection therewith. Because of their possession of and access to such information, the Individual Defendants knew that the statements alleged herein were false and misleading, and/or were deliberately reckless with respect to the truth or falsity of such statements.

28.     As officers and controlling persons of a publicly-held company, registered with the SEC and traded on the New York Stock Exchange ("NYSE"), the Individual Defendants each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, internal controls,

management, and present and future business prospects, and to correct any previously issued statements that were erroneous.

29.    The Individual Defendants, because of their positions as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements alleged herein.  Accordingly, each of the Individual Defendants is responsible for the accuracy of these public filings, press releases, and other statements, and is personally liable for the misrepresentations and omissions contained therein.

30.    The Individual Defendants should also be treated as a group for pleading purposes and presumed to have collectively published the SEC filings, press releases and other announcements that went out under the Company's name. Each is an officer and/or director of Symbol Tech, and by virtue of such high level position within the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein.

## CONFIDENTIAL INFORMANTS

31.    Numerous confidential informants confirmed Defendants' fraud.  These sources, as set forth below, held positions in which they would reasonably be expected to know the information they disclosed.  The confidential informants will hereinafter be identified by the abbreviation "CI" and an identifying number.

32.    CI #1 was employed by Symbol Tech from 1993 until November 2004 as an inventory manager in Symbol Tech's main distribution center in McAllen, Texas.

33.     CI #2 was employed by Symbol Tech as a distribution supervisor at the Bohemia,

New York distribution facility center from 1994 through May 2003.

34.　　CI #3 was employed by Eagle Global Logistics ("EGL") as an operations logistics manager in McAllen, Texas, from December 2002 until November 2003.　Although employed by EGL, CI #3 worked within the Symbol Tech facility in McAllen, Texas, pursuant to a "third party logistics agreement" between Symbol Tech and EGL.

35.　　CI #4 was a marketing manager at Comstor (a subsidiary of WestCon Group) from 2001 until March 2006.　In 2004, WestCon became a distribution partner for Symbol Tech.

36.　　CI #5 was employed by Symbol Tech as an inventory control manager responsible for manufacturing and distribution inventory at the Company's McAllen, Texas facility until April, 2004.

37.　　CI #6 was employed by Scansource as a product manager until August 2003. Scansource was Symbol Tech's largest distribution partner during the Class Period.

38.　　CI #7 was employed by Symbol Tech as a senior marketing manager for global channels from July 2004 until June 2005.　CI #7 worked at Symbol Tech's Holtsville headquarters and reported to Mauricio Capuzzo, director of marketing, who in turn reported to John Bruno, vice president of marketing.

39.　　CI #8 was employed by Symbol Tech as a product manager in the marketing department of Symbol Tech's mobile computing division from May 2003 until January 2005.

40.　　CI #9 was employed by Symbol Tech as an account manager for the Rocky Mountain region in the direct sales division from November 2002 until April 2005.　CI #9 reported to sales managers Dwight Ogletree, John Chis, and Peggy Davidson.　Ogletree, Chis and Davidson reported to John Carlson, area vice president, who in turn reported to Defendant Abbott.

41.     CI #10 was employed by Symbol Tech as a human resources director for business partners in the Company's sales division during the Class Period from April 2004 through September 2005.

42.     CI #11 was employed by Symbol Tech as an account manager from December 2001 through February 2005. CI #11 worked out of the Company's Foothill Ranch, California office and reported to sales managers Chis and Davidson.

43.     CI #12 was employed by Symbol Tech as vice president and general manager of the Company's mobile computing division from July 2005 through December 2005. CI #12 worked out of the Company's San Jose, California office.

44.     CI #13 was employed by Symbol Tech as a materials clerk at the Company's warehouse in El Paso, Texas from August 2003 to February 2006.

## SUBSTANTIVE ALLEGATIONS

### I. Defendants' Fraudulent Scheme To Inflate Revenues and Underreport Inventories

45.     Throughout the Class Period, as set forth below, Defendants engaged in a fraudulent scheme designed to systematically inflate Symbol Tech's revenues and underreport its inventories. The purpose of this scheme was to give investors the false impression that Symbol Tech had put its financial problems behind it, and, thereby, to artificially inflate its stock price.

46.     According to CI #1, Symbol Tech's new executive management team set sales and inventory reduction goals which were so "unattainable" he considered them to be "pie in the sky." CI #1 was instructed by Richard Strauss, Symbol Tech's vice president of global services, to reduce inventory from $32 million to $17 million. This order came from Strauss's boss, Defendant O'Donnell, who knew the goal could not be achieved through proper accounting

measures, but also knew that his subordinates would do anything necessary to make that number.

47.     In order to meet such unrealistic goals, Symbol Tech's inventory management directors in the McAllen center hid inventory from internal auditors. Catherine Garrety (phonetic), director of service and logistics at Symbol Tech, explicitly ordered CI #1 to hide inventory to meet quarterly inventory reduction goals. Symbol Tech would place this hidden inventory on a truck that sat either on a road between its manufacturing plant in Mexico and the distribution center, or at an off-site parking lot. According to CI #1, Symbol Tech also hid inventory in an EGL warehouse close to the McAllen distribution center. The inventory was then returned to the distribution center after the quarter was over.

48.     In another attempt to underreport Symbol Tech's inventory, Garrety and another Symbol Tech manager, John Leone (phonetic), ordered CI #1 to halt entry of raw materials into Symbol Tech's inventory tracking system, from which the Company derived its reported inventory levels. According to CI #1, when vendors sent raw materials to Symbol Tech's McAllen distribution warehouse, the inventory was not entered immediately into the warehouse's inventory tracking system, but rather delayed "depend[ing] on what the numbers were that we were trying to meet." For example, CI #1 was frequently told not to enter the inventory into the system until two weeks after the end of the quarter. This practice continued until CI #1 left the company in November 2004. CI #1 noted that employees at the McAllen distribution center considered the new management team to be just as unethical as the former, now-indicted Symbol Tech executives, calling them "the same crooks, just different names."

49.     CI #3, a logistics manager at EGL, identified other ways in which Symbol Tech hid inventories of raw materials from auditors. According to CI #3, in 2002 Symbol Tech entered into

a "third party logistics agreement" with EGL which designated approximately 15,000 to 16,000 square feet of space in Symbol Tech's McAllen distribution center for use by EGL to manage raw materials headed for Symbol Tech's manufacturing plant in Reynosa, Mexico.

50.     When raw materials were sent by suppliers to Symbol Tech's McAllen distribution center, they were moved to the EGL-designated section of the center. In late 2003, Deloitte & Touche, Symbol Tech's external auditor at the time, notified Symbol Tech that it would have to terminate its agreement with EGL. CI #3 understood that direction was given because Symbol Tech had been moving raw materials into the EGL-designated section of its McAllen facility to avoid properly counting them as Symbol Tech inventory.

51.     Defendants' "ship-and-store" scheme was not limited to the McAllen, Texas facility. According to CI #2, Symbol Tech shipped boxes of inventory to several warehouses near its Bohemia, New York facility to give the false appearance that the inventory had been shipped to a customer. The inventory would be returned to the distribution center two weeks after the end of the quarter. These warehouses were located on Lakewood Avenue and Orville Drive in Bohemia, New York, and on Andrea Drive in Holbrooke, New York. Symbol Tech also shipped empty boxes out of its Bohemia facility to give the false appearance that it was shipping full boxes of inventory to customers. These boxes were returned after the end of the quarter. These practices continued through CI #2's departure in May, 2003. CI #2 understood that the purpose of this scheme was to allow Symbol Tech to book revenue for inventory it had not actually sold or shipped to customers.

52.     Several confidential informants confirmed that Defendants inflated their revenues and reduced inventories by "stuffing" excess products upon its largest distributor, Scansource,

then allowing Scansource unusually liberal return terms for such deliveries. According to CI #4, the relationship between Scansource and Symbol Tech was "fishy" and he thought that the two companies "were sharing inventory." CI #4 believed this because Scansource routinely stocked quantities of Symbol Tech products that CI #4 knew, as a distributor, served no economic purpose. CI #4 stated that a distributor "could not stay in business and have that kind of inventory."

53. For example, CI #4 recalled that a reseller contacted him in 2005 requesting a Symbol Tech mini-scanner. CI #4 told the reseller that Westcon did not have the mini-scanner in stock because "it was the kind of (low demand) product you ordered once every five years." After contacting Scansource, the reseller told CI #4 that Scansource had 1,000 of the obscure mini-scanners in stock. Such occurrences "happened almost every day" until CI #4 departed Westcon.

54. According to CI #5, an inventory control manager in McAllen, Texas, Scansource was given "outrageous" return privileges that were not available to other distributors. Symbol Tech allowed Scansource to return its products for credit "no matter how long they held on to it." In contrast, according to CI #4, Westcon "had a horrible time getting [Symbol Tech] to take back what [it] couldn't sell."

55. CI #6, a Scansource product manager responsible for ordering Symbol Tech products, detailed how the "ship and return" scheme between the two companies operated: "we had to purchase an X [monetary figure] amount of products in order to return an X amount of products." At the end of the month or the end of each quarter, Scansource was expected to accept double or triple the amount of Symbol Tech products that it usually carried.

56. Defendants also improperly used Symbol Tech's marketing development funds ("MDF") and Co-op funds to compensate Scansource for accepting excess Symbol Tech

inventory. According to CI #7, in the beginning of the second quarter of 2005, Scansource asked Symbol Tech's MDF department to help Scansource defray the costs of Symbol Tech inventory that Scansource was having difficulty selling. According to CI #7, Scansource wanted Symbol Tech to give it money for such an offset.

57.     CI #7 participated in a conference call with his boss, Mauricio Capuzzo, Vibha Kapoor, the controller in charge of distribution, Manisha Reck (who worked with Kapoor in accounting), and Scansource managers, wherein Scansource requested that MDF and Co-op funds be used to compensate them for the unsellable inventory Scansource had accepted from Symbol Tech. According to CI #7, this was improper because MDF and Co-op funds were only to be used to assist a distributor with specific marketing projects, not for general use and certainly not to compensate a distributor for accepting excess inventory.

58.     Kapoor and Capuzzo repeatedly informed Scansource that assisting it in this manner would violate GAAP. CI #7 left this conference call with the impression that Scansource would not receive the MDF funds. In internal meetings attended by CI #7 following the conference call, Capuzzo continued to refuse Scansource's request.

59.     However, in May 2005, Susan Bugden, who was in charge of all distribution at Symbol Tech, and Jan Burton, vice president of worldwide channels, pressured Capuzzo to release the MDF funds to Scansource. CI #7, who listened in on the call between Bugden, Burton and Capuzzo, stated that Burton emphasized that Scansource was one of Symbol Tech's largest customers, and concluded that Symbol Tech should assist it. Burton said she was going to fly down to Scansource to "make things right." CI #7 thereafter learned from a Scansource employee that Symbol Tech gave the MDF funds to Scansource.

60.     CI #7 learned from other Symbol Tech employees that the Company also made deals with distribution partners in order to book inventory before the end of a quarter to boost revenue.  For example, Symbol Tech would tell distribution partners that they could return a Symbol Tech product at any time. According to CI #7, Symbol Tech booked revenue for inventory shipped to a distributor when no end customer existed.  Although the Company's published revenue recognition policies stated that inventory was only booked when a distributor sold Symbol Tech products to an end customer, Symbol Tech improperly booked revenue for inventory that sat in the distribution partner's warehouse.

## II.     Defendants' Ineffective Internal Controls

61.     Throughout the Class Period, Symbol Tech lacked effective internal controls. As a result, Defendants lacked any ability to accurately model future revenues.  Thus, the revenue guidance Defendants provided to investors was nothing more than reckless speculation.

### A.     Deficient Revenue Recognition Controls

62.     CI #12, former vice president and general manager of Symbol Tech's mobile computing division, observed that Symbol Tech's internal controls for booking sales were deficient.  Symbol Tech was "kind of winging it" when it came to defining the internal process for identifying a sale.  In CI #12's experience, most companies booked revenue when they "sell into the channel," or when the product is shipped to a distributor.  As part of its settlement with the SEC, Symbol Tech was supposed to use a more conservative measure, booking revenue only "after the channel sells out," or after the distributor has sold the product to an end customer or value added reseller.  However, Symbol Tech lacked effective internal controls to determine when a channel had "sold out," rendering this accounting measure meaningless.

16

63. According to CI #12, unlike most companies of its size, Symbol Tech lacked the ability to determine real time sales information. Instead, at the end of each month, Symbol Tech took a snapshot of its "sell through" (inventory sold to the distributor) and "sell out" (distributor's sales) data from sales and inventory numbers. This information was combined with direct sales forecasts and channel sales forecasts to determine whether the Company was meeting its sales goals for that year. CI #12 admitted that "there was not a lot of process there," and what little process existed was "very loose" and "fragmented." Defendant Abbott was in charge of compiling this data.

### B. Deficiencies in Revenue Forecasting Controls

64. CI #12 observed several problems with Symbol Tech's financial forecasting. At times, sales to distributors and channel sales forecasting figures "overlapped" with direct sales forecasts because it was not clear whether a particular forecasted sale was a channel sale or a direct sale to a customer. According to CI#12, "this was always problematic." As a consequence, many forecasted sales were double-counted as **both** channel sales and direct sales, artificially boosting revenue forecasts.

65. Moreover, the forecasting methodology was designed to pressure sales representatives rather than provide accurate guidance. As a result, the forecasting controls were ineffective even where forecasted sales were not double-counted.

66. The forecasting methodology, which according to CI #8 was designed and implemented by Defendant Abbott, was based on tiers of "commitments," each of which was structured to enhance sales figures rather than derive accurate results.

67. At the base tier, each sales representative was required to provide a weekly

"commit" number for each of his or her accounts, representing the amount of sales expected to close that week for the account. According to CI #8, executives pressed the sales teams to commit to impossibly high numbers. The sales teams were "truly pressured, to the point of fear, that they had to put in a number," even if the truthful number should have been zero. CI # 8 stated that "Todd Abbott drove that fear."

68. CI #9 was consistently pressured to "put up a number" during weekly "commit" conference calls that regional sales managers held with sales representatives. The pressure to inflate numbers gradually grew from 2003 through the time CI #9 left the Company in 2005. If CI #9 or any account manager did not have a number for an account (*i.e.*, had no legitimate basis to believe any sales would shortly close for that particular account), the sales manager would say, "you've got to put something up."

69. According to CI #9, an account manager in Symbol Tech's direct sales division, the regional sales managers held "commit" conference calls with their sales representatives each Friday morning. The regional "commit" numbers were presented each Monday in a conference call with Defendant Abbott or Defendant Nuti, or one of their subordinates, Cathy Paladino, Scott Armour, or John Carlson. The regional "commit" numbers (never accurate to begin with but by now severely distorted) would be rolled into a composite number, which became the basis for the erratic forecasts that Defendants provided to the public, even though they knew and understood that the procedure was unreliable and inaccurate.

70. CI #11 participated in weekly commit calls on Fridays that were led by his region's sales managers, Davidson and Chis. Employees often felt they couldn't commit to the numbers management expected. Symbol Tech sales to customers generally occurred on a two to three

month cycle, so it was difficult to commit to new sales every week. "People were afraid of losing their job," CI #11 stated.

71.     Defendant Abbott, and his subordinates, Cathy Paladino and Scott Armour, applied the most pressure on sales personnel to commit to unrealistic numbers. CI #11 recalled that during the National Retail Federation conference in January 2005, Paladino "cornered" CI #11 and pleaded with him to commit to revenue numbers on his Petco account. CI #11 refused to commit to the numbers because he had no reason to believe Petco was going to commit to a sale. Paladino told CI #11 that he had to commit to the numbers because she was receiving so much pressure from top management to make the deal happen. CI #11 refused to commit to the numbers and was terminated one month later.

72.     CI #12 participated in the highest tier of "commit" calls, directly with Defendants Abbott or Nuti. According to CI #12, Abbott and Nuti conveyed "a very strong expectation to look good with the numbers whether or not they were substantiated."

73.     For example, according to CI #12, in September 2005, Peggy Davidson committed numbers for a $70 million sale to Nestle, even though Symbol Tech had not received a purchase order from Nestle and no sale was imminent. CI #12 stated that the purported sale to Nestle still had not closed when he left the Company in December 2005, and may not have closed at all. CI #11 was also informed that Davidson had falsified "commit" numbers for a $70 million Nestle sale.

74.     According to CI #8 and CI #10, Symbol Tech derived its revenue guidance directly from this inherently unreliable "commit" system. CI #10 stated that Symbol Tech's revenue projections were forecasted through the sales department, consolidated by management, and

"rolled…to the public."

75.     Symbol Tech's annual sales quotas, also part of its revenue forecasting controls, were likewise deficient. CI #11, an account manager at Symbol Tech, stated that sales managers arbitrarily inflated sales quotas without any regard for how much sales were actually possible. According to CI #11, at or immediately after Symbol Tech's January company-wide sales conference, the sales staff received their quotas for the year. When account managers indicated to sales managers the amount of sales they believed were honestly possible, the sales manager would invariably come back with a much higher number. "It was a one way conversation." Quotas increased 10% to 15% every year. At the same time, Symbol Tech reduced the amount of accounts for each account manager, so the forecasts stated that sales staff would meet higher revenue quotas with fewer accounts, something CI #11 said was not possible.

### C.      Deficiencies in Inventory Management Controls

76.     Although Symbol Tech manufactures equipment and services each year that companies use to manage their inventories, Symbol Tech's own inventory controls were woefully deficient. Although the Company conducted physical inventory counts to verify the numbers provided by its inventory tracking system, according to CI #13, a materials clerk who participated in the inventory counts, the numbers rarely matched up. The Company continued to fail to report correct inventory on its inventory tracking system, even after it increased the frequency of the physical inventory counts. These inventory tracking errors continued at least through the time that CI#13 left the Company in February 2006.

### III.     THE FRAUDULENT STATEMENTS ISSUED DURING THE CLASS PERIOD

77.     At the outset of the Class Period, on April 29, 2003, Symbol Tech issued a press

release announcing its financial results for the first quarter of 2003. The Company announced that revenues increased to $357.4 million, compared to $301.3 million in the prior year quarter, before the impact of a restatement expected to address prior accounting irregularities. The Company further announced that its inventories dropped to $310.4 million and that the inventory turnover ratio had improved to 2.8 versus 2.7 in the previous quarter. Defendant Nuti emphasized the Company's success in "significantly reducing inventories."

78. The foregoing representations in ¶ 77 were materially false and misleading because:

  a) reported revenues, and earnings and cash flow figures derived therefrom, were artificially inflated by the fraudulent schemes set forth in ¶¶ 45-76;

  b) reported inventories, and inventory turnover figures derived therefrom, were artificially reduced by the fraudulent scheme set forth in ¶¶ 45-76; and

  c) Defendants failed to disclose that the Company's disclosure controls, revenue recognition controls, revenue forecasting controls, and inventory management controls were deficient and ineffective.

79. On October 8, 2003, Symbol Tech issued a press release announcing its financial results for the second quarter of 2003. It reported quarterly revenues of $375 million, a 15% increase year-over-year, and net earnings of $9 million. Nuti characterized the financial results as "gratifying because they indicate that our fundamental business is on track."

80. Regarding the Company's pending restatement, Richard Bravman, Symbol Tech's interim Chairman and CEO stated:

> There previously existed in the Company an atmosphere and culture that, we believe, allowed for and fostered a working environment that, ultimately, led to the difficulties we're now working so hard to correct. Let me assure you that the Company's Board, the current leadership team−and I, personally−are very committed to setting this right, definitively putting the issues uncovered through our investigation behind us and realizing the potential that we know is

inherent in Symbol.

81. In a conference call that same day, Defendant Nuti stated that: "we have made good progress toward managing inventory in the channel, where inventories in two-tiered distribution are down roughly 30-percent since year-end 2002 and feel that we are approaching optimal inventory balances in two-tier distribution."

82. The foregoing representations in ¶¶ 79-81 were materially false and misleading for the reasons set forth in ¶ 78, *supra*, and because fraud was still rampant at Symbol Tech as set forth above, contrary to Defendants' representation that Symbol Tech had reformed its culture of fraud.

83. On November 4, 2003, Symbol Tech issued a press release announcing its financial results for the third quarter of 2003. The Company announced revenues of $382 million, up slightly from the restated third quarter 2002 revenue of $380 million, and a 2% increase over second-quarter 2003 revenue of $375 million. Defendants boasted "that Symbol is on a sound business foundation."

84. The foregoing representations in ¶ 83 were materially false and misleading for the reasons set forth in ¶ 78, *supra*.

85. On February 20, 2004, Symbol Tech issued a press release stating that revenues for the fourth quarter of 2003, ***then complete***, were approximately $400 million, up about 5% over the previous quarter and 7% year-over-year.

86. Thereafter, on February 25, 2004, Symbol Tech issued a press release announcing that it would finally file 10-Q quarterly reports for the first three quarters of 2003, all of which had been delayed pending restatements intended to clear up prior accounting irregularities. Defendant

Nuti commented:

> The filing of our quarterly reports for 2003's initial nine months is bringing us current with our required regulatory filings and represents another key milestone for Symbol as we continue to work diligently to put matters of the past behind us. Other than the $72 million pre-tax provision related to more current information pertaining to the anticipated legal settlements, the Form 10-Qs we are filing today represent no material change from our previously disclosed results for the nine-month period and ***demonstrate continued improvement in the Company's internal control and financial reporting processes.*** (emphasis added).

87. The foregoing representations in ¶¶ 85-86 were materially false and misleading for the reasons set forth in ¶ 78, *supra*, and because the revenue projections provided by Defendants were either intentionally inflated as a result of the fraud alleged above or were recklessly issued without any reasonable basis as a result of the Company's ineffective internal controls.

88. That same day, Symbol Tech filed its delinquent 10-Q quarterly reports for the first three quarters of 2003. The Company reported revenues of $1.137 billion and net earnings of $39 million for those three quarters. The figures and statements contained in the 10-Q reports were consistent with those announced in the press release issued that day, and were signed by Defendants Greenquist, Nuti and Conboy. These Defendants certified that the financial information contained in the 10-Q quarterly reports complied with GAAP. Defendants Nuti and Greenquist further certified pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

> The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Defendants Nuti and Greenquist also certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 as follows:

1. I have reviewed this quarterly report on Form 10-Q of Symbol Technologies, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

    c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a)     All significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting which are reasonably likely to adversely effect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

89. Each of the aforementioned 10-Q quarterly reports stated that the Company recognized revenue only as follows:

Revenue from the direct sale of our products and systems to end users and OEMs is generally recognized when products are shipped or services are rendered, the title and risk of loss has passed to the customer, the sales price is fixed or determinable and collectibility is reasonably assured. The recognition of revenues related to sales of our products or systems to our value-added resellers is contingent upon the reseller's ability to pay for the product without reselling it to the end user. Sales to resellers that are financially sound are generally recognized when products are shipped, the title and risk of loss has passed, the sales prices is fixed and determinable and collectibility is reasonably assured. Sales to resellers that lack economic substance or cannot pay for our products without reselling them to their customers are recognized when the revenue is billed and collected. Revenue on sales to distributors is recognized when our products and systems are sold by them to the end user.

90. Symbol Tech's 10-Q for the third quarter of 2003 further stated that, as of September 30, 2003, it had decreased inventory levels by almost $70 million to $197,184,000.

91. The foregoing representations in ¶¶ 88-90 were materially false and misleading for the reasons set forth in ¶ 78, *supra*, and because:

a) Defendants misrepresented the revenue recognition policy, by failing to disclose that revenues were actually manipulated by the fraud described above and, at any rate, could not be effectively determined due to the Company's deficient internal controls;

b) contrary to Defendants' representations, the 10-Q quarterly reports did not

25

comply with GAAP because, *inter alia*, they:

    i)        violated FASB Statement of Concepts No. 2, ¶¶ 58-59, requiring that financial information be reliable;

    ii)       violated FASB Statement of Concepts No. 2, ¶ 79, requiring that financial information be complete;

    iii)      violated FASB Statement of Concepts No. 2, ¶¶ 95, 97, requiring that financial information be conservatively reported;

    iv)      violated FASB Statement of Concepts No. 5, ¶¶ 83-84, by recognizing revenue from transactions lacking economic substance; and

    v)       violated AICPA Accounting Research Bulletin No. 43, Chapter 4, by failing to account for all stock of goods awaiting sale as inventory.

c)      The certifications executed by Defendants Nuti and Greenquist pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 were false and misleading because:

    i)        the 10-Q quarterly reports contained untrue statements of material fact and omitted facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, as set forth above;

    ii)       the 10-Q quarterly reports did not fairly represent the financial condition and results of operations and cash flows of the Company due to the fraud and lack of effective controls described above;

    iii)      the Company's disclosure controls, revenue recognition controls, revenue forecasting controls, and inventory management controls were deficient and ineffective;

    iv)      Defendants had not disclosed the significant deficiencies in Symbol Tech's internal controls set forth above to its auditors and the audit committee of its board of directors; and

    v)       Defendants had not disclosed the fraud involving management and other employees who had a significant role in Symbol Tech's internal controls set forth above to its auditors and the audit committee of its board of directors.

92.     After the market closed on March 4, 2004, Symbol Tech issued a press release

announcing its financial results for fourth quarter and fiscal year 2003. The Company announced that quarterly revenue was $393 million, $7 million lower than the $400 million it had stated a mere two weeks earlier. Revenue for the year ended December 31, 2003 was $1.53 billion, compared to $1.4 billion for the year ended December 31, 2002. Defendant Nuti commented:

> We were pleased with fourth quarter results, a 4 percent increase in revenue from 2003's third quarter and a 5 percent increase in revenue over the restated fourth quarter 2002. Although full-year 2003 revenue at $1.53 billion came in slightly under 10 percent growth, it was a year in which *we made great organizational, cultural and financial progress*….That said, in 2004 the Company plans to make investments in systems to drive workforce productivity and improved business controls, sales coverage to drive top-line growth and customer satisfaction, finance to *improve process execution and financial controls*, and new products to increase the market share position of all our business divisions—all necessary to achieve our business plan goals beyond 2004.

93.     In a conference call that same day, Defendant Nuti emphasized purported improvements in the Company's internal controls: "we have an opportunity to take advantage of the work that we're doing for Sarbanes-Oxley….we're going to bolt-on initiatives, focused on improving our close processes, forecast processes and overall business controls." Nuti further stated that these purported improvements "touch[] most of our finance processes and systems."

94.     Investors dumped Symbol Tech shares in response to the Company's failure to meet guidance it had issued only two weeks earlier. The following day, Symbol Tech shares dropped from $17.99 to $15.50 on unusually heavy volume.

95.     On March 12, 2004, Symbol Tech filed its 10-K annual report for 2003 with the SEC. This report was consistent with the figures and statements contained in the March 4, 2004 press release, and was signed by Defendants Nuti, Iannuzzi, Greenquist and Conboy. These Defendants certified that the financial information contained in the 10-K annual report complied

with GAAP.   Defendants Nuti and Greenquist also executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 in the form set forth above in ¶ 88.

96.     Symbol Tech's 2003 10-K reiterated the revenue recognition policy contained in ¶ 89 and also contained the following representations regarding the Company's inventories:

> We have also continued to improve our efficiencies in our manufacturing and distribution operations and have decreased our inventory levels by $48,234[,000] to $212,862[,000] at December 31, 2003 from $261,096[,000] at December 31, 2002.   A key performance indicator used to monitor our inventory levels is inventory turnover.  As a result of the efficiencies we have instituted in our manufacturing and distribution operations, we have been able to increase the average number of times per year that our inventory turns over to 4.0 in 2003 from 3.4 in 2002.

97.     The foregoing representations in ¶¶ 92-96 were materially false and misleading for the reasons set forth in ¶¶ 78 and 91.

98.     On May 10, 2004, Symbol Tech issued a press release announcing its financial results for the first quarter of 2004.  The Company reported revenue of $419.7 million, up 9% year-over-year and 7% sequentially.  The Company also reported net earnings of $6.8 million versus a net loss of $31.0 million in the prior year quarter, and a decrease in inventory levels over the prior sequential quarter.  In the press release, Defendant Greenquist emphasized "an uptick in inventory turns."

99.     That same day, Symbol Tech filed its 10-Q quarterly report with the SEC for the first quarter of 2004, which was consistent with the figures and statements contained in the May 10, 2004 press release, reiterated the revenue recognition policy set forth in ¶ 89, and was signed by Defendants Nuti, Greenquist and Conboy.   These Defendants certified that the financial statements contained in the 10-Q complied with GAAP.   Defendants Nuti and Greenquist also

executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, in the form set forth in ¶ 88.

100. The foregoing representations in ¶¶ 98-99 were materially false and misleading for the reasons set forth in ¶¶ 78 and 91.

101. Analysts reacted positively to the news of Symbol Tech's apparent financial and corporate governance turnaround. J.P. Morgan analyst Paul Coster reiterated his "Overweight" rating, and in light of Defendants' misrepresentations regarding corporate governance improvements, characterized restatement expenses as "legacy" costs that he excluded from his earnings comparisons. "On this basis," he wrote, "Symbol reported a good quarter." Coster also emphasized the Company's improvement in inventory turns.

102. On July 28, 2004, Symbol Tech issued a press release announcing its financial results for the second quarter of 2004. It reported revenue of $432.8 million and net earnings of $28.8 million. The Company stated that its inventory turnover ratio increased to 4.4 from 4.2 in the previous quarter. Defendant Greenquist again emphasized "improving inventory turns."

103. On July 30, 2004, Symbol Tech filed its 10-Q quarterly report for the second quarter of 2004, which was consistent with the figures contained in the July 28, 2004 press release, reiterated the revenue recognition policy set forth in ¶ 89, and was signed by Defendants Nuti, Greenquist and Conboy. These Defendants certified that the financial statements contained in the 10-Q complied with GAAP. Defendants Nuti and Greenquist also executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, in the form set forth in ¶ 88. The 10-Q falsely stated that the Company's internal controls were "improved" and "effective:"

Symbol is committed to maintaining disclosure controls and procedures that are designed to ensure that information required to be disclosed in its Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms, and that such information is accumulated and communicated to its management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure….

During 2003 and 2002, we learned of certain deficiencies in our internal control that existed in 2002 and prior years. Additionally, as of December 31, 2003, we identified a material weakness related to the manner in which we process transactions to record our revenue as our current processes and procedures to record revenue transactions requires substantive manual intervention and are reliant on several departments in our sales and finance organization….

***We have taken measures to improve the effectiveness of our internal controls and we believe these efforts address the matters described above.***

****

As required by Rule 13a-15(b) of the Exchange Act, Symbol has carried out an evaluation, under the supervision and with the participation of its management, including its Chief Executive Officer and its Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures. The evaluation examined those disclosure controls and procedures as of June 30, 2004, the end of the period covered by this report. Based upon the evaluation, Symbol's management, including its Chief Executive Officer and its Chief Financial Officer, concluded that, ***as of June 30, 2004, Symbol's disclosure controls and procedures were effective***, except as described above, at the reasonable assurance level to ensure that information required to be disclosed in Symbol's reports filed or submitted under the Exchange Act was accumulated and communicated to Symbol's management, including its Chief Executive Officer and its Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. (emphasis added).

104.    The foregoing representations in ¶¶ 102-103 were materially false and misleading for the reasons set forth in ¶¶ 78 and 91.

105.     Analysts were duly impressed by Symbol Tech's record revenues and Defendants' false representations that deficiencies in internal controls had been cured.  J.P. Morgan analyst Coster reiterated his "Overweight" rating on the stock and stated that "the company has...installed new systems, processes and controls," a strategy that "appear[ed] to be paying off."

106.     In August 2004, Defendant Nuti decided it was time to cash in on his personal holdings of Symbol Tech stock.  Nuti knew that selling those shares outright would expose him to legal liability because he possessed material adverse non-public information about the continued deficiencies in Symbol's internal controls.  Therefore, Nuti took advantage of a legal loophole which provides substantial protection to insiders selling under an insider trading plan filed with the SEC.  Nuti filed an insider trading plan under which he would sell his shares when the stock price hit $16.00 or above, beginning December 15, 2004.

107.     On October 26, 2004, Symbol Tech issued a press release announcing its financial results for the third quarter of 2004.   The Company announced record revenues of $444.7 million and earnings of $21.1 million.  The Company touted five sequential quarters of revenue growth and improved operating income and margins, and reported an inventory turnover ratio of 4.4.

108.     The foregoing representations in ¶ 107 were materially false and misleading for the reasons set forth in ¶ 78.

**A.     Symbol Tech Mischaracterizes Accounting Errors As "Discrete" And "Corrected"**

109.     Two weeks later, on November 8, 2004, the Company issued a press release stating that it would delay the filing of its 10-Q quarterly report for the third quarter of 2004, and that it might be required to amend one or both of its previously-filed first and second quarter 2004 10-Q quarterly reports due to breakdowns in internal controls, despite the fact that Defendants had just

certified that the Company's internal controls were effective. Defendants attributed the delay and possible need to restate to: (1) a large distribution partner that had underreported inventory levels to Symbol Tech, causing the Company to improperly record approximately $3.3 million in sales during the quarter; and (2) underreporting of inventory levels at a Symbol Tech distribution facility of approximately $10 million, resulting in overstatement of revenues by the same amount.

110.    As a result of this news, investors dumped shares of the Company's stock, driving shares down from $15.20 to $14.11 on unusually heavy trading volume.

111.    On November 15, 2004, Symbol Tech issued a press release announcing that its actual revenues for the third quarter were $429.2 million, a far cry from the record $444 million Defendants had reported them to be only three weeks earlier, and even less than the previous sequential quarter. The Company also announced that net earnings for the quarter were only $17.8 million, or roughly 15% less than it had previously announced, and that its inventory turnover ratio was 4.1, not 4.4.

112.    That same day, Symbol Tech filed its 10-Q for the third quarter of 2004 with the SEC, which was consistent with the figures and statements contained in its November 15, 2004 press release, reiterated the revenue recognition policy set forth in ¶ 89, and was signed by Defendants Nuti, Greenquist and Conboy. These Defendants certified that the financial statements contained in the 10-Q complied with GAAP. Defendants Nuti and Greenquist also executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, in the form set forth in ¶ 88.

113.    In the third quarter 2004 10-Q filing, Symbol Tech admitted that the errors that had devastated its stock price when disclosed a week earlier were caused by ineffective internal

controls:

> As required by Rule 13a-15(b) of the Exchange Act, Symbol has carried out an evaluation, under the supervision and with the participation of its management, including its Chief Executive Officer and its Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures. The evaluation examined those disclosure controls and procedures as of September 30, 2004, the end of the period covered by this report. Based upon the evaluation, Symbol's management, including its Chief Executive Officer and its Chief Financial Officer, concluded that, ***as of September 30, 2004, Symbol's disclosure controls and procedures needed to be strengthened and were not sufficiently effective at the reasonable assurance level*** to ensure that information required to be disclosed in Symbol's reports filed or submitted under the Exchange Act were accumulated and communicated to Symbol's management, including its Chief Executive Officer and its Chief Financial Officer, in a timely manner, to allow timely decisions regarding required disclosure, thus resulting in the delay of this filing. (emphasis added).

114. However, Defendants minimized these accounting errors by falsely portraying them as "discrete events" and ensuring that they had been corrected by supposed improvements in the Company's internal controls:

> In November 2004, during the Company's inventory testing (including a planned physical inventory at a company owned distribution center), two unrelated errors were discovered. ***These errors were the result of two discrete events.***
>
> ****
>
> Since the discovery of the significant deficiencies in November 2004 as described above, ***we have taken the following steps to ensure the financial results as of and for the three and nine month period ended September 30, 2004 as filed in this Form 10-Q are fairly presented in all material respects***:
>
> – re-performed a physical inventory at this distribution center;
>
> – performed a roll back of inventory amounts from the

results of our physical counts to each quarter end;

    –    re-performed cut-off procedures at March 31, 2004, June 30, 2004 and September 30, 2004 to determine proper inventory amounts; and

    –    re-confirmed inventory amounts with the distributor.

***Additionally, we have taken various measures to improve the effectiveness of our internal controls***, including:

    –    placed qualified individuals in the distribution center to manage the movement of inventory within the distribution center; and

    –    developed prospective physical inventory procedures to be performed for the year ending December 31, 2004 and quarterly thereafter at certain of our distributors and our Company-owned distribution center to ensure the value of consigned inventory at our distributors and our Company-owned distribution center are accurately recorded.

115.    The foregoing representations in ¶¶ 109-114 were materially false and misleading for the reasons set forth in ¶¶ 78 and 91.

116.    Analysts responded favorably to the November 15, 2004 press release and SEC filing.  The Buckingham Research Group reiterated its "Strong Buy" rating for Symbol Tech and parroted the Company's characterization of the accounting errors as "isolated events."   Investors also responded favorably, driving the stock to its highest levels in over nine months.

117.    On December 30, 2004, the stock finally traded above the $16 level at which Nuti planned to sell his insider shares, and Nuti dumped 400,000 shares (over 67% of his personal holdings) at an average price of $16.45, generating more than $6.5 million in personal profits.

118.    On March 1, 2005, Symbol Tech issued a press release announcing results for the fourth quarter and fiscal year 2004.  The Company reported quarterly revenue of $450.5 million,

up 15% from the prior year quarter, and earnings of $28.5 million, also substantially above the prior year quarter. It reported annual revenue of $1.73 billion, and annual net earnings of $81.8 million. Symbol Tech projected that revenues for the first quarter of 2005 (which was then two-thirds complete) would total $465 million, but disappointed investors by guiding earnings down to $.10-$.11, under consensus estimates.

119. In the March 1, 2005 press release, Defendants continued to misrepresent the strength of the Company's internal controls. Defendant Nuti stated:

> Fourth Quarter 2004 and the year were validation of the hard work, effort and results of our associates and channel partners. I want to recognize and thank them for their focus and execution. During the last year, Symbol has undergone significant change, management that positively influenced customer and partner satisfaction, bottom line results, cash flow and productivity, and provided us a strong foundation of business and financial controls.

Defendant Greenquist commented:

> Our earnings performance in the fourth quarter was encouraging, and we're also very pleased to be able to announce that Symbol will be certifying its compliance with the internal control provisions of Sarbanes-Oxley 404—an outstanding achievement in light of where we were from an internal controls perspective two years ago.

120. On March 11, 2005, Symbol Tech filed its 10-K annual report for fiscal year 2004 with the SEC, which was consistent with the figures and statements contained in the March 1, 2005 press release. As Defendant Greenquist had earlier advised, the 10-K certified pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 that management had evaluated the Company's internal controls and determined them to be effective. The 10-K described the Company's revenue recognition policy in terms consistent with those contained in ¶ 89, and was signed by Defendants Nuti, Iannuzzi, Greenquist and Conboy. Defendants Nuti and Greenquist also executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, in the form set

forth in ¶ 88, *supra*.

121.     The 2004 10-K annual report touted "improved inventory management," and once again falsely characterized the errors previously disclosed as discrete, unrelated, and fully resolved:

> In 2003 and 2004, we have implemented and continue to implement various initiatives, conducted with the oversight of our audit committee, to address the material weaknesses and deficiencies in our internal controls identified by our prior auditors and our own internal investigations. These initiatives, along with the initiatives related to our compliance with the Sarbanes-Oxley Act of 2002, address our control environment, organization and staffing, policies, procedures, documentation and information systems and are intended to continuously improve our internal controls and procedures, address systems and personnel issues and help ensure a corporate culture that emphasizes integrity, honesty and accurate financial reporting.
>
> In November 2004, during our inventory testing (including a planned physical inventory at a company-owned distribution center), two unrelated errors were discovered. These errors were the result of two discrete events. One event involved inaccurate inventory levels reported to us by a large distribution partner. The second discrepancy was the result of errors that occurred at a company-owned distribution facility that serves one of our large retail customers. Based on these findings, management believed there were significant deficiencies relating to its controls for receiving, shipping and ultimately reporting the amount of inventory. The errors reported as described above led to (i) an overstatement of our revenues in our earnings release on October 26, 2004 for the three- and nine- month periods ended September 30, 2004 and (ii) the delay, but timely, filing of our report on Form 10-Q as of and for the three- and nine-month periods ended September 30, 2004.
>
> Since the discovery of the significant deficiencies in November 2004 as described above, we have taken steps to ensure that the financial results for the fiscal year ending December 31, 2004 are fairly presented in all material respects. We have also taken various measures to improve the effectiveness of our internal controls.

122.     In the 2004 10-K annual report, Defendants certified the efficacy of those internal

controls pursuant to Section 404 of the Sarbanes-Oxley Act of 2002:

### Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as this term is defined under Rule § 13a— 15(e) promulgated under the Securities Act of 1934, as amended (the "Exchange Act"). Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2004.

\*\*\*\*

### Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. The Company maintains accounting and internal control systems which are designed to (1) maintain records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

As of December 31, 2004, management conducted an assessment of the effectiveness of the Company's internal control over financial reporting based on the framework established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has determined that the Company's internal control over financial reporting as of December 31, 2004 is effective.

123.     In a conference call held on March 7, 2005, Defendant Nuti confirmed Symbol

Tech's revenue and earnings guidance for the first quarter of 2005.

124.     The foregoing representations in ¶¶ 117-123 were materially false and misleading for the reasons set forth in ¶¶ 78 and 91, and because the revenue projections provided by Defendants were either intentionally inflated as a result of the fraud alleged above or were recklessly issued without any reasonable basis as a result of the Company's ineffective internal controls.

125.     On April 11, 2005, Symbol Tech issued a press release announcing that Defendant Iannuzzi, previously Chairman of the Board of Directors, would join Symbol Tech's senior management team in the newly-created position of Senior Vice President, Chief Administrative and Control Officer.  Symbol Tech touted this appointment as confirmation of the Company's supposed transformation into a "best practice leader in corporate governance."  Defendant Nuti commented:

> Sal is a great talent, and a man of unquestionable integrity.  He brings a wealth of highly relevant experience that will further strengthen our leadership team.  Having benefited from his contributions as chairman during the past year, I asked Sal to accept this new position because I know we will gain a tremendous amount from his involvement on a daily basis.  Today, Symbol is a vastly different company from a management and corporate governance standpoint, and we look forward to further growth and realizing our Company's true potential.

Defendant Iannuzzi commented:

> I have tremendous respect for Bill Nuti, his leadership team, and the 'new' Symbol Technologies.  Symbol has made great progress in strengthening its management team and delivering solid financial performance.  At the same time, the Company has worked extremely hard to put the issues arising from past management behind it and improve its business controls, all while coming into full compliance with Sarbanes Oxley 404.

126.     The foregoing representations in ¶ 125 were false and misleading because:

a)  Symbol Tech had not put the past management's fraud behind it; instead, it was instead continuing to perpetrate widespread fraud as set forth in ¶¶ 45-76, *supra*; and

b)  Symbol Tech had not "come into full compliance" with Sarbanes-Oxley section 404.

**B.    The Fraud Is Gradually Revealed In A Series Of Partial Disclosures**

127.    After the market closed on May 3, 2005, Symbol Tech issued a press release announcing its financial results for the first quarter of 2005.  The Company reported revenues of $457.5 million, $7.5 million less than the Company's previously announced guidance (despite the fact that the Company reinforced this guidance two-thirds of the way into the quarter), and net earnings of $22.2 million.  The Company also reduced its financial guidance for the rest of the year, admitting that, at best, it would likely do no better than the low end of its previously-announced range of 10-15% revenue gains for 2005.

128.    The following day, as a result of Defendants' failure to meet the inflated revenue targets they had repeatedly promised to the market, investors rapidly dumped Symbol Tech shares, causing the stock price to plummet from $12.98 to $10.97 on extraordinarily high trading volume.

129.    The Company attempted to minimize the impact of this miss by emphasizing other aspects of its business, including: (1) eight sequential quarters of increased product bookings, reaching $382.5 million and representing a 9 percent year over year increase; (2) five sequential quarters of DSO's below 30 days; and (3) first quarter 2005 inventory turnover ratio of 5.8, the highest of any quarter in the past two years.

130.    In its press release, Symbol Tech forecast $460-470 million in revenues for the second quarter of 2005, representing growth of 1-3% sequentially and 6-9% year-over-year.  The Company stated that revenue growth for fiscal year 2005 would be at the bottom of its previously-

disclosed 10-15% range. Diluted earnings per share for second quarter 2005 were expected to be

$0.05 to $0.07 per share.

131. On May 6, 2005, Symbol Tech filed its 10-Q quarterly report for the first quarter of

2005 with the SEC, which was consistent with the figures and statements contained in the May 3,

2005 press release, incorporated by reference the revenue recognition policy set forth in the prior

10-K annual report, and was signed by Defendants Nuti, Greenquist and Conboy. These

Defendants certified that the financial statements contained in the 10-Q complied with GAAP.

Defendants Nuti and Greenquist also executed certifications pursuant to Sections 302 and 906 of

the Sarbanes-Oxley Act of 2002, in the form set forth in ¶ 88.

132. The first quarter 2005 10-Q reported that inventory levels had improved almost $35

million from the previous quarter, and claimed that its high inventory turnover rate was

attributable to "improved efficiencies" with operations. The 10-Q further stated:

> We maintain disclosure controls and procedures (as defined in
> Exchange Act Rules 13a-15(e) and15d-15(e)) that are designed to
> ensure that information required to be disclosed in our Exchange Act
> reports is recorded, processed, summarized and reported within the
> time periods specified in the SEC's rules and forms, and that such
> information is accumulated and communicated to our management,
> including our Chief Executive Officer and Chief Financial Officer, as
> appropriate, to allow timely decisions regarding required disclosure.
> We conducted an evaluation, under the supervision and with the
> participation of management, including our Chief Executive Officer
> and Chief Financial Officer, of the effectiveness of our disclosure
> controls and procedures as of the end of the period covered by this
> report. Based on this evaluation, our Chief Executive Officer and our
> Chief Financial Officer have concluded that, as of March 31, 2005,
> our disclosure controls and procedures were effective.

133. The foregoing representations in ¶¶ 127-132 were materially false and misleading

for the reasons set forth in ¶¶ 78 and 91, and because the revenue projections provided by

Defendants were either intentionally inflated as a result of the fraud alleged above or were recklessly issued without any reasonable basis as a result of the Company's ineffective internal controls.

134.    In reaction to Symbol Tech's revenue miss, The Buckingham Research Group downgraded its rating of Symbol Tech from "Strong Buy" to "Accumulate" citing "disappointing" first quarter results.

135.    On June 15, 2005, Symbol Tech issued a press release announcing that Elise Kirban had been named Symbol Tech's Chief Ethics and Compliance Officer, a newly created position in the Company.  Commenting on this new appointment, Defendant Nuti stated:

> ***For the past two years, we have undertaken an enormous change management turnaround program at Symbol, resulting in becoming a leading example of good corporate governance.***  Elise Kirban's appointment demonstrates our strong and continuing commitment to being a model of good corporate governance with best-in-class-ethics and compliance.  (emphasis added).

136.    The foregoing representations in ¶ 135 were materially false and misleading because Symbol Tech was not "a leading example of good corporate governance" and was not committed to "best-in-class ethics."  Instead, as set forth above, Symbol Tech remained mired in widespread fraud and repeatedly had to amend its SEC filings and financial guidance as a result of ineffective internal controls.

137.    On June 27, 2005, in reaction to criticism it received from the SEC, Symbol Tech amended its 10-K annual report for 2003, as well as its 10-Q quarterly reports for the first three quarters of 2004.  In these amended reports, Defendants admitted that their prior certifications under Sections 302, 404 and 906 of the Sarbanes-Oxley Act of 2002 were false, and that Symbol Tech's internal financial controls were ineffective for those periods.  The second quarter 2004 10-

Q was amended to state:

> During 2003 and 2002, we learned of certain deficiencies in our internal control that existed in 2002 and prior years. Additionally, as of December 31, 2003, we identified a material weakness related to the manner in which we process transactions to record our revenue as our current processes and procedures to record revenue transactions requires substantial manual intervention and are reliant on several departments in our sales and finance organization. ***We believe that as of June 30, 2004, this material weakness and certain deficiencies still exist.***
>
> As required by Rule 13a-15(b) of the Exchange Act, Symbol has carried out an evaluation, under the supervision and with the participation of its management, including its Chief Executive Officer and its Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures. The evaluation examined those disclosure controls and procedures as of June 30, 2004, the end of the period covered by this report.
>
> ***The evaluation revealed that the material weakness and deficiencies described above are not yet fully remediated which we believe may constitute deficiencies in our disclosure controls. Based upon the evaluation, Symbol's management, including its Chief Executive Officer and its Chief Financial Officer, concluded that, as of June 30, 2004, Symbol's disclosure controls and procedures were ineffective.*** (emphasis added).

Similar statements were contained in the other amended reports filed by Symbol Tech.

138. After the market closed on June 28, 2005, with only three days left in the second fiscal quarter, Symbol Tech issued a press release slashing its second quarter revenue guidance from $460-470 million to $440 million. The Company also lowered its earnings guidance from $0.07-$0.09 per share to $0.02-$0.05 per share. Additionally, Symbol Tech announced that it would take a restructuring charge of $75-$95 million.

139. Investors reacted sharply to this partial disclosure. The next day, Symbol Tech's stock fell from $10.47 to $9.72 on unusually heavy trading volume. Analysts were also disappointed by Symbol Tech's miss. Bear Stearns analyst Phillip Alling admitted that his

"Outperform" recommendation on Symbol Tech "has been the wrong call."

140.     In a conference call with financial analysts on June 28, 2005, Nuti blamed the downward revision on **poor sales forecasting**, retail weakness in Europe, and the relative inexperience of a large portion of the Company's sales personnel. Nuti personally promised that he would take personal responsibility for current and future forecasts:

> *That's something I'm going to take personal responsibility for on a go-forward basis. The forecasts you will hear in Q--the forecasts that you're hearing today and you will hear in Q3--they're my forecasts. That's Bill Nuti's forecast.* (emphasis added).

141.     The foregoing representations in ¶¶ 138-140 were materially false and misleading because the revenue projections provided by Defendants were either intentionally inflated as a result of the fraud alleged above or were recklessly issued without any reasonable basis as a result of the Company's ineffective internal controls.

142.     Symbol Tech shares enjoyed a temporary reprieve after investment guru and television personality James Cramer recommended that investors buy Symbol Tech on his popular national television show, "Mad Money," on the evening of July 13, 2005. The next day, Symbol Tech shares gapped up to $12.38 and closed at $12.46 on heavy volume.

143.     The Company took advantage of that rise to release bad news upon the market. After the market closed on July 14, 2005, Symbol Tech issued a press release further reducing the already downwardly-revised second quarter 2005 revenue guidance from $440 million to $425-430 million. The Company also announced that Mark Greenquist, its Chief Financial Officer, had resigned. An article the following week in TRADER DAILY, a periodical covering Wall Street, noted the suspicious timing of the Company's announcement, and stated that but for the boost provided by Cramer, such news could have "spelled disaster" for Symbol Tech shares.

144.    In the conference call following Defendants' July 14, 2005 revelations, Defendants Nuti and Iannuzzi were sharply criticized by analysts. Defendants attempted to argue that their internal controls were *too conservative.* Ianuzzi said that the Company's internal controls were so cautious that they were "Draconian:"

> With regard to what's happening here is, first of all, I think that the firm, as a whole, and I'm not speaking about my experience, not only the past three months but also my experience being associated with the firm as non-executive chairman for the previous 15 months or so. The firm spent enormous amounts of resources, enormous amounts of dollars in terms of getting its financial controls into shape. The number-one priority of the firm was that the reporting to the public in terms of our financial statement had to be accurate. First of all, it's our primary responsibility to the shareholders; it's also part of our agreement with the government; it is extremely essential to the survivability of the company, to state it quite simply. So enormous resource, enormous effort, enormous amounts of money were spent in order to accomplish that, and we continue to do it, we continue to spend it.
>
> What's also happened here is that as a result of what happened, the massive fraud, the restatement of a number of years of earnings and financial statements, ***a number of very Draconian accounting practices, procedures, were put into place, and a number of those processes -- and they were put in place for the right reasons -- they were put in place for fear of -- trying to prevent what occurred from recurring, and from a theoretical standpoint, absolutely the right decisions. What we're seeing is that some of those practices, some of those procedures, are extremely cumbersome to deal with in a practical, real world, real time basis.*** And this is no excuse, it's really a statement of fact -- it is one of the principal reasons that we're having such a difficult time giving you a forecast that works. (emphasis added).

In truth, Defendants knew and would soon admit that Symbol Tech's internal controls were not conservative, were not cautious, and were certainly not "Draconian." Despite all of Defendants' hype about supposed improvements, Symbol Tech's internal controls remained deficient and ineffective.

145.    Analysts reacted poorly to the growing realization that Symbol Tech's internal controls were in shambles.  In a report published July 15, 2005, JP Morgan analyst Paul Coster downgraded Symbol Tech to "Neutral,"  explaining:

> We are concerned by four things: 1) sales forecasting is weak; 2) restructuring and management changes introduce execution risk; 3) sales growth has stalled owing to loss of market share; and 4) the move to sell-in revenue recognition could obscure change in inventory levels.

The Buckingham Research Group likewise downgraded its rating of Symbol Tech stock to "Neutral," citing "added financial reporting concerns."

146.    Investors also dumped Symbol Tech shares as they came to realize the Company's lack of effective internal controls and fraud.  On July 15, 2005 Symbol Tech's stock price sank from $12.46 to $11.11 per share on unusually heavy trading volume.

147.    Industry observers opined that Symbol Tech's revenue miss was a direct result of its fraud and ineffective internal controls.  The August 2005 edition of THE WCCN LETTER, which covers Symbol Tech and other companies in the RFID sector, explained:

> ***Part of the current revenue generation problem has to be attributed to some customers who have simply decided they no longer want to do business with a scandal-ridden company.*** (emphasis added).

148.    On August 1, 2005, Symbol Tech announced that Defendant Nuti, who took "personal responsibility" for Symbol Tech's revenue forecasts, internal controls, and corporate governance, had resigned in the wake of his failure to fulfill his promises to investors in any of these areas.  Following the successive resignations of Greenquist and Nuti, Symbol Tech simply ran out of excuses and could no longer hide the truth from investors.  Wall Street now understood what Defendants had known for years—that Symbol Tech remained plagued by ineffective

controls and a culture of fraud. Investors dumped Symbol Tech stock heavily in response, sending shares down to $9.85 on huge volume, shedding over 15% from the prior day close of $11.64. The next day, shares fell an additional $0.44, also on high volume.

## CLASS ACTION ALLEGATIONS

149.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Symbol Tech securities during the period of April 29, 2003 through August 1, 2005, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are the Defendants, the Company's officers and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity in which any Defendant has a controlling interest or of which the Company is a parent or subsidiary.

150.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company had more than 250 million shares of its common stock outstanding, which were actively traded on the NYSE. While the exact number of Class Members is unknown at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are, at minimum, thousands of members of the Class who traded Company common stock during the Class Period.

151.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

- Whether Defendants acted knowingly or recklessly in making materially misleading statements during the Class Period;

- Whether Defendants acted knowingly or recklessly in publishing revenue and other financial forecasts which lacked any reasonable basis;

- Whether Defendants falsely certified that the Company's internal controls were effective;

- Whether the market prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- Whether the members of the Class have sustained damages as a result of Defendants' misconduct, and, if so, the proper measure of damages.

152.     Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and members of the Class all sustained damages arising out of Defendants' wrongful conduct as alleged herein.

153.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

154.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

155.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made false statements and failed to disclose material facts during the Class Period;

- the misstatements and omissions were material;

- the securities of the Company traded under the Symbol Tech "SBL" on NYSE, an efficient and open market, and the Company was followed by numerous major analysts;

- the misstatements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

- Plaintiffs and members of the Class purchased their Company stock between the time Defendants misstated and concealed material facts and the time the true facts were disclosed, without knowledge thereof.

156. Based upon the foregoing, Lead Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

## CLASS CLAIMS FOR RELIEF

## CLASS COUNT I

### VIOLATION OF § 10(b) OF THE *EXCHANGE ACT* AGAINST SYMBOL TECH AND THE INDIVIDUAL DEFENDANTS

157. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

158. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection

with the purchase and sale of securities, in violation of section 10(b) of the Exchange Act and Rule 10b-5(a)-(c).

159.     Defendants' fraud was intended to, and, throughout the Class Period, did: (a) misrepresent Symbol Tech's financial results, the efficacy of its internal controls, and purported improvements in corporate governance; (b) artificially inflate and maintain the market price of Symbol Tech common stock; (c) enable Nuti to sell Symbol Tech common stock at artificially inflated prices; (d) cause Lead Plaintiff and the other members of the Class to purchase Symbol Tech common stock at artificially inflated prices, and sustain losses as the revelation of Defendants' fraud drove down Symbol Tech's stock price.

160.     This Count is asserted against Defendant Symbol Tech and the Individual Defendants for violations of §10(b) of the *Exchange Act*, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

161.     The representations set forth in ¶¶ 77-148 were false and misleading for the reasons detailed herein following each representation identified.

162.     Defendants intentionally misrepresented the status of the Company's corporate governance, internal controls, and financial prospects to the public, knew facts or had access to information suggesting that their public statements were not accurate, and/or failed to check information which they had a duty to monitor.

163.     Had Lead Plaintiff and the members of the Class known of the materially adverse information concealed by Defendants, they would not have purchased Symbol Tech common stock at all, or not at the inflated prices paid.

164.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the

other members of the Class suffered damages in connection with their purchases or acquisitions of Symbol Tech securities in an amount to be proved at trial.

165.    By virtue of the foregoing, Symbol Tech and the Individual Defendants have violated § 10(b) of the *Exchange Act* and Rule 10b-5 promulgated thereunder.

## CLASS COUNT II

### VIOLATION OF § 20(a) OF THE *EXCHANGE ACT* AGAINST THE INDIVIDUAL DEFENDANTS

166.    Lead Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

167.    This count is asserted against the Individual Defendants for violations of § 20(a) of the *Exchange Act*.

168.    The Individual Defendants, by virtue of their corporate offices, executive management positions and directorships in the Company,  were, at the time of the wrongs alleged herein, controlling persons of Symbol Tech within the meaning of § 20(a) of the 1934 Act.  The Individual Defendants had power and influence over Symbol Tech, and exercised the same to cause Symbol Tech to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information and engage in the fraudulent acts alleged above.

169.    Therefore, the Individual Defendants are liable for Symbol Tech's violations of § 10(b) of the *Exchange Act* and Rule 10b-5 promulgated thereunder as alleged herein, and damages caused thereby.

## PRAYERS FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants with respect to the Class Claims as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23, *Federal Rules of Civil Procedure*, and certifying the Lead Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, Lead Plaintiff demands a

trial by jury for all Class Claims.

Dated:        August 30, 2006

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS, LLP**


By: /s/ _____
Stanley M. Grossman (SG-4544)
Marc I. Gross (MG-8496)
Jeremy A. Lieberman ( JL-1173)
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS, LLP**
Patrick V. Dahlstrom (PD-5328)
Joshua B. Silverman
One North LaSalle Street, Suite 2225
Chicago, IL 60602
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184