UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

IN RE SYMBOL TECHNOLOGIES, INC.                    **MEMORANDUM AND ORDER**
SECURITIES LITIGATION                               05-CV-3923 (DRH) (AKT)

--------------------------------------------------------------X

**APPEARANCES:**

**For the Lead Plaintiff:**
**Pomerantz Haudek Block**
**Grossman & Gross, LLP**
One North LaSalle Street, Suite 2225
Chicago, IL 60602
By: Patrick V. Dahlstrom, Esq.
      Joshua B. Silverman, Esq.

100 Park Avenue, 26th Floor
New York, New York 10017
By: Stanley M. Grossman, Esq.
      Mark I. Gross, Esq.
      Jeremy A. Lieberman, Esq.

**For the Defendants:**
**Dechert LLP**
30 Rockefeller Plaza
New York, New York 10112
By: Andrew J. Levander, Esq.
      William K. Dodds, Esq.
      Kathleen N. Massey, Esq.
      Gina M. Rossettie, Esq.

**HURLEY, Senior District Judge**:

Defendants Symbol Technologies, Inc. ("Symbol"), William R. Nuti ("Nuti"),

Salvatore Iannuzzi ("Iannuzzi"), Mark T. Greenquist ("Greenquist"), Todd Abbott ("Abbott"),

Arthur O'Donnell ("O'Donnell") and James M. Conboy ("Conboy"), (collectively, the

"Defendants"), move pursuant to Federal Rules of Civil Procedure ("FRCP") 9(b) and 12(b)(6)

to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") filed by lead

plaintiff Ironworkers Local # 580 Pension Fund ("Lead Plaintiff") on behalf of a putative class of

plaintiffs (the "Class") who purchased Symbol securities between April 29, 2003 and August 1, 2005 (the "Class Period").  For the reasons stated below, the motion is denied.

## BACKGROUND

The following facts are drawn from the Complaint.  Symbol is a company that manufactures and sells inventory management products such as bar code scanners, radio frequency identification tags and readers, inventory management software, handheld computers and point-of-sale systems.  (Am. Compl. ¶ 2.)  Nuti was Symbol's President and Chief Operating Officer from the beginning of the Class Period until December 30, 2003, at which time he became the Chief Executive Officer, President and Director until August 1, 2005, when he resigned from Symbol.  (*Id.* ¶ 21.)  Greenquist was Symbol's Chief Financial Officer from the beginning of the Class period until July 14, 2005, at which time he resigned from Symbol.  (*Id.* ¶ 22.)  Iannuzzi was the Chairman of the Board of Directors from the beginning of the Class Period until April 7, 2005, as well as a member of the Board's Nominating, Corporate Governance, Compensation, and Audit Committees.  (*Id.* ¶ 23.)  Iannuzzi became Symbol's Senior Vice President and Chief Administrative and Control Officer on April 11, 2005, and, thereafter, on July 14, 2005, he additionally became Symbol's Chief Financial Officer.  (*Id.*)  On August 1, 2005, Iannuzzi assumed the position of interim Chief Executive Officer, which position became permanent in January 2006.  (*Id.*)  In addition, during the Class Period, Abbott was Symbol's Vice President of Worldwide Sales (Am. Compl. ¶ 24), O'Donnell was Senior Vice President, General Manager of Global Services, and Chief Quality Officer (*id.* ¶ 25), and Conboy was Vice President, Controller and Chief Accounting Officer (*id.* ¶ 26).

Before the Class Period, Symbol, its former Chief Executive Officer, and other Symbol executives were investigated by the United States Postal Inspection Service and

Department of Justice "for systematic accounting fraud, including the manipulation of inventory levels to artificially inflate reported revenues." (*Id.* ¶ 3.) "[S]everal former executives pled guilty to criminal charges." (*Id.*) "Thereafter, Symbol [ ] embarked upon a campaign to convince the investing public that the Company had put its financial improprieties behind it." (*Id.* ¶ 4.) "The Company repeatedly stated that new directors and management would make Symbol [ ] a 'leading example of good corporate governance,' and touted the improved 'authenticity and transparency of [its] financial reporting.' " (Am. Compl. ¶ 4.)

> The Complaint alleges that:
>
> [T]he changes were only cosmetic.  Far from being a "model of good corporate governance," Nuti and his team: (a) engaged in various ship-and-store, double-counting, and other schemes to artificially inflate revenues and understate inventories; (b) maintained and implemented internal controls that were wholly deficient and ineffective, notwithstanding their repeated public statements to the contrary; (c) issued false certifications in [Securities and Exchange Commission ("SEC")] filings attesting to the efficacy of such controls and the Company's compliance with Generally Accepted Accounting Principles ("GAAP"); and (d) consistently published revenue guidance that they either knew to be false or which lacked any reasonable basis.

(*Id.* ¶ 5.)  In addition, the Complaint alleges that "[n]umerous confidential informants," who either were employees of Symbol or "held positions in which they would reasonably be expected to know the information they disclosed," "confirmed Defendants' fraud."  (*Id.* ¶ 31.)

Count I of the Complaint sounds in securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, for alleged fraud that was intended to (a) misrepresent Symbol's financial results, efficiency of its internal controls, and improvements in its corporate governance; (b) inflate the price of Symbol's common stock; (c) enable Nuti to sell his shares at inflated prices; and cause Lead Plaintiff and Class members to

purchase stock at inflated prices and subsequently sustain losses when the fraud was revealed.  (*Id.* ¶ 159).

Count II alleges that Nuti, Greenquist, Iannuzzi, Abbott, O'Donnell and Conboy (collectively, the "Individual Defendants"), are liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as "controlling persons of Symbol . . . [who] had power and influence over Symbol . . . , and exercised the same to cause Symbol . . . to engage in the illegal conduct and practices complained of [in the Complaint] by causing the Company to disseminate the false and misleading information and engage in the fraudulent acts alleged."  (*Id.* ¶ 168.)

## DISCUSSION

### I.   *Motion to Dismiss: Legal Standards*

FRCP 8(a) provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Supreme Court has recently clarified the pleading standard applicable in evaluating a motion to dismiss under Rule 12(b)(6).

First, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Court disavowed the well-known statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  550 U.S. at 562. Instead, to survive a motion to dismiss under *Twombly*, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if
doubtful in fact).

*Id.* at 555 (citations and internal quotation marks omitted).

More recently, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court

provided further guidance, setting forth a two-pronged approach for courts deciding a motion to

dismiss. First, a court should "begin by identifying pleadings that, because they are no more

than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

Second, "[w]hen there are well-pleaded factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

at 679. The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference that
> the defendant is liable for the misconduct alleged. The plausibility
> standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are "merely consistent with" a
> defendant's liability, it "stops short of the line between possibility
> and plausibility of 'entitlement to relief.' "

*Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must look to the

allegations on the face of the complaint, but may also consider "[d]ocuments that are attached to

the complaint or incorporated in it by reference." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.

2007). *See also Gillingham v. GEICO Direct*, 2008 WL 189671, at *2 (E.D.N.Y. Jan. 18, 2008)

(noting that a court considering a motion to dismiss "must limit itself to the facts stated in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint") (citation and internal quotation marks omitted).

## II.     *Count I is Adequately Pled*

Section 10(b) of the Exchange Act states that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"In considering a motion to dismiss a 10(b) action, [the court] must accept all factual allegations in the complaint as true and must consider the complaint in its entirety." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Further, "[s]ecurities fraud claims are subjected to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  "In a typical § 10(b) private action[,] a plaintiff must [allege] (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

6

(quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)) (internal quotation marks omitted); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (same).

The Complaint contains allegations of two types of material misrepresentations or omissions, namely, that (1) Defendants issued false and misleading revenue projections (Am. Compl. ¶¶ 118, 123, 130, 138), and (2) Defendants made false and material misrepresentations regarding Symbol's corporate integrity and internal controls (*id.* ¶¶ 77, 79-81, 83, 86, 88-90, 92-93, 95-96, 98-99, 102-03, 107, 112-14, 119-23, 125, 131-32, 135).  Defendants' position is that the Complaint is fatally flawed on the basis of inadequate allegations as to the falsity and materiality of the alleged misrepresentations or omissions, as well as inadequate allegations of scienter and loss causation.  The Court will address the two main types of alleged material misrepresentations and omissions in turn.

**A.**    ***False and Misleading Revenue Projections***

**1.**  ***The Alleged Misrepresentations***

A securities fraud complaint based upon material misrepresentations or omissions "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004), *aff'd*, *Albert Fadem Trust v. Citigroup, Inc.*, 164 F. App'x. 928 (2d Cir. 2006).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C.A. § 78u-4(b)(1); *In re Citigroup*, 330 F. Supp. 2d at 379 (same).

Lead Plaintiff argues that the Complaint contains adequate allegations of four false and misleading revenue projections that identify "when, how, and where appropriate, by whom the false and misleading misrepresentation was made."  (Pl.'s Mem. in Opp'n. at 14.)  The Court agrees.  The specific allegations include: (1) a projection, made in a Symbol press release on March 1, 2005, that revenues for the first quarter of the 2005 fiscal year would be $465 million (Am. Compl. ¶ 118), when the actual revenues were $7.5 million less than the projection (*id.* ¶ 127); (2) Nuti's confirmation of Symbol's 2005 first quarter revenue projection during a conference call conducted on March 7, 2005 (*id.* ¶ 123); (3) a projection, made in a Symbol press release on May 3, 2005, that revenue for the second quarter of 2005 would be $460-470 million (*id.* ¶ 127, 130); and (4) a projection, made in a Symbol press release on June 28, 2005, reducing the previously issued projection for the second quarter from $460-470 million to $440 million (*id.* ¶ 138), when Symbol subsequently issued another press release on July 14, 2005, again reducing the second quarter projection from $440 million to $425-430 million (*id.* ¶ 143).

Since the allegations identify the alleged false and misleading statements, the speakers of the alleged statements,[1] as well as when and where the statements were made, the

---

[1] Lead Plaintiff argues that "Defendants do not dispute that the[] false projections were made in the Company's name and are properly attributed to all Defendants under the 'group pleading' doctrine."  (Pl.'s Mem. in Opp'n. at 14.)  *See Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 494 (S.D.N.Y. 2005) (stating that the group pleading doctrine "permits plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.") (citation and internal quotation marks omitted). However, Defendants argue that the claims against Iannuzzi should be dismissed because Iannuzzi "is not subject to the group pleading doctrine for the period prior to April 11, 2005, when he became an officer of Symbol."  (Defs.' Mem. at 17-18 n. 34.)  The court disagrees with Defendants' contention that the group pleading doctrine does not apply to Iannuzzi in light of the Complaint's allegation at paragraph 23 that Iannuzzi "was the Chairman of the Board of Directors of Symbol . . ., and served on the Board's Nominating, Corporate Governance, Compensation and Audit Committees from the beginning of the Class Period until April 7, 2005" at which time he was named Senior Vice President and Chief Administrative and Control Officer, then later Chief Financial Officer, and ultimately Chief Executive Officer of Symbol for the remainder of the Class Period. *Compare Schnall v. Annuity and Life Re (Holdings) Ltd.*, 2004 WL 231439, at *4-5 (D. Conn. Feb. 4, 2004) (disputing the defendant's "characterization of himself as an 'outsider' " and applying the group pleading doctrine because, *inter alia*, the defendant was the alleged Chairman of the Board of Directors, sat on a Transition Committee that oversaw management, and served on the Executive Committee, Finance and Investment Committee, and Corporate Governance Committee during the Class Period) *with Dresner*, 371 F. Supp. 2d at 494 (rejecting application of

Court must next analyze whether the allegations explain why the statements were false or misleading. Lead Plaintiff argues that the Complaint specifies in paragraphs 124, 133 and 141 why the projections were false and misleading. (Pl.'s Mem. in Opp'n. at 14.) Those paragraphs, in turn, cite to paragraphs 78 and 91 of the Complaint. Paragraph 78 of the Complaint alleges that the representations were materially false and misleading because:

> a) reported revenues, and earnings and cash flow figures derived therefrom, were artificially inflated by the fraudulent schemes set forth in ¶¶ 45-76;
>
> b) reported inventories, and inventory turnover figures derived therefrom, were artificially reduced by the fraudulent scheme set forth in ¶¶ 45-76; and
>
> c) Defendants failed to disclose that the Company's disclosure controls, revenue recognition controls, revenue forecasting controls, and inventory management controls were deficient and ineffective.

Paragraph 91 of the Complaint alleges, in relevant part, that the representations were materially false and misleading because "Defendants misrepresented the revenue recognition policy, by failing to disclose that revenues were actually manipulated by the fraud described above and, at any rate, could not be effectively determined due to the Company's deficient internal controls."

Furthermore, paragraphs 45 through 76 of the Complaint allege details regarding a fraudulent scheme to inflate revenues and underreport inventories, as well as Defendants' ineffective internal controls. The allegations consist of, *inter alia*, information provided by confidential informants that: Symbol's "executive management team set sales and inventory reduction goals which were so 'unattainable' … [they] were 'pie in the sky' " (Am. Compl. ¶ 46); Symbol's "inventory management directors . . . hid inventory from internal auditors" (*id.* ¶ 47);

---

group pleading doctrine where complaint "clump[ed]" defendants together and failed to allege each defendant's corporate involvement such that it could be inferred that the defendant had control over the content of the alleged fraudulent statement).

"to halt entry of raw materials into [Symbol's] inventory tracking system, from which the Company derived its reported inventory levels[,] . . . inventory was not entered immediately into the warehouse's inventory tracking system, but rather delayed" (*id.* ¶ 48); "Symbol [ ] entered into a 'third party logistics agreement' with [Eagle Global Logistics ("EGL")] . . . [whereby] [w]hen raw materials were sent by suppliers to [Symbol's] distribution center, they were moved to the EGL-designated section . . . to avoid properly counting them as [Symbol's] inventory" (*id.* ¶¶ 49-50); "Defendants 'ship-and-store' scheme" was executed at multiple warehouses, in which Symbol "shipped boxes of inventory to several warehouses . . . to give the false appearance that the inventory had been shipped to a customer[, but] [t]he inventory would be returned to the distribution center two weeks after the end of the quarter," and Symbol "shipped empty boxes . . . to give the false appearance that it was shipping full boxes of inventory to customers[, but] [the] boxes were returned after the end of the quarter," both of which were done "to book revenue for inventory [Symbol] had not actually sold or shipped to customers" (*id.* ¶ 51); "Defendants inflated their revenues and reduced inventories by 'stuffing' excess products upon its largest distributor, Scansource, then allowing Scansource unusually liberal return terms for such deliveries" (*id.*¶ 52); Symbol "booked revenue for inventory shipped to a distributor when no end customer existed[ ] . . . [even though] the Company's published revenue recognition policies stated that inventory was only booked when a distributor sold Symbol . . . products to an end customer" (*id.* ¶ 60); Symbol "lacked effective internal controls to determine when a channel had 'sold out' " (*id.* ¶ 62); Symbol "lacked the ability to determine real time sales information" (*id.* ¶ 63); "many forecasted sales were double-counted as **both** channel sales and direct sales, artificially boosting revenue forecasts" (*id.* ¶ 64); "[t]he forecasting methodology, . . . designed and implemented by Defendant Abbott, was based on tiers of 'commitments' " to the numbers of sales, and "executives pressed the sales

teams to commit to impossibly high numbers" (*id.* ¶¶ 66-67);  and "[a]lthough the Company conducted physical inventory counts to verify the numbers provided by its inventory tracking system, according to [a confidential informant], a material clerk who participated in the inventory counts, the numbers rarely matched up" (*id.* ¶ 76).

Here, the Complaint sufficiently alleges facts to explain why the alleged revenue projection statements were misleading.  *See Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 766-67 (S.D.N.Y. 2006) (finding allegations that, *inter alia*, the "Company failed to adjust its aggressively positive earnings announcements even in light of the sharp downturn in business, which was well known to the defendants"; issued statements about "expected growth [that] were lacking in any basis and deceived investors"; and "failed to disclose that the Company's business was experiencing a material downturn in advertising revenue" to be sufficient explanations why the statements were misleading); *Novak*, 216 F.3d at 312-13 (finding that specific factual allegations regarding the defendants' writing off inventory was sufficient to support a claim "that the defendants' positive public statements concerning inventory growth were false and misleading").

### 2. *Materiality*

Both Section 10(b) and Rule 10b-5 require that a complaint identify materially misleading statements made by the Defendants.  "At the pleading stage, a plaintiff satisfies the materiality requirement of [Section 10(b) and] Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  "Materiality is a mixed question of law and fact." *Id.* at 162.  The Second Circuit has "held that, when  presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance.' "
*Id.* (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

    Here, the Complaint's allegations satisfy the materiality requirement because there
is a "substantial likelihood that [ ] disclosure of the omitted fact" that the projections were based
upon inflated sales calculations and artificially reduced inventory levels, "would have been viewed
by the reasonable investor as having significantly altered the total mix of information made
available."  *Id.* (citation and internal quotation marks omitted); *see also In re MCI Worldcom, Inc.
Secs. Litig.*, 93 F. Supp. 2d 276, 282 (E.D.N.Y. 2000) ("The omitted information- the fact that final
merger negotiations . . . were almost completed when defendant issued its denial of any official
company intention- might have given a reasonable investor pause in deciding whether to sell or
hold their . . . shares.") (citation and internal quotation marks omitted).

    In addition, the importance of the alleged misstatements and omissions is bolstered
by the Complaint's allegations that, in the wake of Symbol's "long history of fraud," including
"systematic accounting fraud, . . . [and] manipulation of inventory levels to artificially inflate
reported revenues," (Am. Compl. ¶ 3), and during the same Class Period in which Symbol issued
the alleged fraudulent revenue projections, Symbol was announcing its: "bolt-on initiatives" and
improved "close processes, forecast processes and overall business controls" (Am. Compl. ¶ 93);
"demonstrate[d] continued improvement in the Company's internal control and financial reporting
processes" (*id.* ¶ 86); "becoming a leading example of good corporate governance" (*id.* ¶ 135);
and its "strong and continuing commitment to being a model of good corporate governance with
best-in-class ethics and compliance" (*id.*).  Thus, viewing the Complaint's allegations as a whole,
and assuming the allegations to be true, it cannot be said that the alleged false and misleading
revenue projections, which were issued in the wake of Symbol's alleged prior criminal charges for

similar misconduct, and which were contradictory to Symbol's alleged statements touting its improved corporate governance and processes, could have been "unimportant to a reasonable investor" and, therefore, immaterial. *Goldman*, 754 F.2d at 1067.[2]

The Court notes that "[w]here forecasts are made, . . . liability may be premised on false and misleading projections, as such forecasts may be regarded as 'facts' within the meaning of Rule 10b-5." *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 602 (N.D. Cal. 1991); *In re APAC Teleservice, Inc. v. Secs. Litig.*, 1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999) ("Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year.") (citation and internal quotation marks omitted); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 252 (S.D.N.Y. 1993) ("A forecast is actionable where . . . other misrepresentations and omissions underlie the forecast in question."); *see also United States v. Grayson*, 166 F.2d 863, 866 (2d Cir. 1948) (stating that "to promise what one does not mean to perform, or to declare an opinion as to future events which one does not hold, is a fraud"); *United States v. Herr*, 338 F.2d 607, 610 (7th Cir. 1964) ("The law has been long established that a scheme to defraud may consist of suggestions and promises as to the future, when not made in good faith but with deceptive intent."). "Because an 'earnings forecast is a shorthand description of the general financial well-being of a company; it creates an influential impression of the condition of

---

[2] The Court notes that even though Defendants' statements that it was "becoming a leading example of good corporate governance," had a "strong and continuing commitment to being a model of good corporate governance with best-in-class-ethics and compliance," and the like, may constitute mere inactionable puffery, they are nonetheless relevant for purposes of analyzing whether the alleged false and misleading revenue projections were material in the entire context in which they were issued. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (stating that the "materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available") (citation and internal quotation marks omitted); *Ganino*, 228 F.3d at 162 (stating that "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case").

the company in the eyes of the investing public.' "  *Alfus*, 764 F. Supp. at 603 (quoting *Marx v. Computer Scis. Corp.*, 507 F.2d 485, 492 (9th Cir. 1974)).  "Such forecasts create a duty to disclose materially misleading information, or remedy misleading omissions."  *Id.* (citation omitted).

Moreover, contrary to Defendants' contention, the alleged revenue projections do not constitute inactionable puffery because the projections provided specific ranges for future revenues.  *Compare In re Cytyc Corp.*, 2005 WL 3801468, at *23 (D. Mass. March 2, 2005) (rejecting defendants' argument that revenue projections were mere puffery where the projections provided specific quantification of future revenues), *with Suna v. Bailey Corp.*, 107 F.3d 64, 70 (1st Cir. 1997) (finding projections that "[did] not project specific numbers that the company [would] certainly attain" to be inactionable).  Accordingly, the Court finds that the Complaint adequately alleges the materiality of the misleading statements.

### 3.  *Falsity*

Defendants, citing to FRCP 9(b), and the PSLRA, 15 U.S.C. § 78u-4(b)(1), argue that in order "[t]o plead falsity, . . . plaintiff must allege why each specific misrepresentation was knowingly false when made."  (Defs.' Mem. at 9.)  However, Defendants incorrectly describe the pleading requirements of FRCP 9(b) and the PSLRA, and confuse falsity with scienter.

FRCP 9(b) provides that, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  As evidenced by FRCP 9(b), knowledge pertains to an aspect of the speaker's state of mind, i.e., scienter.  *See also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (stating that malice, intent and knowledge are "condition[s] of mind of a person").  The PSLRA provides that "with regard to a misstatement or omission of material fact, the complaint must 'specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *In re Citigroup*, 330 F. Supp. 2d at 374-75 (quoting 15 U.S.C.A. § 78u–4(b)).  The PSLRA further "requires that a securities fraud complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* at 374 (quoting 15 U.S.C.A. § 78u–4(b)).  Thus, contrary to Defendants' contention, neither FRCP 9(b) nor the PSLRA require allegations that the defendants in fact knew the alleged statements were false when made in order to establish *falsity*, but, rather, require allegations as to the circumstances or reasons why the statements were fraudulent or misleading, and separate allegations as to the speaker's state of mind.  Having concluded that the Complaint's allegations of fraudulent statements are sufficient, the Court will next turn to the Complaint's allegations regarding scienter.

### 4.  *Scienter*

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege[,] is 'an intent to deceive, manipulate or defraud.' " *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168).  Allegations of scienter must satisfy the heightened pleading requirements of FRCP 9(b) and the PSLRA.  *See In re Citigroup*, 330 F. Supp. 2d at 379.  FRCP 9(b) requires allegations "that give rise to a strong inference of fraudulent intent.  The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Novak,* 216 F.3d at 308) (internal quotation marks omitted); *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (same).  "For an inference of scienter to be strong, 'a reasonable

person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.' " *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). The court must consider "plausible opposing inferences." *Id.* (citation and internal quotation marks omitted). As noted above, the PSLRA requires allegations that "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 315 (internal quotation marks omitted); *In re Citigroup*, 330 F. Supp. 2d at 380. Because the Second Circuit has determined that the PSLRA has not changed the pleading requirements for scienter in this circuit, "both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness, survive the PSLRA." *Kalnit*, 264 F.3d at 138-39 (citing *Ganino*, 228 F.3d at 169-70).

The Second Circuit has identified "[a]t least four circumstances [that] may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.' " *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 311); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (same); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109–10 (2d Cir. 2009) (same).

Here, Lead Plaintiff does not argue that scienter is demonstrated through allegations of motive and opportunity, but does argue that the Complaint alleges a strong inference of scienter through allegations constituting strong circumstantial evidence of conscious misbehavior or

recklessness.  (Pl.'s Mem. in Opp'n. at 15.)  However, "[w]here motive is not apparent, . . . the strength of the circumstantial allegations [indicating conscious behavior by the defendant] must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (citation and internal quotation marks omitted).

> To survive dismissal under the "conscious misbehavior" theory, [the complaint must allege reckless conduct] which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

*Id.* (quoting *Honeyman v. Hoyt* (*In re Carter-Wallace, Inc. Secs. Litig.*), 220 F.3d 36, 39 (2d Cir. 2000)).

> [S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

*Id.* (quoting *Novak*, 216 F.3d at 308).

Lead Plaintiff argues that the Complaint contains allegations that "Defendants concealed from investors two critical facts which they knew seriously undermined the validity of their revenue projections."  (Pl.'s Mem. in Opp'n. at 15-16.)  First, Lead Plaintiff alleges that Defendants' revenue projections consisted of "aggregated sales targets" instead of an "accurate forecast."  (*Id.* at 16.)  Second, Lead Plaintiff argues that "Defendants knew that the forecasting processes and controls were not 'improve[d]' and 'effective' as [Symbol] had publicly represented, but were 'poor' and ineffective."  (*Id.*)

In response, Defendants argue that "there is nothing inherently fraudulent about a system that requires sales representatives to commit to specific figures"; "plaintiff fails to allege

that it was the system, rather than any other factor, that resulted in inaccurate projections for the first two quarters of 2005"; "plaintiff never ascribes to any defendant detailed knowledge of a flaw in any specific control, methodology or figure that led to any of the revisions that form the basis of the Complaint"; and "even if plaintiff had alleged that Symbol's forecasting system had an impact on the projections, plaintiff fails to allege that any of the defendants knew they were false when made." (Defs.' Reply at 7-8.)  However, as discussed below, Defendants are mistaken.

Contrary to Defendants' argument, the Complaint alleges more than merely that there was a system "requir[ing] sales representatives to commit to specific figures" but, rather, alleges that the system formed the basis for the misleading sales projections at issue.  Specifically, the Complaint alleges that: "[t]he forecasting methodology . . . was based on tiers of 'commitments,' each of which was structured to enhance sales figures rather than derive actual results" (Am. Compl. ¶ 66); "executives pressed the sales teams to commit to impossibly high numbers" (*id*. ¶ 67); "regional 'commit' numbers . . . [were] rolled into a composite number, which became the basis for the erratic forecasts that Defendants provided to the public" (*id.* ¶ 69); Symbol "derived its revenue guidance directly from [the] inherently unreliable 'commit' system" (*id.* ¶ 74); and "projections were forecasted through the sales department, consolidated by management, and 'rolled [out]. . . to the public' " (*id.*).  Additionally, it is alleged that "inventory management directors . . . hid inventory from internal auditors" (*id.* ¶ 47), and "Defendants inflated their revenues and reduced inventories by 'stuffing' excess products upon its largest distributor" (*id.* ¶ 52).

Although Defendants argue that the Complaint does not "allege that it was the [forecasting] system, rather than any other factor, that resulted in inaccurate projections for the first two quarters of 2005," the Court notes that Defendants do not identify any such "other factors"

that would provide a more compelling, competing inference that the inaccurate projections were the result of something other than the Defendants' alleged misconduct.[3]  Nonetheless, the Court concludes that the Complaint's allegations provide a strong inference of scienter that is at least as compelling as any possible opposing inference of nonculpable intent.  *See Tellabs, Inc.*, 551 U.S. at 324 ("The inference that the defendant acted with scienter need not be irrefutable . . . A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

Further, in the Court's view, the Complaint satisfies the pleading requirement for scienter for each of the Individual Defendants.  The Complaint alleges that Nuti: was presented with the inflated regional sales commitment numbers in conference calls (Am. Compl. ¶ 69); certified to the SEC that he had evaluated the Company's internal controls and determined them to be effective (*id.* ¶ 122); certified that the information contained in Symbol's quarterly reports fairly represented the financial conditions and results of Symbol (*id. ¶* 88); certified to the SEC that he was responsible for "establishing and maintaining disclosure controls and procedures" (*id.*); certified that the financial information contained in the quarterly reports filed with the SEC complied with GAAP (*id.*); "confirmed Symbol['s] . . . revenue and earning guidance for the first quarter of 2005" (*id.* ¶ 123); and admitted that prior SEC certifications were false and that "as of June 30, 2004, Symbol's disclosure controls and procedures were ineffective" (Am. Compl. ¶ 137). The Complaint alleges that Greenquist: certified to the SEC that he had evaluated the Company's internal controls and determined them to be effective (*id.* ¶ 122); certified that the information

---

[3] To the extent Defendants argue that Symbol's disclosure and remedying of the "prior management's misconduct . . . to avoid recurrence of such problems" provides evidence of a nonculpable explanation for the new management's conduct, the Court is not persuaded that such disclosure and remedying of prior misconduct establishes "a pattern of nonculpable conduct" so as to provide a more compelling inference that Defendants' subsequent revenue projections were the result of something other than the alleged misconduct.  (Defs.' Supp. Mem. at 3-4.)  The Court notes that, contrary to Defendants' argument, the admitted prior misconduct establishes a pattern of culpable conduct on the part of Symbol and its management which supports a strong inference of scienter.

contained in Symbol's quarterly reports fairly represented the financial conditions and results of Symbol (*id. ¶* 88); certified that the financial statements contained in the quarterly reports filed with the SEC complied with GAAP (*id.*); and certified to the SEC that he was responsible for "establishing and maintaining disclosure controls and procedures" (*id.*).  The Complaint alleges that Abbott designed and implemented the forecasting methodology that was based upon "impossibly high" sales commitment numbers (*id. ¶¶* 66-67), and was presented with the inflated regional sales commitment numbers in conference calls (Am. Compl. ¶ 69).  The Complaint alleges that O'Donnell set unattainable inventory reduction goals (*id. ¶* 46), and, as Symbol's Senior Vice President, General Manager of Global Services, and Chief Quality Officer during the Class Period, was part of the "management [who] had evaluated the Company's internal controls and determined them to be effective" (*id. ¶¶* 25, 120, 122).  The Complaint alleges that Iannuzzi admitted that Symbol had "Draconian accounting practices," which, according to Iannuzzi, explained why Symbol was having "a difficult time giving . . . a forecast that works."  (*Id.* ¶ 144.)  The Complaint alleges that Conboy, as Symbol's Vice President, Controller and Chief Accounting Officer, was part of the management who had evaluated Symbol's internal controls and "determined them to be effective" (*id. ¶¶* 26, 120, 122), and that Conboy certified that the financial statements contained in the quarterly reports filed with the SEC complied with GAAP (*id. ¶* 88).  *See also In re Atlas Air Worldwide Holdings, Inc. Secs. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.").

Additionally, the Complaint contains allegations pertaining to each of the Individual Defendants, as Symbol's management, which support a strong inference of scienter.

Namely, the Complaint alleges that the Individual Defendants had access to and reviewed the inflated sales projections because the inflated "projections were forecasted through the sales department, consolidated by management, and 'rolled [out] . . . to the public.' " (*Id.* ¶ 74). *Cf. Teamsters Local 445*, 531 F.3d at 193 (finding inadequate allegations of scienter where the complaint failed to allege that the individual defendants "saw or had access to specific reports or statements that indicated malfeasance, nor directly supervised or knew of any identified individual(s) who were engaged in specific wrongdoing, and therefore failed to link that [reckless] behavior to any culpable individuals.") (internal quotation marks and citation omitted).  It is also alleged that:

> On June 27, 2005, in reaction to criticism it received from the SEC, Symbol . . . amended its 10-K annual report for 2003, as well as its 10-Q quarterly reports for the first three quarters of 2004.  In these amended reports, Defendants admitted that their prior certifications under Sections 302, 404 and 906 of the Sarbanes-Oxley Act of 2002 were false, and that Symbol['s] . . . internal financial controls were ineffective for those periods. The second quarter 2004 10-Q was amended to state:
>
> During 2003 and 2002, we learned of certain deficiencies in our internal control that existed in 2002 and prior years.  Additionally, as of December 31, 2003, we identified a material weakness related to the manner in which we process transactions to record our revenue as our current processes and procedures to record revenue transactions requires substantial manual intervention and are reliant on several departments in our sales and finance organization. **We believe that as of June 30, 2004, this material weakness and certain deficiencies still exist.**
>
> As required by Rule 13a-15(b) of the Exchange Act, Symbol has carried out an evaluation, under the supervision and with the participation of its management, including its Chief Executive Officer and its Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures.  The evaluation examined those disclosure controls and procedures as of June 30, 2004, the end of the period covered by this report.
>
> **The evaluation revealed that the material weakness and deficiencies described above are not yet fully remediated which we believe may**

>*constitute deficiencies in our disclosure controls.  Based upon the*
>*evaluation, Symbol's management, including its Chief Executive*
>*Officer and its Chief Financial Officer, concluded that, as of June 30,*
>*2004, Symbol's disclosure controls and procedures were ineffective.*
>(emphasis added).

(Am. Compl. ¶ 137.)  Thus, it is alleged that the Individual Defendants knew, among other things, that its "procedures [for] record[ing] revenue transactions" were "weak[] and deficien[t]" and that prior revenue disclosures were false.  *See In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (finding that prior sales data can be relied upon "to confirm what a defendant should have known" about future sale trends).

Viewing the Complaint in its entirety, and accepting the allegations as true, the Court finds that the Complaint adequately alleges that the Individual Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311.[4]

**5.  *Loss Causation***

In order "[t]o sustain a private cause of action for securities fraud under section 10(b) and Rule 10b-5, a plaintiff must adequately plead . . . loss causation, 'the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.' " *GE Investors v. Gen. Elec. Co.*, 447 F. App'x. 229, 231 (2d Cir. 2011) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).  This requires allegations that (1) "the loss was foreseeable-

---

[4] Although "the PSLRA safe harbor immunizes 'forward-looking' statements . . . unless they are made with actual knowledge that they are misleading or false," the Court finds that the safe harbor does not apply in this case, as discussed *infra*, and therefore its more stringent pleading requirement for scienter for forward-looking statements is inapplicable. *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *15 (E.D.N.Y. Sept. 19, 2005). Nonetheless, even if the Court applies the safe harbor's scienter requirement that the forward-looking revenue projections are protected unless they were issued with actual knowledge that they were false or misleading, the Court finds that the Complaint satisfies that scienter requirement through allegations that give rise to a strong inference that defendants "(1) did not genuinely believe [their revenue projections], (2) actually knew that they had no reasonable basis for making the [projections], or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the [projections]." *Slayton*, 604 F.3d at 775.

*i.e.*, 'the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions,' " *Id.* (quoting *Lentell*, 396 F.3d at 173); and (2) "the fraudulent statement or omission was the cause of the actual loss that they suffered- *i.e.*, that when the risk concealed by the misrepresentations and omissions was disclosed, it negatively affected the value of the security." *Id.*

Lead Plaintiff argues that the Complaint alleges foreseeability through its allegations that Symbol "failed to meet its revenue forecasts" because its forecasting processes were "defective." (Pl.s' Mem. in Opp'n. at 24.) The Court agrees. The Complaint adequately alleges that the risk that caused the losses, i.e., lower actual revenues resulting from defective forecasting processes, was among those risks concealed by the misrepresentations and omissions. (Am. Compl. ¶¶ 78, 91.)

Lead Plaintiff further argues that the Complaint alleges three instances when "the stock dropped substantially . . . as a direct result" of the materialization of the concealed risk. (Pl.'s Mem. in Opp'n. at 24.) Specifically, Lead Plaintiff points to the Complaint's allegations that (1) after Symbol issued a press release on May 3, 2005 that reported "$7.5 million less [revenues] than the Company's previously announced guidance[,] . . . investors rapidly dumped Symbol . . . shares" (Am. Compl. ¶¶ 127, 128); (2) after Symbol issued a press release on June 28, 2005, "lowering its earnings guidance[,] . . . Symbol['s] . . . stock fell from $10.47 to $9.72 on unusually heavy trading volume" and a Bear Stearns' analyst "admitted that his 'Outperform' recommendation on Symbol . . . 'had been the wrong call' " (Am. Compl. ¶¶ 138, 139); and (3) "[i]nvestors also dumped Symbol . . . shares as they came to realize the Company's lack of effective internal controls and fraud. On July 15, 2005[,] Symbol['s] . . . stock price sank from $12.46 to $11.11 per share on unusually heavy trading volume" (Am. Compl. ¶ 146).

While the Court agrees with Defendants that the May 3, 2005 press release does not reveal anything about Symbol's forecasting system so as to properly allege a materialization of the concealed risk, the Court finds that the Complaint adequately alleges a decline in the value of Symbol's stock on June 28, 2005 and July 15, 2005 when the truth regarding the fraudulent revenue projections was revealed.  The Complaint alleges that "[i]n a conference call with financial analysts on June 28, 2005, Nuti blamed the [June 28, 2005] downward revision [in its revenue forecast] on ***poor sales forecasting*** . . . ."  (Am. Compl. ¶ 140.)  Thus, the Complaint adequately alleges loss causation by claiming that the investors' "sharp[ ]" reactions and the fall in stock occurred the day after Symbol "slash[ed]" its revenue guidance and announced that its revision was the result of, *inter alia*, "poor sales forecasting." (*Id.* ¶¶ 138, 139, 140.)  Similarly, it is alleged that after Symbol's July 14, 2005 press release in which Symbol "downwardly-revised" its second quarter revenue guidance, Iannuzzi stated in a conference call that same day:

> What's also happened here is that as a result of what happened, the massive fraud, the restatement of a number of years of earnings and financial statements, ***a number of very Draconian accounting practices, procedures, were put into place, and a number of those processes—and they were put in place for the right reasons – they were put in place for fear of – trying to prevent what occurred from recurring, and from a theoretical standpoint, absolutely the right decisions.  What we're seeing is that some of those practices, some of those procedures, are extremely cumbersome to deal with in a practical, real world, real time basis.***  And this is no excuse, it's really a statement of fact – it is one of the principal reasons that we're having such a difficult time giving you a forecast that works.

(Am. Compl. ¶ 144.)  The Complaint alleges that on July 15, 2005, analysts downgraded their ratings of Symbol, and a JP Morgan analyst stated, "We are concerned by four things: 1) sales forecasting is weak; 2) restructuring and management changes introduce execution risk; 3) sales growth has stalled owing to loss of market share; and 4) the move to sell-in revenue recognition could obscure change in inventory levels."  (*Id.* ¶ 145.)

Further, it is alleged that on July 15, 2005, Symbol's "stock price sank from $12.46 to $11.11 per share on unusually heavy trading volume."  (*Id.* ¶ 146.)  Thus, the Complaint alleges that the value of Symbol's stock dropped after the revelation of Symbol's weak forecasting processes.  *See Lentell*, 396 F.3d at 175 (stating that a plaintiff must allege that "any corrective disclosure regarding the falsity of [the] recommendations[ was] the cause of the *decline* in stock value that plaintiffs claim as their loss"); *cf. GE Investors*, 447 F. App'x. at 232 (finding that the plaintiffs did not adequately plead loss causation because "although a reduced share price was within the 'zone of risk' of the allegedly concealed information revealed in the [ ] announcement[,] . . . no loss occurred upon the revelation of this information").

        The Court is not persuaded by Defendants' argument that the risk related to Symbol's forecasting system had already been revealed to the public when Symbol admitted that it: "was subject to ongoing governmental investigations"; had restated prior financial statements; was "in the process of implementing various initiatives to address material weaknesses and deficiencies in its internal controls"; and "could provide only reasonable assurance of achieving the desired objectives."  (Defs.' Mem. at 10-12; Defs.' Reply at 10.)  None of those revelations can be said to have revealed the risk that the revenue projections were based upon a defective sales forecasting system.  Moreover, the aforementioned revelations were arguably nullified by Symbol's public announcements regarding its: "bolt-on initiatives" and improved "close processes, forecast processes and overall business controls" (Am. Compl. ¶ 93); "demonstrate[d] continued improvement in the Company's internal control and financial reporting processes" (*id.* ¶ 86); "becoming a leading example of good corporate governance" (*id.* ¶ 135); and "strong and

25

continuing commitment to being a model of good corporate governance with best-in-class-ethics and compliance" (*id.*). In any event, Lead Plaintiff's pleading burden is to allege that "*any* corrective disclosure regarding the falsity of [the] recommendations [was] the cause of the decline in stock value." *Lentell*, 396 F.3d at 175 (emphasis added). As discussed above, this pleading burden has been satisfied.

### 6. *PSLRA Safe Harbor and "Bespeaks Caution" Doctrine*

The parties dispute whether the judicial "bespeaks caution" doctrine and the PSLRA's safe harbor provision protect Defendants' revenue projections. "Under the 'bespeaks caution' doctrine, a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *In re MF Global Holdings Ltd. Secs. Litig.*, 2013 WL 5996426, at *16 (S.D.N.Y. Nov. 12, 2013) (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)) (internal quotation marks omitted). "The PSLRA contains a safe harbor provision that is 'closely related' to the bespeaks caution doctrine." *Id.*, at *17 (citation omitted). The safe harbor provides that "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 772. "But the cautionary language itself also must not be misleading; 'cautionary language that is misleading in light of historical fact cannot be meaningful' under the statute." *In re MF Global Holdings*, 2013 WL 5996426, at * 17 (quoting *Slayton*, 604 F.3d at 770).

Notably, the safe harbor provision contains an exclusion which provides, in pertinent part:

> Except to the extent otherwise specifically provided by rule, regulation, or order of the Commission, this section shall not apply to a forward-looking statement--
>
> (1) that is made with respect to the business or operations of the issuer, if the issuer--
>
> (A) during the 3-year period preceding the date on which the statement was first made--
>
> (i) was convicted of any felony or misdemeanor described in clauses (i) through (iv) of section 78o(b)(4)(B) of this title; or
>
> (ii) has been made the subject of a judicial or administrative decree or order arising out of a governmental action that--
>
> (I) prohibits future violations of the antifraud provisions of the securities laws;
>
> (II) requires that the issuer cease and desist from violating the antifraud provisions of the securities laws; or
>
> (III) determines that the issuer violated the antifraud provisions of the securities laws.

15 U.S.C. § 78u-5(b).

Lead Plaintiff argues that the exclusion applies in this case, and Symbol is denied safe harbor protection, because Symbol "entered into consent decrees enjoining future violations of the antifraud provisions of securities laws."  (Pl.'s Mem. in Opp'n. at 20.)  Defendants, on the other hand, assert that safe harbor protection is denied only where a defendant is subject to judicial or administrative decrees or orders, and that the Defendants' consent judgments do not fall within that exclusion.  (Defs.' Reply at 9 n. 10.)

Notably, in arguing that the consent decrees entered into by Symbol prevent Symbol from enjoying safe harbor protection, Lead Plaintiff argues that "the consent decree[s]

[were] entered as . . . final consent judgment[s]."  (Pl.'s Mem. in Opp'n. at 20.)  Neither party has

provided the Court with any case law in direct support of their respective positions, nor is the Court

aware of any.   Nonetheless, the Court is not persuaded by Defendants' argument that an issuer

which is subject to a "judicial or administrative decree or order . . . [that] prohibits future violations

of the antifraud provisions of the securities laws" is denied safe harbor protection, while and an

issuer, such as Symbol, which voluntarily enters into a consent decree that is subsequently entered

by the court as a final consent judgment, and, which promised not to violate the antifraud

provisions of the securities laws, may nonetheless take advantage of the protections of the safe

harbor.   Defendants ask the Court to draw a distinction without a difference.  *See also* 1 Publicly

Traded Corporations: Governance & Reg. § 7:16 n. 8 (2013) ("[C]onsent decrees (or cease and

desist orders) may impose [the] automatic three-year withdrawal of the safe harbor's protection.");

H.R. Conf. Rep. 104-369, at 46 (1995) (stating that "the safe harbor does not extend to an issuer

who . . . during the three year period preceding the date on which the statement was first made, . .

. is the subject of a decree or order involving a violation of the securities laws").

    Nevertheless, separate bases exist for finding that the PLSRA's safe harbor

provision, as well as the bespeaks caution doctrine, do not protect the revenue projections at issue.

Here, the revenue projections are actionable because their cautionary language was merely

boilerplate.  Additionally, the cautionary language "did not specifically reveal the particular risks

allegedly known to" Symbol, i.e., that the revenue projections were premised upon artificially

inflated sales projections and artificially reduced inventory calculations.  *In re MF Global*

*Holdings*, 2013 WL 5996426, at *28; *Slayton*, 604 F.3d at 768 (stating that "meaningful cautionary

statements [must] identify[] important factors that could cause actual results to differ materially

from those in the forward-looking statement") (citation and internal quotation marks omitted);

*Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."). "By superficially warning of possible risks while failing to disclose critical facts, [Symbol] was akin 'to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.' " *In re MF Global Holdings*, 2013 WL 5996426, at *31 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). Accordingly, the revenue projections are not protected by the safe harbor provision or the bespeaks caution doctrine.

### B.    *False and Misleading Representations Regarding Symbol's Corporate Integrity and Internal Controls*

Since the Court has determined that Count I of the Complaint will not be dismissed because the Complaint adequately alleges a cause of action under Section 10(b) of the Exchange Act and Rule 10b-5 for the alleged issuance of false and misleading revenue projections, the Court need not address the additional ground under Count I that Defendants allegedly issued false and misleading representations regarding Symbol's corporate integrity and internal controls.

## III.   *Standing*

Defendants incorrectly argue that Lead Plaintiff lacks standing to sue on certain alleged misrepresentations made either both before or after Lead Plaintiff purchased stock in Symbol. (Defs.' Mem. at 31-32.)

> Under the PSLRA, the Court appoints appropriate plaintiffs, presumptively those seeking the responsibility who have the largest losses, 15 U.S.C. § 78u–4(a)(3)(B)(iii), to undertake the selection of lead counsel and the management of the direction of the litigation. But nothing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case.

> Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management group) or the premature breakdown of the action into an unmanageable number of separate cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders. Nor does anything in the PSLRA prevent the Lead Plaintiffs from constructing a consolidated complaint that brings claims on behalf of a number of named parties besides the Lead Plaintiffs themselves.

*In re Global Crossing, Ltd. Secs. Litig.*, 313 F. Supp. 2d 189, 204-05 (S.D.N.Y. 2003).

This Court appointed Iron Workers Local #580 Pension Fund as lead plaintiff by its Memorandum of Decision and Order dated April 26, 2006.  Accordingly, because Lead Plaintiff is not required to have standing to assert all claims on behalf of the potential class members, and, as Lead Plaintiff argues, the Complaint addresses only the alleged fraud that occurred during the Class Period (Pl.'s Mem. in Opp'n. at 33), Defendants' standing argument is without merit.

## IV.     *Count II is Adequately Pled*

Defendants argue that Count II, which seeks to hold the Individual Defendants secondarily liable under Section 20(a), should be dismissed because the Complaint fails to state a claim pursuant to Section 10(b) and Rule 10b-5.  (Defs.' Mem. at 33.)  Additionally, Defendants argue that the Complaint "fails to allege culpable participation by any of the individual defendants."  (*Id.*)  However, as discussed above, the Court finds that the Complaint adequately states a claim pursuant to Section 10(b) and Rule 10b-5, as well as adequately alleges culpable participation by the Individual Defendants.  Therefore, Defendants' argument is unavailing.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss the Complaint is

DENIED.

**SO ORDERED**

Dated: Central Islip, NY
        December 5, 2013

                            _____/s/_____

                            Denis R. Hurley
                            United States District Judge

31