UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

IN RE SYMBOL TECHNOLOGIES, INC.        **MEMORANDUM AND ORDER**
SECURITIES LITIGATION          05-CV-3923 (DRH) (AKT)

------------------------------------------------------------------X

**APPEARANCES:**

**For the Lead Plaintiff:**
**Pomerantz Haudek Block**
**Grossman & Gross, LLP**
One North LaSalle Street, Suite 2225
Chicago, IL 60602
By:  Patrick V. Dahlstrom, Esq.
    Joshua B. Silverman, Esq.

100 Park Avenue, 26th Floor
New York, New York 10017
By: Stanley M. Grossman, Esq.
   Mark I. Gross, Esq.
   Jeremy A. Lieberman, Esq.

**For the Defendants:**
**Dechert LLP**
30 Rockefeller Plaza
New York, New  York 10112
By: Andrew J. Levander, Esq.
   William K. Dodds, Esq.
   Kathleen N. Massey, Esq.
   Gina M. Rossettie, Esq.

**HURLEY, Senior District Judge**:

Lead Plaintiff Iron Workers Local #580 Pension Fund ("Lead Plaintiff" or "Plaintiff")

commenced this action against Defendants Symbol Technologies, Inc. ("Symbol"), William R.

Nuti ("Nuti"), Salvatore Iannuzzi ("Iannuzzi"), Mark T. Greenquist ("Greenquist"), Todd Abbott

("Abbott"), Arthur O'Donnell ("O'Donnell") and James M. Conboy ("Conboy"), (collectively,

the "Defendants") for violations of Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5 ("Rule

10b-5"), 17 C.F.R. § 240.10b-5, as well as Section 20(a) of the Exchange Act, 15 U.S.C. §

78t(a).  Lead Plaintiff now moves for class certification pursuant to Federal Rule of Civil

Procedure ("Rule") 23.  For the reasons stated below, the motion is granted.

## BACKGROUND

The Court assumes familiarity with the facts as set forth in its December 5, 2013

Order on Defendants' Motion to Dismiss ("Order").  (Docket Entry ("DE") 80.)

## DISCUSSION

**I.**      *Motion for Class Certification: Legal Standard*

Lead Plaintiff seeks to certify a class consisting of:

> All purchasers of Symbol Technologies Inc.
> ("Symbol") common stock during the period from
> April 29, 2003 through and including August 1,
> 2005 (the "Class Period") ***and were damaged
> thereby***, excluding Defendants, officers and
> directors of Symbol[,] members of their immediate
> families and their legal representatives, heirs,
> successors or assigns, and any entity in which
> Defendants have or had a controlling interest.

(Pl.s' Mem. in Supp. at 1; Pl.s' Reply at 15.)

Class action certification is governed by Federal Rule of Civil Procedure 23.  In seeking

class certification, a plaintiff must first demonstrate that the prerequisites contained in Rule 23(a)

have been satisfied. Fed. R. Civ. P. 23(a)(1)-(4); *see also Teamsters Local 445 Freight Div.*

*Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 201–02 (2d Cir. 2008) ("In determining

whether class certification is appropriate, a district court must first ascertain whether the claims

meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy.")

Specifically, Rule 23(a) states that:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all members only if: (1) the
> class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

A plaintiff must also show that the putative class falls within one of the categories set forth in Rule 23(b). Fed. R. Civ. P. 23(b)(1)-(3); *Brown v. Kelly,* 609 F.3d 467, 476 (2d Cir. 2010) ("Not only must each of the requirements set forth in Rule 23(a) be met, but certification of the class must also be deemed appropriate under one of the three subdivisions of Rule 23(b)."). Plaintiff in this case claims to satisfy Rule 23(b)(3), which states that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The Second Circuit has emphasized that "the certification decision requires 'rigorous analysis' " on the part of the district court. *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 33 (2d Cir. 2006); *see also id.* at 33 n. 3 (finding that the "rigorous analysis" "applies with equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)"). In this regard, the Second Circuit has set forth the following standard:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such

> requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Id.* at 41. Moreover, "[t]he Rule 23 requirements must be established by at least a preponderance of the evidence." *Brown,* 609 F.3d at 476.

Here, "Defendants do not contest that the requirements of Rule 23(a)(1) and (2), as well as Rule 23(b)(3), are satisfied." (Defs.' Mem. in Opp'n at 7.) However, Defendants contend that "Plaintiff fails to satisfy the typicality and adequacy requirements of Rule 23(a)(3) and (4)." (*Id*. at 7-8.) As a result, the Court will address each of those requirements in turn.

## II.     *Typicality*

"To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.' " *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). Defendants argue that "[t]ypicality cannot be established and 'class certification is inappropriate [where, as here,] a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.' " (Defs.' Mem. in Opp'n at 14 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (internal quotation marks and citations omitted)).) As Defendants explain, "[i]n such circumstances, 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.' " (*Id*. (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 180 (2d Cir. 1990)).) Moreover, Defendants claim that class certification

is inappropriate here because "Plaintiff is subject to [unique] defenses concerning reliance, economic loss and loss causation." (*Id*.)[1]

*Reliance*

Plaintiff states in its submission that it intends to establish reliance based "on a common basis under the 'fraud-on-the-market' theory" described in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). (Pl.'s Mem. in Supp. at 16.) In *Basic*, the Court explained that:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

485 U.S. at 241-42. Moreover:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id*. at 247. Under this theory, a plaintiff is entitled to a rebuttable presumption of reliance if he can show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."

*Halliburton Co. v. Erica P. John Fund Inc.*, 134 S. Ct. 2398, 2408 (2014). However, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received

---

[1] "To prevail upon a claim under Section 10(b) and Rule 10b-5, a plaintiff must establish a material misrepresentation or omission by each defendant, scienter, a connection between the misrepresentation or omission and the purchase or sale of a security, reliance upon the misrepresentation or omission, economic loss, and loss causation." (Defs.' Mem. in Opp'n at 8 (citing *Halliburton Co. v. Erica P. John Fund*, 134 S. Ct. 2398, 2407-08 (2014)).)

(or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id*. (quoting *Basic*, 485 U.S. at 248). "[F]or example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." *Id*.

Defendants attack Plaintiff's ability to demonstrate reliance on misrepresentations regarding Symbol's internal controls, meaning the methods Defendants used to keep track of and report revenue. By way of background, they argue that Plaintiff's "alleged misleading statements fall into two distinct categories – those concerning corporate integrity and internal controls, and those concerning revenue projections." (Defs.' Mem. in Opp'n at 9.) According to Defendants, "the alleged misrepresentations about corporate integrity and internal controls relate to the period April 29, 2003 through October 26, 2004" and consist of Defendants' misleading statements "ensuring that effective internal controls would be implemented" and "misleading statements concerning inventory management and revenue recognition controls." (*Id*. at 9.) Defendants claim that Plaintiff "cannot establish reliance for a claim based upon the Inventory Control Misrepresentations, both because it is not entitled to a presumption of reliance and also because it cannot otherwise establish it actually relied on any such misrepresentations." (Defs.' Mem. in Opp'n at 14.) Defendants claim that the presumption is not applicable because the "Inventory Control Misrepresentations were made between April 29, 2003 and October 26, 2004, and the truth about such purported misrepresentations was revealed on November 8, 2004," when Symbol issued a press release announcing that it had suffered a breakdown in internal controls that caused it to overstate revenues. (*Id*. at 15.) "However, Plaintiff did not purchase

any Symbol stock until December 2, 2004." (*Id*.)  According to Defendants, therefore, Plaintiff does not meet the presumption's requirement that it purchased stock between the time when the misrepresentations were made and when they were revealed.  Moreover, Defendants claim that Plaintiff cannot satisfy the reliance element without utilizing the presumption because it has not offered any evidence that it specifically relied on Symbol's misrepresentations.

Plaintiff, however, disputes Defendants' description of the two distinct frauds, arguing that the "Complaint alleges a single overarching fraudulent scheme in which Defendants misrepresented the Company's corporate governance while concealing the inadequacy of the Company's internal financial controls and related manipulation of inventory and revenue recognition/projections." (Pl.'s Reply at 2-3 (internal citations omitted).)  Additionally, they argue that "[t]he November 8, 2004 disclosure was only a partial disclosure of the Company's inadequate internal controls that impacted revenue and inventory.  Therefore, it does not extinguish reliance/recoverability of inflation caused by any aspect of Defendants' prior misrepresentations." (*Id*. at 7.)  Moreover, while Plaintiff acknowledges that "Defendants' misrepresentations prior to November 8, 2004 concerned . . . inadequate internal controls," it contends that these misrepresentations "continued to impact the price of Symbol stock and Plaintiff (like all Class members) relied on those representation[s] in purchasing." (Pl.'s Reply at 7.)  Furthermore, Plaintiff claims that "[t]o prove its claim (that its purchases in December 2004 were inflated), Plaintiff will still need to prove that Defendants' pre-November 8, 2004 misrepresentations violated the federal securities laws, just as any pre-November 8, 2004 purchaser would, and that the November 8 disclosures only partially corrected the prior misrepresentations." (*Id*.)

The Court finds that Plaintiff here is not subject to such unique defenses concerning reliance that would disqualify it from acting as lead plaintiff. Although Defendants "are correct in observing that certification is properly denied where class representatives are subject to unique defenses which threaten to become the focus of the litigation, . . . as Judge McKenna observed in *In re Avon* [*Sec. Litig.*, 1998 WL 834366 (S.D.N.Y. Nov. 30, 1998),] this rule has not been rigidly applied in this Circuit." *Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y. 2000) (internal quotation marks and citations omitted). "Moreover, the existence of individual questions concerning reliance is generally insufficient to defeat certification." *Id*. Furthermore, the Court finds that Plaintiff's claims are typical of the rest of the class where, as here, it intends to argue that its "claims of fraud arise out of the same . . . schemes as the rest of the putative class," *id*., namely Defendants' alleged inaccurate revenue and inventory reporting. *See Yang v. Odom*, 2005 WL 2000156, at *5 (D. N. J. 2005) (noting that class action is appropriate where "class representative's interests in proving a continuous scheme to defraud were properly aligned with the other class members"). Additionally, like in *In re Comverse Technology, Inc. Securities Litigation*, a case cited by Plaintiff, "[t]here are undoubtedly many members of the class of plaintiffs who, like [Plaintiff], purchased shares of [stock] only after" the November 8th disclosure. 2008 WL 820015, at *3 (E.D.N.Y. Mar. 25, 2008). Accordingly, the Court is not convinced that Defendants' advancement of the defense that Plaintiff cannot prove reliance on the pre-November 8 misrepresentations would "distract [Plaintiff] from the work of representing the class as a whole." *In re Comverse*, 2008 WL 820015, at *3.

*Loss, and Loss Causation*

In order to prove its 10(b) and 10b-5 claims, Plaintiff must also prove a causal connection between an alleged misrepresentation and a loss. "[T]o establish loss causation, a plaintiff must

8

allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks and citation omitted).

Defendants argue that "because Plaintiff did not purchase any Symbol stock until after November 8, 2004, Plaintiff cannot establish that it suffered any economic loss as a result of the disclosure" that took place on that day.  (Defs.' Mem. in Opp'n at 18.)  Moreover, Defendants argue that "[t]o the extent that Plaintiff argues that Inventory Control Misrepresentations caused it to suffer a loss based on disclosures after Plaintiff first purchased Symbol stock in December 2004, Plaintiff fails to present any evidence, let alone evidence sufficient to establish by a preponderance of the evidence, that such disclosures revealed anything about the truth of such misrepresentations."  (*Id*.)  According to Defendants, as a result, "Plaintiff is subject to a unique defense regarding Inventory Control Misrepresentations, which renders Plaintiff unsuitable to serve as a class representative."  (*Id*. at 19.)

As the Court noted above, however, Plaintiff argues that it purchased stock against the same backdrop of alleged fraud as the rest of the putative class and will attempt to prove loss causation based on that fraud.  The Court is not convinced that the "issues surrounding Plaintiff's trading activity will mire it in dealing with questions about whether it suffered any economic loss causally connected to any Inventory Control Misrepresentations" (Defs.' Mem. in Opp'n at 19) such that the other plaintiffs in the putative class would suffer.  *In re Flag Telecom Holdings*, 574 F.3d 29 (2d Cir. 2009), a case cited by Defendants, is inapposite.  In that case, the Court

excluded from the class in-and-out traders[2] who could not "conceivably" prove loss causation. 574 F.3d at 40. It also concluded that Lead Plaintiff, an in-and-out trader, could not serve as class representative. At this stage, however, Defendants do not argue that Plaintiff is an in-and-out trader. (Defs.' Mem. in Opp'n at 20.) Accordingly, the Court does not find that Plaintiff would be an atypical representative.

## III. *Adequacy*

"Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings*, 574 F.3d at 35 (internal quotation marks and citations omitted). "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent." *Id.* (internal quotation marks and citations omitted).

Preliminarily, Defendants argue that Plaintiff is inadequate because it "does not have Article III standing to pursue a claim based upon" Inventory Control Misrepresentations since Plaintiff, who purchased stock after November 8, 2004, "did not suffer any loss attributable to the revelation of the truth about such misrepresentations." (Defs.' Mem. in Opp'n at 21.) The Court's position on this matter remains the same as it was in its Order on Defendants' Motion to Dismiss, namely that a "Lead Plaintiff is not required to have standing to assert all claims on behalf of the potential class members." (Order at 30 (citing *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204-05 (S.D.N.Y. 2003)).) Moreover, Defendants have not offered any legal authority persuading the Court that Lead Plaintiff's potential lack of standing on certain alleged claims is a basis for denial of class certification.

---

[2] The term "in-and-out traders" refers to individuals who purchased and sold stock prior to any corrective disclosure.

Defendants mainly argue that Plaintiff is not an adequate class representative for the proposed class because its interests in maximizing recovery conflict with those of the other class members. Specifically, Defendants contend that Plaintiff's "argument that the November 8 disclosure was only a partial disclosure conflicts with the interests of absent class members who purchased before November 8." (Defs.' Mem. in Opp'n at 22.) According to Defendants, "[t]reating the November 8 announcement as a full corrective disclosure offers the early purchasers their strongest argument for recovering on the related stock drop." (*Id*.) In other words, Defendants contend that in order for Lead Plaintiff to achieve the maximum recovery under its partial disclosure theory, Plaintiff would argue that the stock remained high after the November 8 disclosure such that it purchased at a highly inflated price on December 2. However, this position is in conflict with those who purchased before November 8 and sold around December 2 who would argue that there was a full disclosure on November 8, thereby minimizing inflation at their point of sale.

Additionally, Defendants argue that Plaintiff's claim that any drop in stock price caused by "the November 8 disclosure was . . . undone by the November 15 disclosures," namely "Symbol's 10-Q for the third quarter of 2004 and related press release," which stated that the inventory control issues had been corrected,[3] is not in the best interests of other members of the class. (Defs.' Mem. in Opp'n at 22-23.) Specifically, Defendants contend that in making such an argument, Plaintiff is in conflict with members of the class who purchased before November 8 and "sold after November 15 and before Plaintiff's chosen disclosure date" who would recover

---

[3] Presumably, this argument would allow Plaintiff to argue on behalf of those who purchased before November 8 and sold before November 15 that inflation was low at their time of sale, while at the same time argue on behalf of itself and other post-November 15 purchasers that Symbol stock was inflated at their time of purchase.

nothing if they sold the stock while it was as Plaintiff alleges at its highest price. (Defs.' Mem.

in Opp'n. at 24.)

Defendants primarily rely upon *In re Seagate Technology II Securities Litigation*, 843 F.

Supp. 1341 (N.D. Cal 1994) to support their position that the above-mentioned conflicts render

Plaintiff inadequate. There:

> [A] district court found that there were potential class conflicts
> between a group of class members who sold a security on a
> particular day on which the price of the security fell and those who
> purchased the security on the same day. In particular, the Court
> noted that those who purchased on that day would have an
> incentive to present evidence showing that the amount of inflation
> still present in the price from undisclosed frauds was as sizeable as
> possible, while those selling on that day would seek to demonstrate
> that most or all of the inflation had already leaked out of the price,
> through previous disclosures. Where there were multiple partial
> disclosures of the misstatements or omissions, the *Seagate* Court
> suggested that the severity and number of such conflicts were
> likely to increase, given that on each day that a partial disclosure
> occurred, the overall amount of price inflation would decrease,
> thus separating the interests of those who sold on that day from
> those who held over or purchased on that day.

*In re American Int'l Group, Inc. Sec. Litig.*, 265 F.R.D. 157, 169 (S.D.N.Y. 2010), *rev'd on other*

*grounds* 689 F.3d 229 (2d Cir. 2012) (internal citations omitted).

As the court in *In re American International Group*, noted, however, "[w]hile *Seagate*

has been widely cited, courts in this jurisdiction have nearly universally declined to follow its

holdings or reasoning." *Id*. at 170 (collecting cases). According to the court in *In re Gaming*

*Lottery Securities Litigation*, the *Seagate* view "overstates the importance of price inflation," the

chief role of which "remains its function in determining each plaintiff's damages." 58 F. Supp.

2d 62, 70 (S.D.N.Y. 1999).

The Court agrees with the reasoning in *In re American International Group*. Similar to

Defendants in this case, there the defendant relying on *Seagate* argued that the lead plaintiff's

"interests [were] divergent from some other members of the class because they purchased stock .

. . after [October 2004 disclosures of certain fraudulent conduct], while other class members

purchased their . . . stock prior to these disclosures and sold their stock prior to [the later

disclosures pointed to by the lead plaintiff]." 265 F.R.D. at 169. Defendants in that case were

concerned that lead plaintiffs would "manipulate their discovery and presentation of evidence" at

the expense of class members. *Id*. The court, however, noted this Circuit's rejection of *Seagate*

and that "[c]ourts have . . . repeatedly recognized that putative intra-class conflicts relating to the

time at which particular class members purchased their securities, and which could potentially

motivate different class members to argue that the securities were relatively more or less inflated

at different time periods, relate to damages and do not warrant denial of class certification." *Id*.

(citing *In re Alstom SA Sec. Litig*. 253 F.R.D. 266, 277 (S.D.N.Y. 2008). Moreover, where, as

here, the alleged frauds "are brought under the same causes of action" and "where [the] frauds

resulted from misinformation disseminated in financial statements, the Court does not find a

class conflict." *Id*. at 171.

Turning to the second part of the adequacy analysis, whether Plaintiff's attorneys are

qualified to conduct the litigation, Plaintiff points out that its counsel "Pomerantz [LLP] has

extensive experience in the field of securities litigation" and that its "vigorous pursuit of the

Class's interests is well documented in its advancement of the Class' claims before this Court,

including, *inter alia*, in its defeat of the Defendants' motion to dismiss." (Pl.'s Mem. in Supp. at

15.) Defendants do not attack counsel's qualifications, but they argue that Plaintiff is an

inadequate representative "because it lacks fundamental knowledge of its claims, is not directing

or meaningfully participating in the litigation, has failed to comply with discovery obligations,

and lacks the individual qualities necessary to a class representative." (Defs.' Mem. in Opp'n at 26.)

With regard to Defendant's argument regarding Plaintiff's lack of knowledge, "the motivation behind requiring representative plaintiffs to demonstrate great familiarity with the case is a fear that the representatives, during pretrial discovery and at trial, will give misleading and contradictory testimony with regard to basic issues in the case that might make their claims subject to unique defenses." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (internal quotation marks and citation omitted). "[I]n that situation, the challenge to class certification can alternatively be viewed as a challenge to the representative plaintiffs' compliance with the typicality requirement of Rule 23(a)(3)." *Id.* (internal quotation marks and citation omitted) (reversing district court's denial of class certification where district court "seized on a myopic view of the knowledge requirement and concluded that [the lead plaintiff] did not have a basic understanding of the litigation and therefore could not be an adequate class representative"). Moreover, although "class representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys," the lead plaintiff is appropriate where he "under[stands] the nature of his proposed role in the litigation and demonstrate[s] his willingness to carry it forward." *Id.* at 61-62.

"Plaintiff's representatives in this action are Patrick Doherty, the Fund Administrator, who has been an iron worker for 33 years, and Christopher O'Hara, an attorney who has served as co-counsel to the Fund for 28 years." (Pl.'s Reply at 12 (internal citations omitted).) Although Defendants contend that these representatives "lack[] fundamental knowledge of"

Plaintiff's claims, (Defs.' Mem. in Opp'n at 26), the record does not suggest that Plaintiff has so little knowledge of the action that it would be unable or unwilling to protect the interests of the class. Here, Plaintiff has demonstrated that it is aware of its role in the litigation and is willing to carry it forward. Specifically, Mr. O'Hara testified that Plaintiff reviewed the complaint before it was filed and explained that it was Plaintiff's practice to review certain motion papers before they were filed. (O'Hara Dep. at 39, 57, 80.) In addition, Mr. O'Hara expressed his understanding regarding his obligation to keep the rest of the class members informed of the progress of the litigation. (*Id*. at 51-52). Moreover, Mr. O'Hara and Mr. Doherty "are entitled to rely on the expertise of counsel" in conducting the litigation. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y. 2003) ("[a]ttacks on the adequacy of a class representative based on the representative's ignorance . . . have been expressly disapproved of by the Supreme Court.") (internal quotation marks and citations omitted). Furthermore, while the Court acknowledges that Defendants' contentions regarding the representatives' failure to produce certain documents if discussed at trial could impact their credibility, it is not convinced that such contentions render Plaintiff an inadequate representative.

Finally, the Court finds unavailing Defendants' argument that Plaintiff is inadequate because of its involvement in the litigation is a result of its subscription to "its counsel's 'Pomtrack' service, whereby Plaintiff receives periodic reports about potential litigations in which it might be a suitable plaintiff." (Defs.' Mem. in Opp'n at 28.) Defendants rely on *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Serv. & Sec., LLC*, 616 F. Supp. 2d 461 (S.D.N.Y. 2009) for this position. There, the court "criticized monitoring arrangements and found that the arrangement at issue in that case went 'far beyond any traditional contingency arrangement . . . creat[ing] a clear incentive for [the law firm] to discover "fraud" in the

investments it monitors and to recommend to the Fund's non-lawyer administrator (and, through

him, to the trustees) that the Fund, at no cost to itself, bring a class action lawsuit.' " *Livonia*

*Employees' Retirement Sys. v. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012) (quoting *Iron*

*Workers*, 616 F. Supp. 2d at 464). As other courts have noted, however, the court in *Iron*

*Workers*, "nonetheless appointed a lead plaintiff who was represented by counsel as part of a

monitoring agreement," *Id.*; *Iron Workers*, 616 F. Supp. 2d at 466. "Moreover, courts routinely

appoint institutional investors with monitoring agreements as lead plaintiffs and class

representatives." *Id.* (collecting cases). Furthermore, although as one court has noted, such

arrangements create "incentives for firms to recommend filing suit even if the case is weak,

leading to an increase in frivolous securities fraud claims," no such danger exists where as here

the action "has survived a motion to dismiss and cannot be deemed frivolous." *In re Diamond*

*Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 255 (N. D. Cal. 2013). As a result, the Court finds that

Plaintiff has satisfied the adequacy requirement.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for class certification is granted subject to a

determination as to the precise language of the class definition. Defendants are directed to notify

the Court if Plaintiff's proposed amended class definition limiting the class to those that

purchased Symbol common stock during the class period "and were damaged thereby," (Pl.'s

Reply at 15), does not satisfy Defendants' concern that the class definition "exclude purchasers

who bought Symbol shares and then sold them without holding over at least one of the" alleged

corrective disclosure dates, i.e., "in-and-out traders" (Defs.' Mem. in Opp'n at 30). Such a

position should be filed with the Court within thirty (30) days of this Order.

**SO ORDERED.**

Dated: Central Islip, NY
      June 25, 2015

/s/
_____
Denis R. Hurley
United States District Judge
