**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

IN RE SYMBOL TECHNOLOGIES, INC.
SECURITIES LITIGATION

                                          **MEMORANDUM AND ORDER**
                                            CV 05-3923 (DRH) (AKT)

------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

## I.    PRELIMINARY STATEMENT

      Lead Plaintiff Iron Workers Local #580 Pension Fund ("Plaintiff" or "the Fund")

commenced this action against Defendants Symbol Technologies, Inc. ("Symbol"), William R.

Nuti ("Nuti"), Salvatore Iannuzzi ("Iannuzzi"), Mark T. Greenquist ("Greenquist"), Todd Abbott

("Abbott"), Arthur O'Donnell ("O'Donnell") and James M. Conboy ("Conboy"), (collectively,

the "Defendants" or "Symbol") for violations of Section 10(b) of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-

5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, as well as Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a). *See generally* Complaint [DE 1]. Plaintiff brings the instant motion seeking to

compel Defendants' production of documents pursuant to Federal Rule of Civil Procedure 37

and Local Rule 37.3. *See* Lead Plaintiff's Notice of Motion to Compel Production of Documents

[DE 153] at 1.[1] For the reasons stated below, Plaintiff's motion to compel is DENIED.

---

[1]     For purposes of this motion, the Court presumes familiarity with the background facts
and procedural posture of this case which are set forth in detail in Judge Hurley's December 5,
2013 Memorandum and Order [DE 80] adjudicating Defendants' Rule 12(b)(6) Motion to
Dismiss as well as this Court's prior Order denying Plaintiff's initial motion to compel. *See* DE
143.

## II.   RELEVANT BACKGROUND

On November 7, 2014, the Fund filed a motion to compel production of certain documents related to an internal investigation conducted in the wake of a revenue misstatement for which Symbol has asserted work product privilege.  *See* DE 106.  Specifically, Plaintiff sought "documents collected or created in the course of the internal investigation into the cause of [Symbol's] October 26, 2004 misstatement of revenues . . ." *Id*.  On that same date, Symbol submitted its opposition to Plaintiff's motion to compel production.  *See* DE 109-111.  Plaintiff submitted its reply on the same day.  *See* DE 112-113.  On April 23, 2015, Plaintiff filed a supplemental submission in further support of its motion to compel.  *See* DE 124-126.  On May 22, 2015, Symbol filed an additional memorandum in opposition responding to Plaintiff's supplemental submission.  *See* DE 129.  Thereafter, on September 30, 2015, the Court denied Plaintiff's motion, without prejudice.  *See* DE 143.  Specifically, the Court based its decision on the fact that "[t]he supporting documentation, [including Symbol's privilege log and provision of allegedly privileged documents] which would enable such an inquiry, [was] lacking[.]"  DE 143 at 17.  As such, the Court directed that

> [w]ithin 21 days of this Memorandum and Order, Symbol shall produce a privilege log in conformity with Fed. R. Civ. P. 26 and Local Civil Rule 26.2 with respect to any document that it is withholding on a claim of privilege. Upon production of the privilege log, the parties shall meet and confer within the following 21 days with respect to those documents listed on Symbol's log to which the Fund claims the privilege should not apply. If, after that meet-and-confer, Plaintiff still seeks to refile its motion to compel, Plaintiff will have until Nov. 24, 2015 to file its motion. At that juncture, Symbol will be required to simultaneously provide the documents at issue to the Court for an *in camera* review.

DE 143 at 18.  On November 24, 2015, Plaintiff filed its renewed motion to compel documents.

DE 153-155.  Subsequently, on December 8, 2015, Symbol filed its opposition [DE 160] and on

December 15, 2015, Plaintiff filed its reply.  DE 161.

After reviewing the parties' respective briefs in support of and in opposition to the

motion, it is apparent that the parties primarily rely on the same arguments that were raised in

Plaintiff's previous motion to compel.  As such, the Court will briefly address the parties'

positions concerning the instant motion.

Plaintiff relies on two theories as to why the documents at issues are discoverable:

(1) the internal investigatory documents at issue do not fall within the ambit of the work-product

privilege; and (2) even if the documents were entitled to work product protection, Symbol

waived any such protection by permitting disclosure to the government as well as the

Independent Examiner.  *See generally* Lead Plaintiff's Memorandum of Law in Support of

Motion to Compel Production of Documents ("Pl.'s Mem.") [DE 154].  Specifically, Plaintiff

maintains that the documents at issue are not covered under the work product privilege because

the investigation conducted by Symbol in the aftermath of the revenue misstatement "was not

conducted 'because of' impending litigation" but was instead undertaken "pursuant to business

imperatives to determine the amount of the discrepancy, how exactly it happened, and take

corrective action to prevent recurrence, which [Symbol] would have done irrespective of any

threatened or prospective litigation." *Id*. at 11.  In addition, according to Plaintiff, even if the

work product privilege did apply, Symbol waived any such protection through voluntary

disclosure to the Independent Examiner concerning the substance of interviews conducted by

outside counsel "as well as the mental impressions and theories of the lead attorney. . . ." *Id*. at

3

14. Further, Symbol's "voluntary disclosure" as to "details of the [internal] Investigation to the SEC . . . [likewise] waived any work product protection that may have existed as to the documents created pursuant to the Investigation. . . ." *Id*. at 16.[2]

In response, Symbol asserts that: (1) the documents at issue are protected by the work product privilege since they were prepared in anticipation of litigation; (2) disclosures to the SEC and the Independent Examiner did not result in waiver of the privilege; and (3) assuming that the privilege attaches, Plaintiff is unable to establish the "substantial need" necessary to overcome such protection. *See generally* Memorandum of Defendant Symbol Technologies, Inc. in

---

[2] The Court points out that Plaintiff appears to have made the strategic decision to forgo interposing any argument regarding its "substantial need" with respect to the documents in question, noting in a footnote only that "[b]ecause work product protection never applied to the Investigation, or was waived, Plaintiff need not demonstrate 'substantial need' . . . [and that in any event] such need is self-evident." *Id*. at 15 n. 3. *See Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 61 (E.D.N.Y. 2012) (recognizing that despite the existence of the work product privilege "[w]ork product may nevertheless be discoverable if the party seeking disclosure (1) shows that it has a substantial need for the materials to prepare its case and (2) cannot obtain their substantial equivalent without undue hardship."); *Garnier v. Ill. Tool Works, Inc.*, No. 04–CV–1825, 2006 WL 1211201, at *2 (E.D.N.Y. May 4, 2006). Therefore, in the event the Court determines that the privilege applies and that no waiver occurred, the documents will be considered protected by the privilege since Plaintiff has effectively waived any argument regarding substantial need. *See Lagace v. New England Cent. R.R.*, No. 3:06 CV 1317, 2007 WL 2889465, at *4 (D. Conn. Sept. 28, 2007) ("Because the plaintiff has failed to establish both substantial need and the inability to obtain the substantial equivalent without undue hardship, . . . [the document at issue] need not be disclosed as it is protected by the work product doctrine."); *Marchello v. Chase Manhattan Auto Fin. Corp.*, 219 F.R.D. 217, 219 (D. Conn. 2004) ("Both the federal and Connecticut rules require that Plaintiff make a showing of substantial need to overcome the work product doctrine. Plaintiff's conclusory allegation that he has a "substantial need" is not enough to meet the standard."); *Plew v. Ltd. Brands, Inc.*, No. 08 CIV. 3741, 2009 WL 1119414, at *3 (S.D.N.Y. Apr. 23, 2009) (finding no waiver of the work product privilege and noting that "plaintiff makes no effort to demonstrate the particularized need and hardship that are a prerequisite for overcoming the otherwise applicable immunity from disclosure for these materials. Hence there is no basis for requiring their production").

Opposition to Lead Plaintiff's Motion to Compel Production of Documents ("Def.'s Opp'n")

[DE 160]. Specifically, Symbol states that the documents at issue constitute work product since

> in addition to Symbol's internal investigation of the overstatement of revenues for the third quarter of 2004, which was for business purposes, Symbol's outside counsel conducted a separate investigation because of anticipated litigation. *See, e.g., id*. at 5-7, 10-11. All of the work product at issue in this motion was prepared by outside counsel or compiled by or at the direction of outside counsel in connection with outside counsel's investigation of issues relating to the overstatement of revenue for the third quarter of 2004. Thus, that material is all protected from discovery by virtue of the work product doctrine. Some are also protected by the attorney-client privilege.

*Id*. at 12.[3] In addition, Symbol claims no waiver occurred since "work product protection as to source documents is not waived through disclosure to the SEC unless 'those specific materials are explicitly identified, cited, or quoted in information disclosed to the SEC,'" *id*. at 17 (quoting *In re Weatherford Intern. Sec. Litig.*, No. 11 Civ. 1646, 2013 WL 6628964, at *2 (S.D.N.Y. Dec. 16, 2013)), and in this instance "Plaintiff cannot point to any explicit identification, citation or quotation of source material warranting additional production." Def.'s Opp'n at 17. Likewise, Symbol maintains that there was no waiver with regard to any disclosure to the Independent Examiner since his "interests were aligned with Symbol's since they both sought to ensure that Symbol complied with its obligations under the Deferred Prosecution Agreement and the Final Consent Judgment. [The Independent Examiner] also agreed that his retention by Symbol [wa]s governed by the strictest confidentiality, with the retainer agreement." *Id*. at 18. Thus, Symbol concludes that "[u]nder these circumstances, where the independent examiner did

---

[3]   Notably, this is the first time Symbol suggests that two distinct investigations into the third quarter revenue overstatement were undertaken — one overseen by the internal audit group while the other being conducted by Symbol's outside counsel which "was undertaken because of litigation." *Id*. at 8-9; 12.

not testify that Symbol or its counsel explicitly identified, cited or quoted information from their interview memoranda or notes in communications with him, Plaintiff cannot establish a waiver of work product protection over counsel's interview memoranda or notes." *Id*. at 19-20. Symbol also asserts that Plaintiff "has not made even the barest attempt to establish any substantial need, let alone substantial justification, for the work product it seeks or to show undue hardship in obtaining the substantial equivalent . . . [and therefore] Plaintiff's attempt to overcome work product protection fails." *Id*. at 21, 23.

## III. THE WORK PRODUCT PRIVILEGE

### 1. *The Privilege Generally*

The so-called "work product privilege" is codified in Federal Rule of Civil Procedure 26(b)(3) which provides, in part, as follows:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation . . . . But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable . . . ; and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> . . . .

If a court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other legal representative concerning the litigation. Fed. R. Civ. P. 26(b)(3).

Essentially, the work product privilege "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007) (quoting *In re Grand Jury*

*Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003)); *see also United States v. Adlman*, 134 F.3d 1194, 1196–97 (2d Cir. 1998) (noting that "work product privilege 'is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries") (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)).  The party asserting the privilege bears the "heavy burden of establishing its applicability."  *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F. 3d at 183.

 "Because the work product protection arises only for materials 'prepared in anticipation of litigation,' the doctrine is not satisfied merely by a showing that the material was prepared at the behest of a lawyer or was provided to a lawyer.  Rather the materials must result from the conduct of 'investigative or analytical tasks to aid counsel in preparing for litigation.'" *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 393-94 (S.D.N.Y. 2015) (quoting *Costabile v. Westchester, N.Y.*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008)).  Significantly, work product protection does not apply to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation . . . [e]ven if such documents might also help in preparation for litigation. . . ." *Adlman*, 134 F.3d at 1202.  In making a determination, a court must ask "not merely whether [the party invoking the privilege] contemplated litigation when it generated the materials at issue, but rather whether these materials 'would have been prepared in essentially similar form irrespective of litigation.'" *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (quoting *Adlman*, 134 F.3d at 1204).  Nevertheless, "[n]othing" in Rule 26(b)(3) states or suggests that documents prepared 'in anticipation of litigation' with the purpose of assisting in the making of a business

decision do not fall within its scope." *Adlman*, 134 F.3d at 1198-99; *see Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir. 2015) ("Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings."); *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 532 (S.D.N.Y. 2015); *Patel v. L-3 Commc'ns Holdings, Inc.*, No. 14-CV-6038, 2016 WL 4030704, at *2 (S.D.N.Y. July 25, 2016). Further, as *Adlman* made clear, "[t]here is no requirement that documents be produced primarily or exclusively to assist in litigation in order to be protected [a]s [such a requirement is] at odds with the text and the policies of the Rule. Nowhere does Rule 26(b)(3) state that a document must have been prepared to *aid* in the conduct of litigation in order to constitute work product, much less *primarily* or *exclusively* to aid in litigation. Preparing a document 'in anticipation of litigation' is sufficient." *Adlman*, 134 F.3d at 1198. Therefore, to establish that documents are protected under the work-product privilege, a party need only demonstrate that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Schaeffler*, 806 F.3d at 43 (quoting *Adlman*, 134 F.3d at 1202) (emphasis in original).

The burden of establishing that the doctrine applies rests on the party asserting the privilege, and, as such, it is that party who is tasked with showing what "would have" happened in these circumstances. *Wultz*, 2015 WL 362667, at *11. As the court noted in *Allied Irish Banks*,

> it is not easy for a factfinder to determine what "would have" happened in some hypothetical situation. . . . Nonetheless, this is the question that the *Adlman* test requires us to answer and it is an exercise that courts have regularly performed.

8

240 F.R.D. at 106; *see Verizon Directories Corp. v. Yellow Book USA, Inc.*, No. 04-CV-251, 2004 WL 4054842, at*2 (E.D.N.Y. July 22, 2004) (e-mail released where no showing made that it would not have been created in essentially similar form irrespective of the litigation); *DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, No. 04 Civ. 4099, 2006 WL 357825, at *1 (S.D.N.Y. Feb. 15, 2006) (documents created by management consultant not work product where consultant "would have created" them in similar form "even if the potential for litigation had been remote"); *In re Otal Invs. Ltd. v. Capital Bank Pub. Ltd. Co.*, No. 03 Civ. 4304, 2005 WL 1473925, at *1 (S.D.N.Y. June 22, 2005) (factual statement prepared following collision of boats not work product where "business reasons for obtaining a statement from their captain's" would have compelled the report regardless of litigation).

### 2. *Subject Matter Waiver*

Subject matter waiver is a type of implied waiver "which allows the attacking party to reach all privileged conversations regarding a particular subject once one privileged conversation on that topic has been disclosed," and is grounded in "fairness considerations at work in the context of litigation." *Falise v. Am. Tobacco Co.*, 193 F.R.D. 73, 84 (E.D.N.Y. 2000) (quoting *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987)). In applying subject matter waiver, "courts have invoked the metaphors of 'sword' and 'shield' to describe the type of strategic assertion of privilege that would implicate fairness considerations." *Falise*, 193 F.R.D. at 84; *see, e.g.*, *Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.*, No. 95–CV–8833, 1997 WL 801454 at *1 (S.D.N.Y. Dec. 31, 1997); *In re Kidder Peabody*, 168 F.R.D. 459, 473 (S.D.N.Y. 1996); *Stratagem Development Corp. v. Heron Intern. N.V.*, 153 F.R.D. 535, 545 (S.D.N.Y. Feb. 28, 1994). In general, [t]he test for waiver is "whether the disclosure at issue has 'substantially

increased the opportunities for potential adversaries to obtain the information.'" *In re Vitamin C Antitrust Litig.*, No. MD 06–1738, 2011 WL 197583, at *2 (E.D.N.Y. Jan. 20, 2011) (quoting *In re Visa Check/Master Money Antitrust Litig.*, 190 F.R.D. 309, 314 (E.D.N.Y. 2000)); *see NL Indus., Inc. v. ACF Indus. LLC*, No. 10CV89W, 2015 WL 4066884, at *5 (W.D.N.Y. July 2, 2015).

Federal Rule of Evidence 502 codifies the doctrine of subject-matter waiver where disclosure is made in a federal proceeding or to a federal office or agency. *See* Fed. R. Evid. 502(a). Specifically, "Rule 502 of the Federal Rules of Evidence, titled 'Attorney-Client Privilege and Work Product; Limitations on Waiver,' provides that 'when [a] disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding *only if*: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; *and* (3) they ought in fairness to be considered together.'" *In re GM LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 533 (quoting Fed. R. Evid. 502(a)) (emphasis added); *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 304 F.R.D. 369, 371 (S.D.N.Y. 2015) (recognizing that "Fed. R. Evid. 502(a) addresses the precise issue of when a partial disclosure of protected information results in a waiver of undisclosed information."). "As the Advisory Committee Notes state, the Rule — enacted in 2008 — 'provides that a voluntary disclosure in a federal proceeding or to a federal office or agency . . . generally results in a waiver *only* of the communication or information disclosed.'" *Id.* (quoting Fed. R. Evid. 502, Committee Notes (emphasis added)). "In particular, such disclosure results in a subject matter waiver of undisclosed materials only in those 'unusual

10

situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary.'" *Id*. (quoting Fed. R. Evid. 502, Committee Notes); *see Mitre Sports Int'l Ltd.*, 304 F.R.D. at 372 ("Subject matter waiver is reserved for the rare case where a party either places privileged information affirmatively at issue, or attempts to use privileged information as both a sword and a shield in litigation."); *Favors v. Cuomo*, 285 F.R.D. 187, 198–99 (E.D.N.Y. 2012); *Shinnecock Indian Nation v. Kempthorne,* 652 F. Supp. 2d 345, 365–66 (E.D.N.Y. 2009) (collecting cases).

Generally, in analyzing whether and to what extent waiver may have occurred, the court must review the facts and circumstances of each case. *See Lugosch v. Congel*, 218 F.R.D. 41, 50 (N.D.N.Y. 2003) ("the work product doctrine is not absolute. Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances."). Thus, "there is no *per se* rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all the situations when and how such disclosure is required." *Lugosch*, 218 F.R.D. at 51. As such, when a party makes a voluntary disclosure to the government it may not operate to waive the work-product protection as to third-parties in all cases. Indeed, in the case of *In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993), the Second Circuit declined to adopt a bright line rule "that all voluntary disclosures to the government waive work product protection." *Id*. at 236. Instead, the Court emphasized that "[c]rafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis." *Id*. Importantly, the court envisioned that "a rigid rule would fail to anticipate situations in which the disclosing party and the government

may share a common interest in developing legal theories and analyzing information, or situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials." *In re Steinhardt Partners, L.P.*, 9 F.3d at 236; *see In re Initial Public Offering Securities Litig.*, 249 F.R.D. 457, 461 (S.D.N.Y. 2008) (noting that "neither the Supreme Court nor the Second Circuit has expressly upheld a claim of selective waiver" but recognizing that "the *Steinhardt* court did not completely foreclose the possibility of selective waiver.").

Although the concept of "selective waiver" has not been universally accepted, *see, e.g.*, *In re Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981); *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991); *United States v. Mass. Institute of Tech.*, 129 F.3d 681, 685 (1st Cir. 1997); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 307 (6th Cir. 2002); *In re Qwest Communications Int'l*, 450 F.3d 1179 (10th Cir. 2006); *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1127-28 (9th Cir. 2012), its application — based upon the *dicta* in *Steinhardt* — has been approved by courts in this Circuit. *See, e.g.*, *Police and Fire Retirement Sys. Of the City of Detroit v. Safenet, Inc.*, No. 06 Civ. 5797, 2010 WL 935317 (S.D.N.Y. Mar. 12, 2010); *In re Cardinal Health, Inc. Sec. Litig.*, No. 04 Civ. 575, 2007 WL 495150 (S.D.N.Y. Jan. 26, 2007); *United States v. Wilson*, 493 F. Supp. 2d 348, 362 (E.D.N.Y. 2006); *In re Natural Gas Commodities Litig.*, 232 F.R.D. 208 (S.D.N.Y. 2005); *Maruzen Co. v. HSBC USA, Inc.*, Nos. 00 Civ. 1079, 00 Civ. 1512, 2002 WL 1628782, at *2 (S.D.N.Y. July 23, 2002); *In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. 274 (S.D.N.Y. 1995); *see also S.E.C. v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 310, 313 (S.D.N.Y. 2011) (quoting *Steinhardt* and recognizing that "some courts in this

District—relying on the language in *Steinhardt*—have suggested that waiver will not be found when documents are disclosed to the government pursuant to a confidentiality agreement); *but see Gruss v. Zwirn* No. 09 Civ. 6441, 2013 WL 3481350, at *7 (S.D.N.Y. Jul. 10, 2013) (acknowledging the *dicta* in *Steinhardt* but nevertheless interpreting *Steinhardt's* holding to encompass all factual situations where a party makes a "voluntary submission to a governmental agency in an adversarial posture of a document containing attorney work product [and that this disclosure] waives work product protections in that document.").

Therefore, courts should engage in a "case-by-case" analysis when faced with issues involving voluntary disclosure of privileged information to governmental authorities and whether such disclosure destroys the privilege as to third-parties. *Steinhardt*, 9 F.3d at 236; *see Vitesse Semiconductor Corp.*, 771 F. Supp. 2d at 313 ("Whether a party has waived privilege by disclosing confidential materials to a governmental agency must be analyzed on a case-by-case basis. . . ."); *Police and Fire Retirement Sys. Of the City of Detroit*, 2010 WL 935317, at *1 (finding that "courts should assess selective waiver [issues] on a case-by-case basis"); *In re Initial Public Offering Securities Litig.*, 249 F.R.D. at 464 (citing with approval *Steinhardt's* case-by-case approach to selective waiver and finding that this approach "appears reasonable given the variety of possible situations in which a defendant might disclose information to the government."); *In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150, at *8; *see also In re Natural Gas Commodities Litig.*, 232 F.R.D. at 211 (finding no waiver of work product privilege pursuant to guidance in *Steinhardt* and noting that "the Court is bound by Second Circuit authority and is not free to adopt the opinion of other circuits.") (citing *United States v. Collado*, 201 F.3d 433 (2d Cir. 1999).

13

The party asserting that the work-product privilege applies "bears the burden of demonstrating that it has not been waived." *Norton v. Town of Islip*, No. CV 04-3079, 2015 WL 5542543, at *3 (E.D.N.Y. Sept. 18, 2015) (quoting *HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 70 (S.D.N.Y.2009); *see NL Indus., Inc.*, 2015 WL 4066884, at *5; *Curto v. Med. World Commc'ns, Inc.*, 783 F. Supp. 2d 373, 380 (E.D.N.Y. 2011) ("[t]he party asserting the protection afforded by the work product doctrine has the burden of showing both that the protection exists and that it has not been waived" (internal quotation and citation omitted)).

## IV. DISCUSSION

### 1. Applicability of the Work-Product Privilege

In order to determine whether the documents at issue are subject to the work-product privilege, the Court needs to determine whether these documents were created "in anticipation of litigation." *Wultz*, 304 F.R.D. at 393-94 (S.D.N.Y. 2015). Therefore, the Court will review the events leading up to the present litigation in order to assess whether the documents in question were created "in anticipation of litigation" so as to be under the protection of the work product privilege.

Beginning in 1999 and continuing through 2002, "Symbol's former senior management engaged in fraudulent practices that inflated Symbol's reported earnings by hundreds of millions of dollars." June 3, 2004 Deferred Prosecution Agreement between Symbol and the U.S. Attorney's Office, attached as Exhibit ("Ex.") F to the December 7, 2015 Declaration of Kathleen N. Massey ("Massey Decl."). The fraudulent practices encompassed: "(1) material misrepresentation and generation of false and prematurely recognized revenue; (2) manipulation

14

of Symbol's corporate books and records through top-side corporate journal entries. . . .; and (3) fabrication and utilization of improper restructuring expenses and 'cookie jar' reserves." *Id*. As a result of these unlawful practices, Symbol was informed by United States Attorney's Office that it was "the target of an investigation being conducted by a grand jury . . . involving accounting and financial fraud at Symbol." *Id*. In addition, Symbol was notified by the Securities and Exchange Commission (the "SEC") that it was "also conducting an investigation of Symbol's accounting practices." *Id*.

In March 2002, after learning of the investigations being pursued by both the U.S. Attorney's Office and the SEC, Symbol "retained the law firm of Swidler Berlin Shereff Friedman, LLP ("Swidler") to conduct an internal investigation into Symbol's accounting and financial practices." *Id*. The investigation, which was conducted with the assistance of a third-party forensic accounting team, involved "more than 200 interviews and the review of hundreds of thousands of pages of documents and emails. The results of this investigation were shared with both the U.S. Attorney's Office and the SEC pursuant to a Confidentiality Agreement entered into by all parties in November 2002." *Id*.; *see* November 19, 2002 Confidentiality Agreement, attached as Ex. Z to the Massey Decl.

During the course of the investigations conducted by the U.S. Attorney's Office and the SEC, Symbol was subjected to a number of class action lawsuits involving the issuance of "materially false and misleading statements throughout the class period that had the effect of artificially inflating the market price of [Symbol's] securities." Symbol's 2004 Third Quarter Form 10-Q, attached as Ex. H to the Massey Decl. In addition to these shareholder lawsuits, Symbol also faced related litigation concerning its prior acquisition of Telxon Corporation in

November 2000. *Id*. In fact, "from December 1998 through March 1999, a total of 27 class

actions were filed in the United States District Court . . . by certain alleged stockholders of

Telxon . . . alleging claims for 'fraud on the market' arising from alleged misrepresentations and

omissions with respect to Telxon's financial performance and prospects and an alleged violation

of generally accepted accounting principles by improperly recognizing revenues." *Id*. Further,

Symbol was involved in unrelated lawsuits involving its business dealings as well as patent and

trademark litigation. *Id*.

On June 3, 2004, Symbol announced that it had "resolved the investigation by the [U.S.

Attorney's Office] relating to [its] past accounting practices by entering into a non-prosecution

agreement with the [U.S. Attorney's Office]." *Id*. As part of this agreement, Symbol stated that

"no criminal complaint will be filed against us." *Id*. At the same time, Symbol entered into an

agreement with the SEC "to resolve allegations against us relating to our past accounting

practices that were under investigation by the SEC since May 2001." *Id*. As part of these

agreements, Symbol

> agreed to continue our cooperation with the [U.S. Attorney's
> Office] and the SEC, to retain an independent, government-
> approved examiner to review our internal controls, financial
> reporting practices and our compliance with the settlement
> agreements and to establish and maintain an annual training and
> education program designed to diminish the possibility of future
> violations of the federal securities laws.

*Id*. In addition, in the event that Symbol

> Violate[d] the agreement with the [U.S. Attorney's Office] or the
> SEC or commit[ed] other violations, such as accounting offenses
> that were not the subject of the investigations, we have waived
> certain defenses that may have otherwise been available to us,
> including the statute of limitations, and will be subject to
> prosecution for any offense, including any offense related to our

> past accounting practices. Pursuant to the agreement with the SEC, the SEC filed, and the court has approved, a Final Consent Judgment in the Eastern District of New York providing for injunctive relief, enjoining us from further violations of the securities laws, and a civil penalty in the amount of $37,000, as described above.

*Id.*

On October 26, 2004 — approximately four months after the agreements were signed with both the U.S. Attorney's Office and the SEC — Symbol issued a press release in which it announced its 2004 third quarter revenue. November 15, 2004 Press Release Issued by Symbol Technologies, attached as Ex. P to the November 24, 2015 Declaration of Michael J. Wernke ("Wernke Decl."). Thereafter, on November 8, 2004, "Symbol announced it was delaying the third-quarter 2004 10-Q filing as the company [ ] discovered certain discrepancies in the amount of inventory that affected third-quarter 2004 results. . . ." *Id.* Specifically, Symbol learned that one of its distribution partners had underreported inventory levels which led Symbol to "inaccurately record [ ] approximately $3.3 million in sales in the third quarter [of 2004]." November 8, 2004 Press Release Issued by Symbol Technologies, attached as Ex. O to the Wernke Decl. In addition, due to "errors that occurred at a Symbol-owned distribution facility that serves one of its large retail customers . . . revenue for the nine months ended September 30, 2004, was overstated by approximately $10 million" and Symbol was of the opinion that "the large majority of this overstated revenue relates to third quarter 2004. . . ." *Id.*

Upon learning of the issues surrounding the release of its third quarter earnings, Symbol immediately commenced an internal investigation. *See* June 17, 2015 Deposition of Mark Greenquist ("Greenquist Dep."), attached as Ex. I to the Massey Decl. at 161:15-162:13. The investigation was undertaken by Symbol's internal audit group. October 28, 2015 Deposition of

Salvatore Iannuzzi ("Iannuzzi Dep."), attached as Ex. J to the Massey Decl. at 221:10-223:17.

The internal investigation was led by James Langrock, Vice President of the internal audit group.

Def.'s Opp'n at 8. During the pendency of the internal investigation conducted by Symbol's

audit group, outside counsel from Swidler was retained to conduct "a confidential investigation

of the issues surrounding the misreporting of inventory . . . for the purpose of determining the

nature and cause of the incidents." November 8, 2004 Memorandum from Salvatore Iannuzzi to

Andrew Levander Containing the Subject Line "Possible Litigation," attached as Ex. A to the

December 4, 2015 Declaration of Andrew J. Levander ("Levander Decl."). Indeed, the

memorandum seeking to have Swidler, and specifically Andrew Levander ("Levander"), conduct

a confidential investigation was composed "in view of the circumstances [that], it [wa]s possible,

indeed likely, that a significant portion of the information generated by the investigation will be

involved in some way in future litigation." *Id*. Levander stated that it was his understanding that

Swidler had been retained to "do an independent investigation of this matter in light of

anticipated litigation both with the government and private parties." Levander Decl. ¶ 5. In light

of the then recent "financial improprieties at Symbol" as well as the "expansive investigations"

into those misrepresentations by the SEC and the U.S. Attorney's Office, "Symbol hired Swidler

Berlin to conduct its own investigation, because of litigation, since it was obvious that both the

regulators and shareholders were likely to, and in fact did, raise issues with the Company." *Id*.

Based upon the particular circumstances in this case, and in light of the fact that

"[n]othing" in Rule 26(b)(3) states or suggests that documents prepared 'in anticipation of

litigation' with the purpose of assisting in the making of a business decision do not fall within its

scope," *Adlman*, 134 F.3d at 1198-99, the Court finds that the documents at issue are protected

by the work product privilege. From approximately 1999 through 2002, Symbol had been experiencing accounting improprieties which drew the attention of both the U.S. Attorney's Office and the SEC. In addition to the investigations that were conducted by both agencies, Symbol was also engaged in contemporaneous shareholder class action litigation related to its accounting practices as well as unrelated litigation concerning patent disputes. Thus, at the time it experienced the 2004 third quarter earnings misstatement, Symbol had already had a checkered history of accounting noncompliance and shareholder litigation. As such, when it conducted the internal investigation into its 2004 third quarter earnings overstatement, Symbol had every conceivable reason to believe that once the issues were publicly disclosed, it could be facing the real prospect of additional shareholder suits as well as further investigations by both the SEC and the U.S. Attorney's Office. Indeed, such a specter was a very real possibility, particularly in light of the fact that barely five months prior to the 2004 revenue overstatement, Symbol had entered into a deferred prosecution agreement with the U.S. Attorney's Office as well as a consent judgment with the SEC in order to settle claims pertaining to previous accounting improprieties. *See* Massey Decl. Ex. F (Deferred Prosecution Agreement), Ex. G (Final Consent Judgment). The deferred prosecution agreement provided that if Symbol "[v]iolate[d] the agreement with the [U.S. Attorney's Office] or the SEC or commit[ed] other violations, such as accounting offenses that were not the subject of the investigations, [Symbol would] waive [ ] certain defenses that may have otherwise been available to us, including the statute of limitations, and will be subject to prosecution *for any offense*, including any offense related to our past accounting practices." Massey Decl., Ex. H (Symbol's 2004 Third Quarter 10-Q); Ex. F (Deferred Prosecution Agreement) ¶ 13; Ex. G (Consent and Undertakings of Defendant Symbol

Technologies, Inc.) at ¶ 5. Therefore, although Symbol "would have, or at least should have, conducted a review upon learning of the [third quarter revenue overstatement], the scope and manner of conducting the investigation was clearly influenced by the expectation and reality of litigation." *Patel*, 2016 WL 4030704, at *3.

To be sure, Symbol did have a business reason for engaging in its internal investigation. Mark Greenquist, Symbol's Chief Financial Officer, testified that "the most important thing was to get the numbers right so that we could file the [10-]Q, but that wasn't necessarily the end of it because then after that I guess the lesson learned chart would demonstrate that we continued to look at like, okay, what happened, and therefore what could we do better to make sure that we avoided that in the future." Greenquist Dep., at 162:6-13. In addition, Salvatore Iannuzzi, Chairman of the Board of Directors, stated that he "demanded [that] our internal audit department go to Bentonville and find out what was going on. I talked with I guess it was Swidler at the time and directly with Mr. Levander to [say], I want a complete review from top to bottom done, we've got to understand what happened here because this doesn't make sense, right, and I thought outside counsel was the best to do that. . . ." Iannuzzi Dep., at 223:14-23. In addition, Symbol referenced the internal investigation in its November 8, 2004 press release in which Chief Executive Officer, William Nuti stated that "[a]s part of our regular control procedures, we discovered certain discrepancies in the amount of inventory at a distributor as well as inventory on hand that affected our previously announced results . . . We've moved swiftly to ascertain the nature and extent of these discrepancies . . . Symbol is committed to ensuring that its financial statements are accurate and can be relied upon by our shareholders." Wernke Decl., Ex. O. Thus, Symbol had an interest in assuaging the public, its shareholders and

the entire business community that it was acting in the manner expected of a responsible business entity. However, conducting an investigation for business purposes on the one hand and in anticipation of litigation on the other are not mutually exclusive, especially when viewed through the lens of the facts in the instant case. Indeed, in light of the factual circumstances attendant in the present case "[a]pplying a distinction between 'anticipation of litigation' and 'business purposes' is . . . artificial, unrealistic, and the line between [the two] is [therefore] essentially blurred to oblivion." *In re Woolworth Corp. Sec. Class Action Litig.*, No. 94 CIV. 2217, 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996); *see In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 532.

The case of *In re Cardinal Health, Inc. Sec. Litig.*, No. 04 Civ. 575, 2007 WL 495150 (S.D.N.Y. Jan. 26, 2007) is instructive. In *Cardinal*, Defendant Cardinal Health, Inc. was the subject of an investigation conducted by the SEC surrounding "certain accounting practices at Cardinal [that] were not in accordance with applicable laws and regulations, and requested production of documents from Cardinal. As Cardinal reviewed the documents to be produced, it discovered documents suggesting certain employees might have engaged in improper practices. In April 2004, the Audit Committee of Cardinal's Board of Directors resolved to conduct its own independent investigation of these accounting practices and issues, and retained Kramer Levin to advise it." *In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150 at *1. Upon being retained by Cardinal, Kramer Levin, "performed a number of legal services for the Audit Committee, including an investigation of the legal and accounting issues that the Cardinal documents had raised." *Id*. In addition, Kramer Levin subcontracted with a forensic accounting firm which

"carried out work under Kramer Levin's direct supervision and who reported their findings directly to Kramer Levin." *Id*. During the pendency of the internal investigation, Kramer Levin was also advised by the [U.S. Attorney's Office] that it was pursuing an investigation into Cardinal's accounting practices. *Id*. Upon completion of the internal investigation, Kramer Levin provided its findings to Cardinal's Audit Committee who, in turn, "decided to recommend a number of steps to Cardinal's Board of Directors, including a restatement of certain of Cardinal's financial statements, a series of improvements in Cardinal's policies and procedures for accounting and financial reporting, and actions concerning a number of Cardinal employees." *Id*.

During the discovery phase of the case, Kramer Levin sought work-product protection for particular categories of documents involved in Cardinal's internal investigation. Specifically, such documents included: "(1) interview memoranda and related exhibits of more than 300 witnesses; (2) presentation binders prepared for the Audit Committee containing a review of the evidence of accounting issues and actions of Cardinal employees involved in those issues; (3) work papers of [the forensic accounting firm] containing its analysis of a series of issues presented to the Audit Committee with documentary support; (4) compilations of documents organized by issue and prepared by Kramer Levin; [and] (5) materials compiled and produced by individual witnesses or lawyers for Cardinal." *Id*. at *2. Plaintiffs opposed Cardinal's motion and filed a cross-motion to compel these documents since, according to plaintiffs, the documents prepared by Kramer Levin were not "prepared in anticipation of litigation." *Id*. In particular, plaintiffs asserted that

1) Cardinal hired other firms-Gibson Dunn and Wachtell-to represent it in the litigation with the SEC; Kramer Levin was hired by the Audit Committee for business purposes to conduct an independent investigation and assessment of Cardinal's accounting documents, practices, and issues; and 3) the purpose of the investigation was only to enable Kramer Levin to advise the Audit Committee as to whether any of Cardinal's accounting practices had been misused and how to prevent future misuse. Plaintiffs rely on *In re Leslie Fay Cos. Sec. Litig.,* 161 F.R.D. 274, 280 (S.D.N.Y.1995), to claim that, under such circumstances, these documents are subject to production.

*Id.* at *5.

In denying the plaintiffs' cross-motion to compel, the court emphasized that

Plaintiffs' argument overlooks the context in which Kramer Levin was hired by the Audit Committee:

In late 2003, the U.S. Securities and Exchange Commission began an inquiry into certain issues at Cardinal, and the SEC requested that Cardinal produce documents concerning those issues. As Cardinal began to collect and review documents in response to those requests, it discovered documents which suggested that certain Cardinal employees might have engaged in accounting practices that were not in accordance with applicable law and regulations. In April 2004, the Audit Committee of the Board of Directors of Cardinal resolved to conduct its own, independent investigation of those accounting practices and issues, and the Audit Committee retained Kramer Levin to advise it.

*Id.* The court also pointed out that the internal investigation revealed that Cardinal's accounting practices "might not have been in accordance with the applicable laws and regulations [and that given the SEC's ongoing investigation] . . . the likelihood of civil or criminal litigation was anticipated before hiring Kramer Levin." *Id.* Therefore, the court concluded, based upon these facts, that "the work product doctrine applies when outside counsel is retained to determine the vulnerability of the corporation in general to criminal and civil sanctions . . . [and that] in light of the nature of the document [s collected] and the factual situation leading to the retention of

23

Kramer Levin the document[s] can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Id.* (internal citations omitted) (brackets in original).

At the time Symbol conducted its internal investigation into the third quarter 2004 revenue overstatement, it had recently settled claims by both the SEC and the U.S. Attorney's Office. The reasoning in *Cardinal* is no less applicable here given Symbol's history of accounting improprieties, its prior class action shareholder litigation concerning previous revenue misstatements as well as the very real threat of future litigation in the event it breached its agreements with either the SEC or the U.S. Attorney's Office. Indeed, the third quarter 2004 accounting issue could have been construed by the SEC and the U.S. Attorney's Office as a breach of Symbol's respective agreements and litigation could have ensued immediately. It is therefore highly probable that despite any business reasons which existed for conducting the internal investigation, Symbol engaged the services of Swidler because it foresaw the distinct possibility that this latest accounting mishap could have subjected Symbol to both government litigation as well as further private shareholder class action lawsuits. Consequently, apart from any business purpose Symbol may have had in engaging in the internal investigation, "in light of the nature of the document[s] and the factual situation in th[is] particular case, the document[s] can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Adlman*, 134 F.3d at 1202; *see In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150 at *5; *Patel*, 2016 WL 4030704, at *3 ("Although L-3 may have had independent obligations or business reasons to seek to assure itself that the accounting problems discovered within ASD were limited to the C-12 Contract and were not duplicated elsewhere in the company, that fact does not alter the reality that the review was conducted as it was in large part because of

expected litigation. Because work product protection applies even when documents are created for multiple purposes, it applies in this case.").

Notwithstanding Plaintiffs' reliance on *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, *In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. 274 (S.D.N.Y. 1995) and *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96 (S.D.N.Y. 2007), these cases are distinguishable. With respect to *Kidder* — a pre-*Adlman* decision — the court employed the "principally or exclusively" standard with regard to whether the documents at issue were created in anticipation of litigation. *See In re Kidder Peabody Sec. Litig.*, 168 F.R.D. at 463. This standard was expressly rejected by the Second Circuit in *Adlman*, in which the court emphasized that

> [w]e believe that a requirement that documents be produced *primarily or exclusively to assist in litigation in order to be protected is at odds with the text and the policies of the Rule.* Nowhere does Rule 26(b)(3) state that a document must have been prepared *to aid* in the conduct of litigation in order to constitute work product, much less *primarily or exclusively* to aid in litigation. Preparing a document "in anticipation of litigation" is sufficient.

*Adlman*, 134 F.3d at 1198 (emphasis added); *see In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 532. Thus, the reasoning utilized in *Kidder* is inapplicable to the instant case inasmuch as the court relied on the "principally or exclusively" standard that is no longer the appropriate test for determining whether the work-product privilege applies in the first instance.[4]

---

[4] The court also stated that "even if this 'but for' analysis were not the appropriate tool for determining the relative significance of multiple purposes for the creation of a document, the result here would have been the same." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. at 466. However, as previously stated, the *Kidder* court engaged in a pre-*Adlman* analysis. Therefore, although some of the reasoning relied upon in *Kidder* may still be viable, the Court declines to rely upon it inasmuch as *Kidder* did not have the benefit of applying the test set forth in *Adlman*.

With respect to *Leslie Fay*, the factual circumstances involved were different from those in the instant case and thus warrant a different result. In *Leslie Fay*, the defendant's Board of Directors were informed of "certain accounting irregularities with respect to the Company's financial statements." *In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. at 277. Thereafter — and prior to the opening of any formal investigation by either the SEC or the U.S. Attorney's Office — "the Board requested its Audit Committee to commence an investigation . . . ." *Id*. The Audit Committee thereafter "retained [the law firm] Weil to assist in the investigation and report its findings to the Board." *Id*. Once the internal investigation concluded, "Leslie Fay publicly announced . . . that the results might cause the company to restate previously reported earnings." *Id*. Only after this public announcement was Leslie Fay alerted that the SEC and the U.S. Attorney's Office "had commenced investigations into the accounting irregularities." *Id*. Unlike *Leslie Fay*, at the time Symbol began its internal investigation into the 2004 third quarter revenue overstatement, it had already been the subject of a multi-year investigation by both the SEC and the U.S. Attorney's Office regarding accounting improprieties. Symbol had, in fact, entered into agreements with both agencies to settle the matter. As such, the defendant in *Leslie Fay* initiated its internal investigation prior to any inquiry from either the SEC or U.S. Attorney's Office — and with perhaps the sole purpose of ferreting out any misconduct. That scenario lies in stark contrast to the factual backdrop existing at the time Symbol engaged in its internal investigation. Further, the agreements which Symbol had entered into with both the SEC and the U.S. Attorney's Office potentially exposed it to future legal action in the event of noncompliance. In light of these factual differences, the Court does not find the reasoning in *Leslie Fay* to be persuasive here.

Similarly, Allied Irish Bank ("AIB") instituted an internal investigation after learning that one of its traders had gone rogue and "created bogus transactions to disguise losses he had incurred while engaging in foreign exchange trading." *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. at 99. The scheme "resulted in $691 million in losses" which prompted AIB to begin an internal investigation into the matter. *Id.* Within days of learning of the fraud, both the Central Bank of Ireland and the United States Federal Reserve Board announced that they were launching investigations . . . [and] [t]he Federal Bureau of Investigation began a criminal investigation[.]" *Id.* Thereafter, AIB revealed the investigation to the public. *Id.* The key difference between the facts in *Allied Irish* Banks on the one hand and the instant case on the other is the circumstances precipitating the internal inquiry. AIB initiated its investigation without having a history of any prior inquiries by law enforcement or regulatory agencies. Such is not the case here, where Symbol clearly had been previously embroiled in investigations with both the SEC and the U.S. Attorney's Office by the time the 2004 third quarter revenue overstatement occurred. In addition, although Symbol, like AIB, disclosed both the accounting issue and the subsequent investigation to the public, *see* Wernke Decl., Exs. O, P, the retention of outside counsel was made with the dual goals of finding the cause of the overstatement and being prepared for likely litigation resulting from the overstatement. In *Allied Irish Banks*, the court pointed out that "the business reasons for the preparation of the Report figure prominently in the initial commissioning of the investigation [but that] AIB's Engagement Letter . . . says nothing about litigation." *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. at 107–08. In contrast, when Symbol engaged Swidler's Andrew Levander, the Engagement Memorandum utilized the subject line "Possible Litigation" and highlighted the fact that although Swidler was to

"determine the nature and cause of the incidents" that led to the revenue misstatement, the investigation was to be carried out "in view of the circumstances [that], it [wa]s possible, indeed likely, that a significant portion of the information generated by the investigation will be involved in some way in future litigation." Levander Decl., Ex. A. In addition, Levander stated it was his understanding that Swidler had been retained to "do an independent investigation of this matter in light of anticipated litigation both with the government and private parties." Levander Decl. ¶ 5. Therefore, it is fair to say that aside from any business purpose, Swidler was retained "to determine the vulnerability of the corporation in general to criminal and civil sanctions." *In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150 at *5.

In light of the factual background in this case, "[i]t did not take a fortune teller with a well-tuned crystal ball to know that the disclosure of the [third quarter 2004] accounting misstatement would generate at least one private securities class action lawsuit and [potentially further] governmental investigations." *Patel*, 2016 WL 4030704, at *3. Accordingly, "in light of the nature of the document[s] and the factual situation in th[is] case, the document[s] can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Schaeffler*, 806 F.3d at 43 (emphasis in original). As such, although these documents may be relevant, the Court finds that the work-product doctrine attaches and that the documents are therefore shielded from discovery.

### 2. Whether Symbol's Disclosure to the SEC and the Independent Examiner Waived the Privilege

Plaintiff asserts that Symbol's disclosures made to the SEC in the wake of the 2004 third quarter revenue overstatement as well as those made to the Independent Examiner served to waive any privilege that may have attached to the documents at issue. Pl.'s Mem. at 14-17.

Specifically, Plaintiff asserts that: (1) Symbol's "voluntary disclosure" of "details of the [internal] Investigation to the SEC . . . waived any work product protection that may have existed as to the documents created pursuant to the Investigation. . . .;" and (2) Symbol waived any work product protection through voluntary disclosure to the Independent Examiner concerning the substance of interviews conducted by outside counsel "as well as the mental impressions and theories of the lead attorney. . . ." *Id*. at 14. The Court will briefly summarize the underlying facts before analyzing the issue of waiver.

On November 5, 2014, in accordance with the terms of the non-prosecution agreement and Final Consent Judgment entered into with the U.S. Attorney's Office and SEC respectively, Symbol notified the Independent Examiner about the 2004 third quarter revenue overstatement. *Id*., Ex. E (November 24, 2004 PowerPoint Presentation to the Government). On November 7, 2014, Symbol voluntarily notified both the SEC and U.S. Attorney of the revenue overstatement. *Id*. Thereafter, on November 24, 2004, Symbol executives as well as outside counsel from Swidler met with the SEC and the U.S. Attorney's Office in order to review the facts and circumstances surrounding the 2004 third quarter revenue overstatement and to ascertain whether there was any indication of a more widespread accounting issue. *See* Wernke Decl., Ex. E (November 24, 2004 PowerPoint Presentation to the Government). In addition, on January 7, 2005, Symbol submitted a confidential memorandum to the SEC in response to the SEC's "pending informal inquiry regarding Symbol's initial third quarter earnings press release." *Id*., Ex. C (January 7, 2005 Letter from Symbol to the SEC). The January 7, 2005 submission was made in light of the SEC's "suggestion that it is considering recommending . . . [that] Symbol [be held] in civil contempt in connection with the Final Consent Judgment . . . so ordered on

June 9, 2004." *Id.* Subsequently, on June 29, 2015, Symbol submitted another memorandum in "response to the [SEC's] indication that it is considering recommending that . . . a fine [be imposed] upon Symbol in connection with an alleged violation of the Final Consent Judgment . . . so ordered on June 9, 2004." *Id.*, Ex. D (June 29, 2005 Letter from Symbol to the SEC).

Waiver of the work-product privilege will generally occur where disclosure of otherwise protected material is inconsistent with the protection afforded by the privilege. *See GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51 (S.D.N.Y. 1979); *Spanierman Gallery, Profit Sharing Plan v. Merritt*, No. 00 CIV 5712, 2003 WL 22909160, at *2 (S.D.N.Y. Dec. 9, 2003). Therefore, [w]ork product may be shown to others, 'simply because there was some good reason to show it' without waiving the privilege." *Spanierman Gallery, Profit Sharing Plan*, 2003 WL 22909160, at *2 (quoting *Adlman*, 134 F.3d at 1200 n. 4). However, where "disclosure [is made] to a non-adversary that 'substantially' or 'materially' increases the likelihood that an adversary will obtain the information [such a disclosure] results in a waiver of the work product protection." *Bank of America, N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002); *see Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, Nos. 93 Civ. 5298, 93 Civ. 8270, 94 Civ. 1317, 93 Civ. 6876, 1996 WL 944011, at *3 (S.D.N.Y. Dec. 19, 1996) ("Work product immunity is waived only if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary."). It follows that where a party has taken particular precautions — such as entering into a confidentiality agreement — to ensure that disclosure to a non-adversarial third-party will not substantially increase the likelihood that an adversary will obtain the information, the material may still be protected notwithstanding such disclosure. *See, e.g.*, *Bank of Am., N.A.*, 212 F.R.D. at 173 (recognizing that where defendant

voluntarily disclosed certain privileged information to the government, waiver of the privilege resulted, in part, because defendant "made no effort to seek confidential treatment of the information, [and therefore] showed a 'conscious disregard' for the possibility that an adversary such as Mollin or Bank of America might obtain access to the information."); *Spanierman Gallery, Profit Sharing Plan*, 2003 WL 22909160, at *5 (finding that defendant's disclosure of privileged materials to the FBI "substantially increased the likelihood that privileged information would be secured by [the defendant's] adversaries . . . [where] [t]he production [ ] was not made under circumstances which would ensure the confidentiality of the material [and] [t]he documents provided to the FBI were not identified as 'privileged,' and no agreement was reached with the FBI to treat the information as privileged."); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 CIV. 4763, 2002 WL 31296430, at *5 (S.D.N.Y. Oct. 11, 2002) (finding waiver where there was "an unsolicited, uncompelled disclosure of the information" to the Government without any agreement as to confidentiality and "in circumstances that increased the likelihood that the work product would come into the possession of its adversary"); *see also Police and Fire Retirement Sys. Of the City of Detroit*, 2010 WL 935317, at *1 ("district courts within the Second Circuit [ ] give the existence of confidentiality agreements weighty consideration in rendering selective waiver decisions").

Initially, the Court points out that there is some tension in properly characterizing the nature of the relationship which existed between Symbol and the SEC during the time period in which privileged materials were disclosed. On the one hand, the relationship could be considered "adversarial" since the SEC was informally considering instituting contempt proceedings and levying a fine against Symbol based upon the 2004 third quarter earnings

overstatement.  On the other hand, the SEC is not a party to the instant litigation and Symbol had previously entered into the Final Consent Judgment with the SEC in order to settle its earlier accounting improprieties.  Therefore, both Symbol and the SEC arguably shared a common interest in ensuring that Symbol was in compliance with the consent judgment's terms and conditions.  Further, in disclosing certain documents to the SEC, Symbol sought to assure the SEC that moving forward, Symbol's "accounting practices [would] be 'clean as a hounds tooth,' an interest common to both [Symbol and] the SEC. . . ."  *In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150, at *9.  Indeed, "[t]he SEC's obligation is to ensure that the securities laws of the United States are enforced, including that the financial reports of corporations are not false and misleading."  *Id*. at *9 n. 7.  Such a common interest aligns directly with this obligation.

Although reasonable minds may differ, based on the facts of the instant case, the Court finds that Symbol and the SEC shared a common interest in ensuring that the terms of the consent judgment were adhered to and that Symbol's accounting practices, notwithstanding the third quarter revenue overstatement, were sound.  This common interest — which squarely aligns with the SEC's mandate of ensuring compliance with the nation's securities laws — therefore overshadows any possible adversarial relationship that could be deemed to exist based upon the SEC's pending informal inquiry at the time.  *See id*.  (finding that despite the ongoing inquiry by the SEC into defendant's accounting practices, disclosure of privileged materials to the SEC did not waive work product privilege where defendant and SEC shared a common interest in ensuring that defendant's "financial and accounting practices [were] 'clean as a hounds tooth. . . .'"); *see also Police and Fire Retirement Sys. Of the City of Detroit*, 2010 WL 935317, at *2 (recognizing "strong public interest in encouraging disclosure and cooperation

with law enforcement agencies [and that] violating a cooperating party's confidentiality expectations jeopardizes this public interest.").

Having determined that the relationship between Symbol and the SEC was predominantly non-adversarial, the Court turns to whether the disclosure nevertheless "'substantially' or 'materially' increase[d] the likelihood that an adversary w[ould] obtain the information." *Bank of America, N.A.*, 212 F.R.D. at 170. As stated above, in the wake of *Steinhardt*, "district courts within the Second Circuit [ ] give the existence of confidentiality agreements weighty consideration in rendering selective waiver decisions." *Police and Fire Retirement Sys. Of the City of Detroit*, 2010 WL 935317, at *1; *see Wilson*, 493 F. Supp. 2d at 362-63; *In re Natural Gas Commodities Litig.*, 232 F.R.D. at 211; *Maruzen Co.*, 2002 WL 1628782, at *5; *In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. at 284. In part, the Second Circuit's rationale is that the existence of such agreements evidences a party's conscious interest in safeguarding the materials from disclosure. *See, e.g.*, *Bank of Am., N.A.*, 212 F.R.D. at 173; *Spanierman Gallery, Profit Sharing Plan*, 2003 WL 22909160, at *5; *U.S. Info. Sys., Inc.*, 2002 WL 31296430, at *5.

In the instant case, the record establishes that on November 19, 2002, Symbol entered into a confidentiality agreement with both the SEC and U.S. Attorney's Office whereby Symbol agreed to produce certain confidential documents with the understanding that Symbol did "not intend to waive the protection of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties." Massey Decl., Ex. Z. In exchange for such disclosures, both the SEC and U.S. Attorney's Office agreed to "maintain the confidentiality of the Confidential Materials . . . and will not disclose them to any third party, except to the extent that the [SEC] or the USAO determine this disclosure is otherwise required by law or would be

in furtherance of the SEC's or USAO's discharge of their respective duties and responsibilities."
*Id.* Therefore, by entering into such an Agreement, Symbol recognized the importance of safeguarding the material from disclosures to its adversaries. Based upon the existence of this agreement, and in light of the surrounding factual circumstances, the Court finds that the disclosure to the SEC did not waive the work-product privilege. *See Maruzen Co.*, 2002 WL 1628782, at *5 (finding no waiver of work-product privilege where defendant had entered into oral confidentiality agreement with U.S. Attorney's Office); *Police and Fire Retirement Sys. Of the City of Detroit*, 2010 WL 935317 (no waiver where defendant "produced the Privileged Materials to the government, not private litigants, pursuant to Confidentiality Agreements that provide for non-waiver"); *In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150, at *9 (same); *In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. at 284 (no waiver where government "agreed to hold all materials produced to it . . . in confidence, disclosing the material to third parties only as necessary to further law enforcement objectives"); *Wilson*, 493 F. Supp. 2d at 362-63 (no waiver of privilege where defendant "secured a non-waiver agreement before disclosing the contested material" and where such disclosure was made "in the hopes of assisting the State, and then the Federal Government, in its decision-making process. . . ."); *but see Vitesse Semiconductor Corp.*, 771 F. Supp. 2d at 313-14 (finding waiver of privilege despite existence of confidentiality agreement, in part, because "the SEC—the very government agency that received the allegedly privileged materials—is actually a party to the instant action. . . .").

Although Plaintiff relies on *Gruss v. Zwirn*, No. 09 Civ. 6441, 2013 WL 3481350, at *8 (S.D.N.Y. 2013) in attempting to diminish the overall effectiveness of the confidentiality agreement — asserting that it "permitted disclosure anytime the government determines it

'would be in furtherance of the SEC's and USAO's discharge of their respective duties and responsibilities,'" the Court finds *Gruss* distinguishable.  In that case, the court determined that "[t]here was no question [ ] that the relationship between Defendants and the SEC was adversarial, regardless of the fact that the disclosures were voluntary."  *Id*.  In the context of such an adversarial relationship, the court analyzed the language of the confidentiality agreement and determined that it "provides no meaningful protection."  *Id*.  Here, however, the Court has already determined that a common interest existed between Symbol and the SEC in light of the factual circumstances of this case.  Therefore, even if Symbol failed to enter into a confidentiality agreement with the SEC, such "failure . . . does not waive the work product protection."  *In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150, at *9.  Having conducted its own research on this issue, the Court has been unable to unearth any subsequent decisions relying on *Gruss* for the sweeping proposition that a confidentiality agreement which contains certain discretionary language in favor of the government is either unenforceable or otherwise offers no meaningful protection from disclosure despite the unique factual circumstances which exist in each particular case.  Significantly, the court in *Gruss*, in assailing the soundness of the confidentiality agreement at issue in that case, cited no binding authority from this Circuit in support of its interpretation.  In addition, such a proposition would appear to be at odds with *Steinhardt*, which counseled that "[c]rafting rules relating to governmental investigations must be done on a case-by-case basis."  *Steinhardt*, 9 F.3d at 236.  Therefore, although the Court finds *Gruss* to be distinguishable from the instant case, it would nevertheless diverge from *Gruss* as to this issue.

Further, although Plaintiff makes a perfunctory waiver argument with respect to any disclosures made to the Independent Examiner, the Court finds Plaintiff's position unavailing. Neither party has properly briefed the issue whether the Independent Examiner was truly "independent" or whether, despite his title, he was an agent for the government or was instead Symbol's consultant since he presumably was paid from Symbol's corporate treasury and not from public funds. Plaintiff appears to take the position that the Independent Examiner was an agent for the government since Plaintiff refers to him as "the government's Independent Examiner" and as the "government's agent." Pl.'s Mem. at 14, 16. Likewise, Symbol asserts that the Independent Examiner's "interests were aligned with Symbol's since they both sought to ensure that Symbol complied with its obligations under the [agreements with the SEC and U.S. Attorney's Office.]" Def.'s Opp'n at 18. It is worth noting the record establishes that the Independent Examiner was subject to the same November 19, 2002 confidentiality agreement to which the SEC and the U.S. Attorney's Office were parties. *See* Wernke, Ex. L (October 13, 2004 Letter from Andrew Levander to Douglas R. Jensen regarding retention as Independent Examiner). Specifically, the October 13, 2004 engagement letter stated that "[t]o the extent Symbol or its counsel provides you with information otherwise covered by either the attorney-client or work product privileges, the disclosure to the Independent Examiner by Symbol shall be governed by the terms of Symbol's agreement with the USAO and the SEC dated November 19, 2002. . . ." *Id.* In addition, the deferred prosecution agreement contemplated that the Independent Examiner must be "acceptable to the [U.S. Attorney's] Office and the . . . SEC" and that part of his duties would include reporting "on an annual basis to the General Counsel of

Symbol, the [U.S. Attorney's] Office and the . . . SEC as to propriety of Symbol's revenue recognition and accounting practices. . . ."  Massey Decl., Ex. F.

Based upon the evidence in the record, and in the absence of any briefing by the parties, the Court finds that although labeled as "independent," the examiner was, for all practical purposes, acting as an agent for the government with the primary purpose of ensuring that Symbol complied with the terms and conditions of the deferred prosecution agreement as well as the Final Consent Judgment.  The Court further concludes that the Independent Examiner shared the same common interest as the SEC itself, *see supra* at page 32, and was subject to the same terms and conditions in the confidentiality agreement.  Thus, based on the same reasoning as discussed above, the Court finds that any disclosures made to the Independent Examiner — acting as an agent for the government — did not function to waive the work-product privilege in the same way that the privilege remained intact as to any disclosure to the SEC itself.

In light of the foregoing analysis, the Court finds that protection of the work product doctrine has not been waived through Symbol's disclosure to the SEC or the Independent Examiner.  Further, as already discussed, *see supra* page 4 n. 2, because Plaintiff has not made the necessary showing concerning "substantial need," there is otherwise no basis for requiring production of the documents in the instant case.  *See Plew*, 2009 WL 1119414, at *3 (finding no waiver of the work product privilege and noting that "plaintiff makes no effort to demonstrate the particularized need and hardship that are a prerequisite for overcoming the otherwise applicable immunity from disclosure for these materials. Hence there is no basis for requiring their production").

## V.  CONCLUSION

For the reasons set forth in this Memorandum and Order, Plaintiff's motion to compel is

DENIED.


**SO ORDERED.**


Dated:  Central Islip, New York
       September 30, 2016


/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge